```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ROD WHEELER ,

 4                    Plaintiff,

 5            v.                          17 CV 5807 (GBD)

 6   TWENTY-FIRST CENTURY FOX,
     INC., ET AL.,
 7
                      Defendants.
 8
     ------------------------------x
 9                                        New York, N.Y.
                                          February 28, 2018
10                                        10:38 a.m.

11   Before:

12                    HON. GEORGE B. DANIELS

13                                          District Judge

14                         APPEARANCES

15   WIGDOR LLP
          Attorneys for Plaintiff
16   BY:  DOUGLAS HOLDEN WIGDOR
          MICHAEL JOHN WILLEMIN
17        JEANNE-MARIE BATES CHRISTENSEN

18   WILLIAMS & CONNOLLY LLP
          Attorneys for Defendants Twenty-First Century Fox, Inc.
19   and Fox News Network LLC
     BY:  KEVIN TAYLOR BAINE
20        JOSEPH M. TERRY
          KATHERINE ANNE PETTI
21        KATHERINE MEEKS

22   HUGHES HUBBARD & REED LLP
          Attorneys for Defendant Malia Zimmerman
23   BY:  DAVID H. STERN

24   SPIRO HARRISON
          Attorneys for Defendant Ed Butowsky
25   BY:  DAVID BUTLER HARRISON
```

 1                (Case called)

 2                MR. WIGDOR:  Good morning, Judge Daniels.

 3                Doug Wigdor, Wigdor LLP, for the plaintiff, Rod

 4     Wheeler.

 5                And with me are two of my partners, Jeanne Christensen

 6     and Mike Willemin.  And Mr. Willemin will be arguing the motion

 7     on behalf of Mr. Wheeler.

 8                Thank you, your Honor.

 9                THE COURT:  Good morning.

10                MR. BAINE:  Good morning, your Honor.

11                Kevin Baine, from Williams & Connolly, representing

12     Fox News Network and Twenty-First Century Fox.

13                With me is my partner, Joseph Terry, and my associates

14     at the end of the table, Katherine Petti and Katherine Meeks.

15                Mr. Terry and I will be arguing.

16                Thank you.

17                THE COURT:  Good morning.

18                MR. STERN:  Good morning, your Honor.

19                David Stern, Hughes Hubbard & Reed, representing Malia

20     Zimmerman.

21                THE COURT:  Good morning.

22                MR. HARRISON:  Good morning, Judge Daniels.

23                David Harrison from Spiro Harrison on behalf of

24     defendant Ed Butowsky.

25                THE COURT:  Good morning.

1          So let's start with the defense.  Who wants to be

2     heard with regard to the motion?  I have some -- I just have

3     some brief preliminary questions with regard to the arbitration

4     motion.  But I really want to concentrate on the substantive

5     motion to dismiss.

6          MR. BAINE:  Yes, your Honor.  Kevin Baine I'm prepared

7     to argue for the Fox defendants on that motion.

8          THE COURT:  All right.

9          MR. BAINE:  Thank you, Judge.

10          THE COURT:  Before we get to that substantive motion,

11     my understanding is that the activity at issue was not activity

12     for which Mr. Wheeler was employed by Fox News or Fox and that

13     there wasn't any compensation pursuant to an employment

14     agreement from Fox to Mr. Wheeler that covered this activity.

15     My understanding is that Mr. Wheeler was hired by the Rich

16     family and I believe that the allegation is that Mr. Butowsky

17     paid for that employment.

18          Do I have that wrong?

19          MR. BAINE:   It is correct that Fox News did not pay

20     Mr. Wheeler for this particular article.  Fox News did pay

21     Mr. Wheeler for his appearances on the Sean Hannity show which

22     discussed the same material and on which he made the same

23     statements.  And so insofar as the arbitration argument is

24     concerned, our position, which Mr. Terry was going to address,

25     is that he was paid for this work and for appearing on that

 1    specific television program.

 2            THE COURT:  But that's not the work that's at issue.

 3            MR. BAINE:  Well, an interesting question is whether

 4    he's owed money for his work on the article.  But the

 5    contributor agreement does say that he is to be paid two hours

 6    of off-air time would be equal to one appearance and he's to be

 7    paid $515 for that.  He was not paid that.

 8            THE COURT:  He wasn't paid for the article -- by Fox,

 9    and he wasn't, pursuant to that agreement, and he wasn't paid

10    by Fox for whatever investigation that he was involved in with

11    regard to the information that was attributed to him pursuant

12    to that.

13            MR. BAINE:  He was not, in fact, paid for the

14    investigation.  He was paid for his appearances on television.

15            THE COURT:  And the comments at issue, the defamation

16    claim is not a claim based on any statements that were made

17    during the course of -- related to his employment with Fox.

18            MR. BAINE:  Well --

19            THE COURT:  That's not the defamatory statements that

20    they claim.

21            MR. BAINE:  The defamatory statement is the statement

22    in the article.  But part of the plaintiff's burden is to prove

23    that he didn't make those statements.

24            THE COURT:  No.  I understand that.  And we'll get to

25    that.

1          MR. BAINE:  And he did make those statements on

2   television for which he was paid.

3          So on the arbitration argument the argument is not

4   that the quotes on the website were compensated but that he was

5   compensated for appearing on Fox television saying the same

6   things.

7          THE COURT:  But he wasn't compensated by Fox for the

8   statements that were attributed to him in the article.

9          MR. BAINE:  That's correct.

10         THE COURT:  And the investigation, Fox News did not

11   employ him pursuant to this written agreement that has the

12   arbitration clause to do the investigation for the Riches.

13         MR. BAINE:  That is true.  They did not go to him and

14   say we'd like to employ you to do this investigation for us.

15   But they did identify him in the article as a Fox News

16   contributor.

17         THE COURT:  Right.

18         MR. BAINE:  Which he is.

19         THE COURT:  But it's not your contention that he was

20   in any way employed by Fox News to do the investigation for the

21   Riches.

22         MR. BAINE:  Not to do the investigation.

23         THE COURT:  Right.

24         MR. BAINE:  But to appear on television.

25         THE COURT:  But he didn't -- okay.  To appear on

1   television.  I'm trying to separate the issues so I can see

2   what the relatedness is.

3           So your position with regard to arbitration is that he

4   was not hired by Fox News to do the investigation.  He was not

5   hired by Fox News for providing any particular conclusions

6   based on that investigation.  And he was not -- I don't know --

7   I'll just change it a little bit.  He was not compensated by

8   Fox News pursuant to the agreement, the employment agreement,

9   for the statements that were attributed to him in the article.

10          MR. BAINE:  That is true.

11          THE COURT:  And your position is that the part that he

12  was compensated for were the appearances that he made on Fox

13  News where you argue that he made essentially the same

14  comments.

15          MR. BAINE:  That's correct.

16          And Mr. Terry, is prepared to address why it's

17  sufficient for purposes of sending the case to arbitration that

18  we have these relationships with the contributor agreement;

19  namely, that he was compensated before making the same is

20  statements on television; that the plaintiffs are going to have

21  to bear the burden of proving that he didn't make those

22  statements, so the television appearance is very much part of

23  the case.  And his damages flow from the contributor agreement.

24  The damages he claims are damages flowing from the contributor

25  agreement.

1            For these reasons we think that a sufficiently close

2    connection to send it to arbitration --

3            THE COURT:  I'll hear further, if that's necessary.

4            MR. BAINE:  But you have the facts right.

5            THE COURT:  I don't understand what you mean that it

6    flows from that.

7            MR. BAINE:  You have the facts about what he was paid

8    for.

9            THE COURT:  Okay.  Also, I'm trying to figure out from

10   your perspective, you want me to send this -- dismiss it and

11   send it to arbitration or you want me to address this on the

12   merits?

13           MR. BAINE:  Well, your Honor, I have to say that I

14   think if the case --

15           THE COURT:  If you win, you'd rather me --

16           MR. BAINE:  That's what I'd like.

17           THE COURT:  If you lose, you'd rather me send it to

18   arbitration.

19           MR. BAINE:  I'd like you to grant our motion in the

20   case.  But I have to, in all candor, I have to say that if the

21   case is arbitrable, it should be sent to arbitration, and your

22   Honor should probably not rule on the merits of our motion.  As

23   much as I'd love for to you grant it, I think I have to be

24   candid with you and tell you if you agree that it must go to

25   arbitration, then I can't really sit here and say but, please,

1   rule on the merits.  So we've made both those arguments in the

2   alternative.

3          But on the merits, your Honor, this is an unusual

4   libel case in that the plaintiff, a Fox contributor, claims

5   that he was defamed by being misquoted.

6          What's unusual about it is that the plaintiff,

7   Mr. Wheeler, made the same comments on television.  So we know

8   that he, in fact, holds those positions because he said those

9   things on the air, and we can see him saying it.

10         And it's also unusual because Fox News sent him three

11  drafts of the article containing the quotes for him to review

12  before they published it.

13         And, in fact, he responded by saying, after receiving

14  the draft containing these very quotes he's now challenging:

15  Oh, I've got one more quote, which Fox took and then added to

16  the article.  And, of course, we also know from the text

17  message that Mr. Butowsky has attached to his motion that

18  Mr. Wheeler says I am reading it now.  And then he sends the

19  additional quote which is inserted into the draft.

20         So what's unusual about the case is that we know from

21  indisputable evidence referred to in the complaint from these

22  television appearances that he said these things.  And we know

23  that he had the opportunity to review the draft in advance and

24  at least gave his apparent consent to them.

25         So our arguments here are threefold.  Number one, that

1    these quotes were accurate in that they accurately reflected

2    Mr. Wheeler's position.  Number two, he consented to their

3    publication because he had them in advance and he didn't say I

4    object.  And three, that the quotes are not defamatory.

5            Now the first two arguments I have to say sound

6    factual and sometimes the Court might say well maybe that's not

7    a motion to dismiss.  But in this case the record that

8    establishes the truth and establishes apparent consent are

9    matters that are either referred to in the complaint or you can

10   take judicial notice of.  So I think you can rule on them.

11   However, I would like to begin by talking about the purely

12   legal defense that these quotes are not defamatory.

13           Your Honor, to do that I do have a copy of the

14   article, if I may, I'd like to hand up, and it's highlighted to

15   show the quotes that are in issue.

16           THE COURT:  Okay.

17           MR. BAINE:  Your Honor, if we look at this article,

18   I've highlighted in yellow the two quotes that are alleged to

19   be false and defamatory.  The first one is on the second page

20   which says:  My investigation up to this point shows there was

21   some degree of e-mail exchange between Seth Rich and WikiLeaks.

22   And the second one is on the third page:  My investigation

23   shows someone within the D.C. government, Democratic National

24   Committee, or Clinton team is blocking the murder investigation

25   from going forward, Wheeler told Fox News.  That is

1   unfortunate.  Seth Rich's murder is unsolved as a result of

2   that.

3           Now what's interesting about the first quote, your

4   Honor, is if you look at the rest of that paragraph, it goes

5   on, and Mr. Wheeler does not contest the second quote in that

6   paragraph on page two, where he says:  I do believe that the

7   answers to who murdered Seth Rich sits on his computer on a

8   shelf at the D.C. police or FBI headquarters.  Mr. Wheeler does

9   not claim that that is false.

10          THE COURT:  I'm sorry.  Where are you?

11          MR. BAINE:  Page two of the article, right below the

12   highlighted sentence that says my investigation.

13          THE COURT:  Right.

14          MR. BAINE:  The rest of the paragraph contains another

15   quote which he acknowledges is accurate because, in fact, those

16   were the exact words that he used on television.

17          So he concedes he said that.  And he says but I didn't

18   say the first part.  So our first argument, your Honor, is

19   there is nothing remotely defamatory about quoting an

20   investigator saying my investigation shows some degree of

21   e-mail exchange between Seth Rich and WikiLeaks.

22          How does it defame Mr. Wheeler to attribute that

23   statement to him?  After all, the article has already said that

24   a federal investigator, and this is the top of the page, has

25   seen and read the e-mails.  He says I have seen and read the

1    e-mails between Seth Rich and WikiLeaks.

2            So, Mr. Wheeler is not presented as somebody off on

3    some crazy tangent.  Fox has reported that a federal

4    investigator has actually seen and read e-mails between Seth

5    Rich and WikiLeaks and all Mr. Wheeler is saying is my

6    investigation shows some degree of e-mail exchange.  How is

7    that defamatory?

8            He is saying something that is actually quite mild,

9    some degree of e-mail exchange, and is being presented as being

10   entirely consistent with the statement of a federal

11   investigator who has seen and read the e-mails.  How does that

12   expose him to ridicule or how is that defamatory?

13           To be defamatory a statement must expose the plaintiff

14   to public contempt, ridicule, aversion or disgrace or induce an

15   evil opinion of him.

16           It's not enough that Mr. Wheeler might in retrospect

17   be embarrassed by this quote.  The publication has to make him

18   appear odious and despicable.  That's the Chou v. Lewis case in

19   the Second Circuit.

20           So it's for the court to decide initially on this

21   motion, your Honor, whether that statement is defamatory,

22   either on its face or because of some extrinsic fact that

23   Mr. Wheeler wants to bring to the Court's attention that makes

24   it defamatory.

25           THE COURT:  Just let me make sure -- and I think I

1   have it correctly.  The quote that's before that about having

2   seen and read the e-mails between Seth Rich and WikiLeaks,

3   that's not a quote attributable or attributed to Mr. Wheeler.

4           MR. BAINE:  That's correct, your Honor.  That's a

5   different source.  That person is referred to as a federal

6   investigator.  That's different from Mr. Wheeler.

7           THE COURT:  And that is not information that you

8   contend was provided through Mr. Wheeler.

9           MR. BAINE:  That's right.

10          THE COURT:  That's information that the article is

11  quoting that came directly from the federal investigator.

12          MR. BAINE:  That's correct.

13          So, what is the plaintiff's claim?  The plaintiff's

14  claim is that this is defamatory because it injures him in his

15  trade or profession.

16          Now not every negative statement -- this is not a

17  negative statement -- not every negative statement about a

18  person's professional conduct rises to the level of defamation

19  and the courts, in this Court, the Second Circuit, have

20  explained that to be defamatory in this respect the statement

21  must be targeted as specific standards of performance relevant

22  to the plaintiff's conduct and it must impute conduct that is,

23  this is a quote, incompatible with the proper conduct of the

24  business or profession.  Incompatible with the proper conduct

25  of the business or profession.

 1                And there's a second principle which this Court has

 2       written about in the Croton Watch Company case.  And that's

 3       there's a single instance rule in New York.  And the single

 4       instance rule provides that if all you do is suggest that a

 5       professional made a mistake on one occasion, that doesn't rise

 6       to the level of libel per se.  If you have not alleged general

 7       impropriety or general incompetence and all you've done is said

 8       well someone was wrong on one occasion, that's not libelous per

 9       se.

10                This quote doesn't even accuse Mr. Wheeler of being

11       wrong on a single occasion.  It doesn't say, for example, that

12       he's wrong.  In fact, it suggests he's right because it says

13       his findings were consistent with those of a federal

14       investigator who read the actual e-mails.  So we don't even

15       have a situation here in which the plaintiff was portrayed as

16       being wrong on a single instance much less as being generally

17       incompetent.

18                Mr. Wheeler argues in his papers that the article made

19       it look like he was bragging about having cracked a case that

20       federal officials couldn't crack and that somehow that makes

21       him look bad.  Well, to the contrary, the article doesn't

22       indicate that he cracked a case that no one else had cracked.

23       The article first says that a federal investigator saw and read

24       the e-mails and then it says well Mr. Wheeler has reached a

25       similar conclusion.  So there's nothing on the face of this

1      article that casts any aspersions on Mr. Wheeler at all.

2              The second quote simply says my investigation shows

3      someone within the D.C. government, Democratic National

4      Committee, or Clinton team is blocking the murder investigation

5      from going forward.  That's unfortunate.  Seth Rich's murder is

6      unresolved as a result of that.

7              Again, what is defamatory about an investigator

8      suggesting that someone is interfering with the investigation.

9      The article doesn't say that's wrong.  The article doesn't even

10     imply in any remote way that Mr. Wheeler is way off base here.

11     And even if he is, maybe he made a mistake on a single

12     occasion.  That's not enough.

13             So, the other argument that the plaintiff makes in the

14     brief is that somehow people would conclude from reading this

15     article that Mr. Wheeler was acting for political reasons in

16     making these statements.  Well, the article doesn't say that.

17     There's nothing remotely on the face of the article that

18     suggests that.  I don't know how one could reach that

19     conclusion.  But the only way you could is if you somehow

20     assumed a bunch of separate facts that are not in the article

21     that might lead you to the conclusion that someone who said

22     what the federal investigator said and someone who said what

23     Mr. Wheeler said must have been acting for improper political

24     reasons.  Well, if there are facts out there that might suggest

25     that, I don't know what they are.  But if there are such facts,

at the most that would render this article libelous per quod or

by reference to extrinsic facts and in that case the plaintiff

has to allege and prove special damages.  And there is no

allegation of special damages in this case that would satisfy

the law.

        Typically, plaintiff would say after your article was

published some third party with whom I do business read the

article, thought less of me and stopped doing business with me.

Mr. Wheeler doesn't claim that that happened here.  He doesn't

claim that any specific third party read the Fox News article

and said wow he's a disreputable figure I can't do business

with him.  What he's claiming is that after this article Fox

stopped using him on its own programs.  That can't support an

allegation of special damages for at least three reasons.

        Number one, and the most basic of which, is that

defamation is the publication of false information to a third

party causing the third party to think less of you.  Here the

claim is that somehow not a third party thought less of you but

Fox News, the actual publisher thought less of you.  That's not

because of any publication by Fox News to a third party.

That's not a result of a defamatory publication.

        THE COURT:  Well there are general allegations by the

plaintiff that it affected his work with other clients.

        MR. BAINE:  Yes, your Honor.  And that's exactly the

right way to put it, general allegations that it affected his

1    work with other clients.

2         The law requires the special damages be pleaded with

3    particularity.  That's the law of New York State.  That's also

4    the Federal Rules of Civil Procedure which say that special

5    damages have to be alleged with specificity.

6         What that usually means is that a plaintiff comes in

7    and says I used to do business with the ABC corporation and the

8    ABC corporation dropped me as a supplier as a result of which I

9    have lost $15,000.  What's required is for the plaintiff to

10   identify a third party that he no longer does business with and

11   say how much business he lost.

12        Now I'll also drop a little footnote here.  There's

13   some authority in some jurisdictions that if that's impossible

14   because of the nature of your business you at least have to

15   allege some very specific information that here's my level of

16   business before, here's my level of business afterwards,

17   nothing else could possibly have explained this difference.

18   But there is no allegation here at all other than the most

19   general of allegations that my income has gone down.  So, just

20   as a matter of law these allegations of special damages don't

21   meet the law's requirements.  They don't come close.

22        THE COURT:  Let me just backup a little bit because I

23   want to go back to your argument related to the first two

24   arguments before special damages is:  One, the quotes are not

25   defamatory; and two, that the quotes are true.

1          MR. BAINE:  Yes, your Honor.

2          THE COURT:  I understand from the amended complaint

3     that -- and I have to look at it more closely, it's 60 pages or

4     so -- but my understanding is that the plaintiff's position is

5     that the quotes that were attributed to him were not quotes

6     that he made, were not statements that he made.  That's what I

7     understand primarily is the claim by the plaintiff.

8          What is your understanding as to whether or not there

9     are allegations in this complaint that say not just that the

10    quotes were not attributed to me, it should not have been

11    attributed to me, but the information was not true?

12         MR. BAINE:  There is, as far as I know, no such

13    allegation in the complaint.

14         THE COURT:  Because when I go back to the substance of

15    the allegations, the substance of the statements, the substance

16    of the statement, the first statement is that his investigation

17    showed some degree of e-mail exchange between Seth Rich and

18    WikiLeaks.

19         Is there, and I'll ask them the same thing, is there a

20    claim in this complaint that that is an untrue statement?

21         MR. BAINE:  I don't think there's a claim that it's

22    untrue in the sense that I don't think the complaint alleges

23    there were no e-mail communications between Seth Rich and

24    WikiLeaks.  I do not think that allegation is in the complaint.

25         THE COURT:  Or more specifically that it is not true

1    to say that his investigation showed some degree of e-mail

2    exchange between Seth Rich and WikiLeaks.

3           MR. BAINE:  I don't read the complaint as exactly

4    saying that either but I'll let the plaintiffs explain that.

5    They say it's a misquote.

6           THE COURT:  Right.  I understand that.

7           MR. BAINE:  The quote was fabricated.

8           But the only way that a quote can be defamatory is if

9    it inaccurately states the person's position.  It's not

10   defamatory if there's a word wrong.

11          The question is:  Have we falsely attributed to

12   Mr. Wheeler the notion that there was some degree of e-mail

13   exchange between the two?  And that's why we point to the

14   on-air statements in which he says exactly that.

15          THE COURT:  I understand that.  But I'm trying to

16   first concentrate on the contention in the complaint.

17          MR. BAINE:  Yes.

18          THE COURT:  Is it your understanding what the

19   contention in the complaint, the defamatory claim is that the

20   quotations themselves that were attributed to him, he did not

21   make those statements to the reporter and/or do you read the

22   complaint as saying not only did I not make those statements to

23   the reporter, those statements are not true?

24          MR. BAINE:  I don't think he says those statements are

25   not true.

1          THE COURT:  For example, if someone writes an article

2     today that says I said that I road the subway to work today, I

3     could say that I never told that reporter that but, in truth, I

4     did ride the subway to work today.  So, the question is:  Is

5     the falsity in the claim that I made the statement or is the

6     falsity in the claim that the statement that's attributed to me

7     is false?

8          MR. BAINE:  I believe the complaint alleges that the

9     falsity is I didn't make the statement.

10          Now, in fairness to plaintiff, I think the plaintiff

11     has assumed somewhere in the complaint that he's been defamed

12     because the underlying statement is untrue.  But he never

13     alleges in the complaint that there was no e-mail communication

14     between Rich and WikiLeaks.  I think they believe that.  But

15     they have not alleged that.  They can explain their position.

16     But what's interesting is --

17          THE COURT:  Well, he doesn't have to allege

18     specifically that.  He doesn't have to allege there was no

19     e-mail exchange between Seth Rich and WikiLeaks.  He has to

20     allege that the statement that my investigation showed some

21     degree of that is not true.

22          MR. BAINE:  I think to prevail in the case ultimately

23     he has to prove at least two things.  Number one, I never said

24     that.

25          THE COURT:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. BAINE:   And number two.

2          THE COURT:   I understand that.

3          MR. BAINE:   That's untrue.  You attribute a false

4    sentiment to me.  Number three, not only is it untrue but it's

5    defamatory to me to attribute that thought to me because that

6    suggests that I'm somehow corrupt or evil.

7          THE COURT:   I understand.

8          MR. BAINE:   I don't think he can prove any of those

9    things.  And the first point that I'll be making -- and I'll

10   turn to truth in a second -- the first point I'll be making is

11   that assume he didn't say this at all, and even assume that, in

12   fact, it turns out there were no e-mails between Rich and

13   WikiLeaks, it's still not defamatory --

14         THE COURT:   No.  I understand that.

15         MR. BAINE:   -- an article that quotes a federal

16   investigator saying I saw them, for him to say, yeah, I think

17   there was some degree of e-mail exchange.  He's being presented

18   as backing up what a person says based on firsthand

19   observation.  That doesn't make him look ridiculous even if it

20   turns out later on he was wrong.

21         THE COURT:   That's not necessarily so.  Both the

22   federal investigator and Mr. Wheeler could be misquoted.

23         MR. BAINE:   In theory, yes.  But, the question of

24   defamation is when someone doesn't know anything else in the

25   world about this and reads this article and that's what the

1    person knows, does the person drop the article and say, Wow,

2    Wheeler is crazy, he is incompetent, he's corrupt?  No.  No one

3    would say that.  They would say, That's interesting, a federal

4    investigator has read these e-mails between Rich and WikiLeaks

5    and Mr. Wheeler said his investigation shows some degree of

6    e-mail exchange.  That doesn't mean that he said -- he's not

7    presented here as saying Rich was murdered by a Democratic

8    National Committee person.  He's just saying some degree of

9    e-mail exchange.  That's not defamatory to say that someone

10   believes that or concluded that.  The worst that you could say

11   is that if, in fact, it's proven wrong, and there is no

12   allegation that it is wrong, certainly no proof, if it's later

13   proven that that's wrong, then the most we said is that well he

14   made a mistake, not that he's evil or corrupt or he committed

15   malpractice.

16            And, again, what are the facts that are alleged that

17   even would lead someone reading the complaint to conclude that

18   he was wrong?  There are no facts alleged to show that he was

19   even wrong.  But that's the defamation point.

20            Now, the truth point is that he said these things

21   before.  Again, to help the Court I'd like to pass up a little

22   chart that simply compares what Mr. Wheeler said in this

23   article to what he said on the air.  Can I do that, your Honor?

24            THE COURT:  Yes.

25            MR. BAINE:  Your Honor in the first column of this

chart we have the two quotes on top of each other that are in

the Fox News online report that is the subject of the

complaint.

In column two we have what Fox quoted Mr. Wheeler as

saying in that article but that he doesn't challenge.  That's

the sentence I showed you before, your Honor, that's in the

article but that he does not challenge as false.  So he

concedes he said that.

The third column is what he said on Fox 5.  Fox 5 is

not the same as Fox News.  Fox News is the national news

operation.  Fox 5 is a local channel 5 in Washington, D.C. that

operates separately.  So when you hear it on Fox 5 the night

before this is what he said on camera.

And then in the fourth column is what he said on the

Hannity show on Fox News for which he was compensated again on

the next day, May 16.

THE COURT:  Remind me.  Is the Hannity quote before or

after the article?

MR. BAINE:  After.  In time sequence.

THE COURT:  So in these sequence of events, it's the

Fox 5 quotes that you have here, then the article comes out,

and then the Hannity appearance.

MR. BAINE:  That's right.  Yes, your Honor.

So, Fox News simply quotes him as saying there's some

degree of e-mail exchange, some degree.  He doesn't challenge

1    the statement that I do believe the answers to who murdered

2    Seth sits on the computer.  A much stronger statement.  That

3    statement, which he doesn't challenge, indicates not only are

4    there e-mails between Rich and WikiLeaks but I believe that's

5    the key to the murder.  That's a much stronger statement than

6    there was some degree of e-mail exchange.

7            But he doesn't challenge that and, of course, we see

8    why because on Fox 5 that's exactly what he said, almost word

9    for word.  Interesting that he uses the same word on the air

10   which was in the drafts.  He actually texted that quote to the

11   Fox News reporter.  And so she put, after she sends two drafts

12   of the article containing the two quotes that are at issue, he

13   says:  Reading it now, here's an additional quote you can use

14   and this is the additional quote, which they then put into the

15   draft before it's final.

16           So then you go to Fox 5 in which he not only says in

17   the bolded part, I believe the answer to the death lies on that

18   computer.  But then look at the next exchange between Fox 5 and

19   Wheeler.  Fox 5 says:  But you, Mr. Wheeler, you have sources

20   at the FBI saying there is information that could link...

21   Wheeler, for sure ...Seth Rich to WikiLeaks.  Absolutely, yeah,

22   and that's confirmed.  So he is telling Fox 5 that he has

23   sources saying that there is information linking Seth Rich to

24   WikiLeaks.

25           Having said that, how could he say it's false to

1    attribute to him the idea that there's some degree of e-mail

2    exchange between the two?  He's just said it powerfully,

3    confirmed, he says, absolutely true, to Fox 5.

4            And then he goes on Hannity after the Fox News

5    articles is out, after he knows it's out, he doesn't go on

6    Hannity and say I never said that to Fox News.  Instead, he

7    says to Hannity, there's a federal investigator we, we checked

8    him out.  We have to check him out.  Very credible.  When you

9    look at that with the totality of everything else that I've

10   found in this case, it's very consistent for a person with my

11   experience to begin to think, well, perhaps there were some

12   e-mail communications between Seth and WikiLeaks.

13           So if Mr. Wheeler concededly made those statements,

14   how can it be false to attribute to him the observation that

15   there was some degree of e-mail exchange, a very, very mild

16   statement, much milder than the powerful statements he makes on

17   television to Fox 5 and Hannity.

18           Then again with the second quote.  He's quoting Fox

19   News as saying nonetheless my investigation -- I won't read the

20   whole thing, I've read it before -- shows that someone within

21   the DNC or the government is blocking the investigation and I

22   think that's unfortunate.

23           So he tells Fox 5, in the third column on the bottom,

24   the police department or the FBI have been forthcoming.  They

25   haven't been cooperating at all.  I believe the answer to his

1    death lies on that computer which I believe is either at the

2    police department or at the FBI.  I've been told both.

3         Then he says actually I have a source, I have a source

4    inside the police department that has looked me straight in the

5    eye and said Rod, we were told to stand down in this case and I

6    can't share the information with you.  Now, that's highly

7    unusual for a murder investigation.  I do believe there's a

8    correlation within the Mayor's office and the DNC.  That's the

9    information that's going to come out tomorrow, tomorrow being

10   the Fox News article, which he's received a draft of.

11        Then on Hannity, again, he says that night, now after

12   the Fox News article, says what he told Fox 5 he's going to

13   say, that night he tells Hannity, Here's one of the things

14   that's going to be startling.  I reached out to the police

15   department way back in March.  Guess what I learned yesterday

16   from the family of Seth Rich.  The police department did not

17   call me back because someone, a high-ranking official at the

18   DNC called the Rich family, wanted to know why I was snooping

19   around.  The person that called the father after I called the

20   police to get information, that's the person that Seth was

21   having problems with at the DNC.  So, you know, connect the

22   dots here, it's all starting to come together.

23        So, again, if Mr. Wheeler is out there saying those

24   things on camera, how can he say he's been defamed by Fox News

25   putting it in print?  It can't be false to attribute these

1   thoughts to him when we know he said them on the air.

2          Now, plaintiff says, your Honor, they say you can't

3   look at the Hannity show and you can't look at Fox because we

4   didn't quote those in the complaint.

5          Well, it's true they didn't quote these particular

6   portions of those interviews in the complaint.  But the Fox 5

7   interview is all over the complaint.  And the complaint refers

8   to the Hannity interview.  And even if it didn't refer to them,

9   your Honor can take judicial notice of the fact that they were

10  broadcast.  You have the videos.  There is no question that

11  Mr. Wheeler made these statements.

12          They say well it's hearsay.  It's not hearsay.  We're

13  not showing them to you to prove that the underlying statement

14  was true.  We're just showing them to you to show you that

15  Mr. Wheeler said those things.

16          The rules of procedure would be pretty -- pretty

17  ineffective if they told your Honor:  You may not consider the

18  undeniable fact that Mr. Wheeler made these exact same

19  statements on television on the video that we've shown you.

20  You may not look at that.  You must let this case go forward

21  into expensive discovery.  That's not what the Rules of Civil

22  Procedure say.

23          They say that when a plaintiff refers to broadcasts

24  like this in the complaint you can look at it.  And they say

25  that you can take judicial notice of certain things on a motion

1   to dismiss.  And the courts have dismissed libel cases at the

2   outset on motions to dismiss on the grounds of substantial

3   truth when by looking at something that's indisputable before

4   the court you can see that the person has said the same things

5   before.

6           So, we say that in this case you can rule on

7   substantial truth at this stage.  The plaintiff has the burden

8   of alleging facts showing that the statement, that the

9   publication was false.  Far from doing that, they have

10  submitted a complaint which makes reference to interviews that

11  show indisputably that the publication was true.

12          And the third argument is consent.  Now, we think that

13  there was explicit consent for these quotes.  And, your Honor,

14  again, if I may, I'd like to hand up three exhibits to your

15  Honor, the drafts of the article that were sent to Mr. Wheeler

16  before the article here.

17          Your Honor, Exhibits 2, 3, and 4 which I've handed up

18  are three drafts -- these are exhibits to our motion.  These

19  are three drafts that the Fox News reporter, Malia Zimmerman,

20  e-mailed to Mr. Wheeler before the article was published.

21          The first one bears a time of May 15 7:58 p.m.  That's

22  Greenwich Mean Time.  We made a mistake in a footnote, your

23  Honor.  We said the difference between Greenwich Mean Time and

24  New York Time was five hours.  This was Daylight Savings Time.

25  So, it's a four-hour difference.  So 7:58 p.m. is 3:58 p.m.

 1  New York Time.

 2          By the way, the text that is attached as Exhibit 4 to

 3  the Butowsky Rule 11 motion is at 3:59 p.m., one minute later

 4  when Mr. Wheeler texts back to Malia Zimmerman, reading it now,

 5  and then texts again adding the new quote that was stuck into

 6  the article.

 7          So Exhibits 2 and 3 are drafts of the article

 8  containing the quotes at issue in this case.  Exhibit 4 is a

 9  final draft that adds the quote that Mr. Wheeler texted

10  Mr. Zimmerman.

11          So on Exhibit 4, if you look at the second page, at

12  the top, you see:  My investigation up to this point shows

13  there is some degree of e-mail exchange.  That sentence has

14  always been in each of these drafts.  But now we add the

15  sentence:  I do believe that the answers to who murdered Seth

16  Rich sits on his computer on a shelf at D.C. police

17  headquarters.

18          Now Fox News added that quote to the previous drafts

19  because Mr. Wheeler, having received these drafts, having said

20  reading it now, sends that additional quote, which Malia

21  Zimmerman adds to the piece.

22          So, we say that at the very least Mr. Wheeler gave his

23  apparent consent to the publication of those quotes.  The law

24  is clear, and we quote the restatement on this in other cases,

25  consent can be apparent as well as actual.  And in the law of

1   libel there are cases that say, for example, that if you

2   solicit a recommendation from your employer and your employer

3   says something terrible about you, well you have given apparent

4   consent because you've solicited that statement.

5            This is much more direct.  This is a Fox News

6   contributor who works with Fox News on stories.  He's sent two

7   drafts of this story that contain the quotes at issue.  The Fox

8   reporter sending this to a Fox contributor has every

9   expectation that he's going to respond and when he responds:

10  By the way, saying here's an additional quote, at the very

11  least it appears that he has consented to the publication of

12  the other two, and that apparent consent is a complete defense

13  to any libel claim.

14           So, your Honor, the amended complaint here tries to

15  tell a story about some broad conspiracy among people in the

16  White House, among Mr. Butowsky who is a defendant, among Fox

17  News to somehow blame the release of these DNC e-mails on

18  someone other than the Russians.  And I anticipate that counsel

19  may make arguments to that effect today trying to make this

20  look like some broad conservative conspiracy.

21           For the record, though, there is no allegation in the

22  complaint that anyone at Fox News had any contact with anyone

23  in the Trump administration about this story.  There is no such

24  allegation.  There are allegations that Mr. Butowsky had

25  contacts.  Whether those allegations are true or not it doesn't

1    matter, but there is no allegation that anybody at Fox had any

2    contact with anyone in the administration.

3           THE COURT:  What difference would it make in this

4    case?

5           MR. BAINE:  Well I'm just trying to puncture a little

6    bit this broad set of allegations.  But my main point is the

7    allegations are irrelevant.  More importantly, the allegations

8    that the plaintiffs kind of build into a big elaborate story in

9    their complaint are irrelevant to the three issues that we have

10   raised on this motion.  There are three simple questions.

11          Did this news article make Mr. Wheeler appear odious

12   or contemptible?  The answer is no.  Clearly, it did not.

13          Did this article misrepresent Mr. Wheeler's position?

14   No, it did not.  He said the same thing on the air.

15          Did Mr. Wheeler at least appear to consent to these

16   quotes?  Yes.  He said he was reading the draft and he

17   responded with more quotes.  And he never questioned the quotes

18   in the drafts that were sent to him.

19          For these reasons, your Honor --

20          THE COURT:  Where he said he was reading the draft, is

21   that part of the exhibit that you handed up?

22          MR. BAINE:  I've not handed that up.  I can hand that

23   up.

24          THE COURT:  I didn't see that.

25          My recollection is, and you can correct me if I'm

 1    wrong, my recollection is that was a reference to the first

 2    draft.

 3              MR. BAINE:  Yes, your Honor.

 4              THE COURT:  There were two subsequent drafts after

 5    that.

 6              MR. BAINE:  Yes.

 7              If you look at the time on that text it says 3:59.

 8    And you recall the time on Exhibit 2 was 7:59 Greenwich Mean

 9    Time -- it says 7:58 which is 3:58 New York Time.  So one

10    minute later Mr. Wheeler texts back, reading it now.  And then

11    the quote, that I do believe the answer lies on the computer.

12    And excuse me one second, your Honor.

13              (Pause)

14              I may have misunderstood your question because I'm

15    getting a note that suggests that maybe I did.  So let me say

16    it again.

17              Exhibit 2 that I've given your Honor, which has a

18    timestamp of 7:58, which is 3:58, contains the disputed quotes

19    at issue; does not contain the additional quote.  The text, one

20    minute later, sends the additional quote, which then gets

21    incorporated into the other Exhibit 4 that I gave you

22    initially.  There are two exhibit fours in your hand, your

23    Honor.  The drafts are two, three, and four.  The draft that is

24    Exhibit 4 contains the quote from the text that is the other

25    Exhibit 4.

1          THE COURT:  Well I see the first quote in Exhibit 2.

2   I don't see the second quote.

3          MR. BAINE:  The second challenged quote, your Honor,

4   appears in Exhibit 2, the second page, six paragraphs down.

5          THE COURT:  What line?

6          MR. BAINE:  6th paragraph down on the second page,

7   my investigation also shows.

8          THE COURT:  I'm sorry.  Which line is that in that

9   paragraph?

10          MR. BAINE:  We're both looking at Exhibit 2, right?

11          THE COURT:  Yes.  I have Exhibit 2.

12          MR. BAINE:  The second page attached, the 6th

13   paragraph, quote, my investigation also shows.

14          THE COURT:  I have it on page three.  I thought you

15   said page --

16          MR. BAINE:  Page one says --

17          THE COURT:  It says page three of seven.

18          MR. BAINE:  You're right.  I'm sorry.  It's the second

19   page of text.  You're right.  It does say page three at the

20   top.

21          THE COURT:  I see my investigation shows that someone

22   within the D.C. government.

23          MR. BAINE:  Right.

24          And Exhibit 3 also contains these two quotes.

25          THE COURT:  Because I thought I had read in the --

1   somewhere in their papers that their position was that some or

2   all of the quotes that were issued -- at issue were not in the

3   first e-mail.

4          MR. BAINE:  Yes, your Honor.

5          THE COURT:  Did I misread that?

6          MR. BAINE:  Let me clarify that.  There were drafts

7   before these drafts that did not contain the quotes.

8          THE COURT:  Okay.

9          MR. BAINE:  These are the first two drafts that

10  contain the quotes at issue in the case.  And one gets sent at

11  three -- remember, these are published on the 16th.  At

12  3:58 p.m. on the 15th Ms. Zimmerman sends a draft with the

13  two quotes.  Again, at 8:20 Mean Time, 4:20 New York Time, she

14  sends another draft containing the same quotes.

15         THE COURT:  That's Exhibit 3?

16         MR. BAINE:  Yes, your Honor.

17         THE COURT:  Exhibit 3 is at 8:20.

18         MR. BAINE:  That's right.

19         THE COURT:  Exhibit 2 is at 7:58:56.

20         MR. BAINE:  Greenwich Mean Time, yes.  Subtract four

21  hours to get to New York Time.

22         THE COURT:  So -- and then Exhibit 4 is at what time?

23         MR. BAINE:  Exhibit 4 is the draft at 8:47 or 4:47.

24         THE COURT:  All right.  So the first draft is

25  basically a little over one minute before what would be

1  4 o'clock and then we have the second draft that is basically

2  approximately 20 minutes later.

3           MR. BAINE:  Yes, your Honor.

4           THE COURT:  And then the third draft which is

5  approximately 17 minutes after the second.

6           MR. BAINE:  Yes, your Honor.

7           THE COURT:  And you say the e-mail exchange is, the

8  relevant e-mail is at 3:59.

9           MR. BAINE:  Yes.  Text.  Text message.  Yes.

10           So the text message comes a minute after the first of

11  those three drafts, says reading it now.  Then sends a new

12  quote.  And the new quote is inserted into the third of the

13  three drafts I sent your Honor, Exhibit 4, the one that says

14  8:47.

15           THE COURT:  So it was not inserted in the 8:20 draft?

16           MR. BAINE:  I beg your pardon.

17           THE COURT:  It was not inserted in the 8:20 draft?

18           MR. BAINE:  That's correct.

19           THE COURT:  It was inserted in the 8:47 draft?

20           MR. BAINE:  That is correct.

21           It says page three at the top.  And there's a quote:

22  My investigation up to this point shows that there's some

23  degree of exchange.  Then the paragraph goes on to include the

24  new quote, I do believe.

25           THE COURT:  So is the paragraph before that in all

1   drafts, Rod Wheeler, a former D.C. homicide police detective,

2   is that --

3           MR. BAINE:  Yes, with maybe some little word changes;

4   but the substance of it, yes.

5           THE COURT:  So where is that in the drafts?

6           MR. BAINE:  In Exhibit 2, for example?

7           THE COURT:  Yes.

8           MR. BAINE:  Exhibit 2, the fourth paragraph of the

9   article says:  Rod Wheeler, a retired D.C. homicide detective

10  instead of former.

11          THE COURT:  That's the same.

12          MR. BAINE:  A couple words gets changed as she edits

13  this.

14          THE COURT:  And that is also in the -- in all of the

15  drafts?

16          MR. BAINE:  Yes, your Honor.

17          THE COURT:  So in essence what is added in this second

18  or third draft that was not in the first draft was what?

19          MR. BAINE:  Is the new quote that Mr. Wheeler has

20  texted to Ms. Zimmerman in that other series of text messages

21  that I sent you.  That's where she gets that quote.

22          So Mr. Wheeler has read an article containing two

23  quotes, or at least apparently read it, says reading it now,

24  and then sends an additional quote which he inserts.

25          THE COURT:  Which is in essence:  I do believe that

1    the answers to who murdered Seth Rich sits on his computer on a

2    shelf at the D.C. police or FBI headquarters.

3              MR. BAINE:  Yes.  And if you think about it, your

4    Honor, that quote is a much more powerful quote than the one

5    that Mr. Wheeler now disputes which simply says some degree of

6    e-mail exchange.  You've got to go several leaps beyond that to

7    say that that's the answer to who murdered Seth Rich.  So the

8    quote that he doesn't challenge the one that he added -- what

9    he did is he strengthened the quote.  The quote is a mild one

10   that says there's some degree of e-mail exchange.  And he

11   responds not by saying whoa, I never said that.  Instead, he

12   supplies a much more powerful quote saying that's the key to

13   the murder.  The fact that there are e-mail exchanges between

14   the two, that's not only interesting, that's the key to the

15   murder.

16             So he juices up the quote, tells Fox News to add this,

17   so they add it.  Then he turns around and says I never said the

18   first thing?  That doesn't pass the straight face test, your

19   Honor.  It's not false, not defamatory, and he apparently

20   consented.  Thank you.

21             THE COURT:  Did you want to be heard before I hear

22   from the plaintiffs?

23             MR. HARRISON:  I would, your Honor.  Good morning.  Or

24   good afternoon at this point.  I don't want to rehash all the

25   arguments that counsel for Fox covered.  There are some

overlapping arguments, but we do have some arguments that are
individual to Mr. Butowsky that I'd like to cover.

There really are two threshold issues here that I
believe make this a very easy case for the Court to dismiss.
The first was covered by counsel for Fox, and that's consent.
It's very clear that Mr. Wheeler manifested an intent to
consent to the publication of the statements in the Fox News
article.  He was sent the publication three times prior to it
being published.  He responded directly to it.  He added
language to one of the quotes.  And on top of that he appeared
on at least two television shows, one prior and one after, in
which he made almost identical statements to -- in those media
appearances.

Consent can be manifested by action or inaction and it
can be apparent or it can be express.  In this case I think all
of those were covered by the conduct of Mr. Wheeler and I think
that that dismisses the case on that basis alone.

The second issue that I wanted to cover with respect
to Mr. Butowsky before we get into the technical elements of
defamation is jurisdiction.

The jurisdictional facts in this case are as follows.
Mr. Butowsky, a Texas resident, worked with Ms. Zimmerman, a
California reporter, on an article for Fox News that contained
quotes about a Maryland detective.  None of those things have
anything to do with New York.  The only nexus --

1          THE COURT:  The only thing you skipped is Fox News.

2          MR. HARRISON:  That's what I'm getting to, your Honor.

3     The only nexus in this case is Fox News and Fox News happens to

4     be headquartered here.  But that really is just a coincidental

5     nexus.  There is no case law that plaintiff has provided, no

6     case law that we have seen, that such tenuous connections to

7     New York would establish jurisdiction over Mr. Butowsky in this

8     case.  Nevertheless, plaintiffs have set forth two arguments

9     for jurisdiction.

10          The first is general jurisdiction.  And plaintiffs, as

11     I'm sure the Court is aware, plaintiffs have to prove that

12     Mr. Butowsky has such systematic and continuous contacts with

13     New York to make this his home, to make this foreign state his

14     home.  Systematic and continuous.  Mr. Butowsky has submitted

15     an affidavit that he visits New York three or four times per

16     year.  He's here very infrequently.

17          Beyond that, the facts as alleged by plaintiff in this

18     case with respect to Mr. Butowsky's contacts with New York are

19     as follows.  Number one, Mr. Butowsky is an international

20     private wealth manager and, therefore, may have clients in

21     New York.  Number two, he works with, quote, Wall Street

22     financial experts who assist him with advising his clients.

23          THE COURT:  What is Mr. Butowsky's relationship to Fox

24     News.

25          MR. HARRISON:  Mr. Butowsky doesn't have a

1    relationship with Fox News.  He occasionally appeared on Fox

2    programming over the last several years.  That is the extent of

3    his relationship with Fox News.  But I'd add that that

4    participation in Fox programming largely happened out of the

5    State of New York.  Really, the nexus to New York is

6    coincidental to Mr. Butowsky's connection to this case.

7            Even assuming that Mr. Butowsky had clients here, and

8    the case law is clear that having clients in a particular

9    jurisdiction does not subject you to personal jurisdiction of

10   the courts there.  If that were true Mr. Butowsky would have --

11   if he had clients in Alaska, he would be subject to general

12   jurisdiction in Alaska or in Minnesota.  Corporations could be

13   subject to jurisdiction wherever they had customers, perhaps in

14   all 50 states.  The law doesn't support it.

15           THE COURT:  But this isn't corporate jurisdiction.

16           MR. HARRISON:  That's fair.  This is not corporate

17   jurisdiction.  Mr. Butowsky, again, if he had clients in

18   Alaska, based on their theory, based on their arguments, if he

19   had clients in Alaska, he'd be subject to jurisdiction for

20   anything, for any claim in Alaska, general jurisdiction in

21   Alaska based on the fact that he had a single client there.

22   The law doesn't support it.

23           THE COURT:  I'm still unclear what Mr. Butowsky's

24   relationship is to Fox.

25           MR. HARRISON:  Mr. Butowsky currently does not have a

relationship with Fox.  He has appeared on Fox News programming

as well as other television shows where he has spoken about his

financial expertise with respect to the economy and the stock

market, advising clients on financial matters.  That is the

extent of it.

          THE COURT:  But he clearly had some -- and maybe this

isn't a general jurisdiction question -- but he clearly has

some interest in the Seth Rich story.

          In what way does he have an independent interest in

the Seth Rich story or a combined interest in the Seth Rich

story with Fox News?

          MR. HARRISON:  As is alleged in the complaint,

Mr. Butowsky was a mere intermediary between Rod Wheeler who

was investigating the Seth Rich case and Malia Zimmerman who

had an interest in the case and was writing a story about it.

          THE COURT:  But I don't know how he got in the middle

of this.  Through his relationship with Fox News?  Through his

relationship with Zimmerman?  Through his relationship with

Wheeler?  I'm not sure.

          MR. HARRISON:  I think in this case in particular his

relationship with Ms. Zimmerman, I think he had a relationship

with her, he's worked with her in the past.  He's worked with

people at Fox in the past and I think as a result of that he

made an introduction.

          THE COURT:  He made an introduction of who?

1              MR. HARRISON:  Mr. Wheeler and Ms. Zimmerman.

2              THE COURT:  So he was the one that put them together?

3              MR. HARRISON:  Correct.

4              THE COURT:  And what was his relationship with

5    Ms. Zimmerman?

6              MR. HARRISON:  He's worked on stories.  As I said,

7    he's contributed to Fox.  He's been involved in financial

8    programming on Fox.  And as a result of his involvement with

9    Fox financial programming, he has been introduced to people and

10   was introduced to Ms. Zimmerman through that relationship.

11             THE COURT:  Is that a social acquaintance or a

12   business?

13             MR. HARRISON:  I would say more of a social

14   acquaintance than a business acquaintance, your Honor.

15             THE COURT:  What is his relationship with Mr. Wheeler

16   at this point?

17             MR. HARRISON:  He didn't have a preexisting

18   relationship with Mr. Wheeler.

19             THE COURT:  Well you said to me that he brought

20   Ms. Zimmerman and Mr. Wheeler together so he must have had some

21   kind of relationship with Mr. Wheeler to bring the two parties

22   together.

23             MR. HARRISON:  He was introduced to Mr. Wheeler.

24             THE COURT:  By.

25             MR. HARRISON:  At some point in time.

```
 1              THE COURT:  By Fox News people or by somebody --

 2              MR. HARRISON:  I don't have that information.

 3              THE COURT:  The most that you can tell me about his

 4   relationship with Mr. Wheeler is that some unknown individual

 5   introduced Mr. Wheeler to Mr. Butowsky.

 6              MR. HARRISON:  Mr. --

 7              THE COURT:  At what point in time and for what

 8   purpose?

 9              MR. HARRISON:  As alleged in the complaint

10   Mr. Butowsky was introduced to Rod Wheeler as a private

11   investigator.

12              THE COURT:  Right.  I understand that.

13              MR. HARRISON:  In Washington, D.C.

14              THE COURT:  And that was in --

15              MR. HARRISON:  That was in connection with figuring

16   out what happened with this murder investigation.

17              THE COURT:  It's still unclear to me how Mr. Butowsky

18   is in the middle of the relationships between Zimmerman, the

19   Rich family and Mr. Wheeler.  Why is he the common denominator?

20              MR. HARRISON:  Because he knew all these people so he

21   put them together.  He had the relationships and he put them

22   together.

23              THE COURT:  And he put them together for his own

24   purposes or because someone, one of those three asked him to

25   put them together for this particular purpose?
```

1          MR. HARRISON:  He was just helping facilitate all of

2    the parties who were working on mutually similar issues.

3          THE COURT:  Well he did more than just put them

4    together.  He paid Wheeler's bill, right?

5          MR. HARRISON:  That's correct.  But that predated all

6    of this.

7          THE COURT:  That what?

8          MR. HARRISON:  That predated the engagement of -- or

9    at least the involvement of Fox News and the writing of the

10   article, the publication of the article.

11         THE COURT:  When you say that predated it, you're

12   saying that after she started working on this article that

13   Mr. Butowsky had no relationship with any of these parties with

14   regard to the Seth Rich investigation?

15         MR. HARRISON:  That's correct, if I understand what

16   you're asking, yes.

17         THE COURT:  And so he paid the bill when?  In

18   relationship to when this article came out?

19         MR. HARRISON:  Well so -- long prior to -- well months

20   prior to the article being published.

21         THE COURT:  And so once he paid Mr. Wheeler's bill

22   months prior, what was his relationship to these individuals

23   and this story?

24         MR. HARRISON:  He didn't have much of a relationship

25   with Mr. Wheeler.  Mr. Wheeler is actually on record as saying

1   that they had very little contact during this time.  He paid

2   the bill and Mr. Wheeler conducted the investigation.

3          We submitted documents both attached to our motion to

4   dismiss as well as our Rule 11 that show Mr. Butowsky was on

5   certain correspondence in connection with the findings that

6   Mr. Wheeler had discovered during his investigation, and he was

7   copied on a few e-mails with regard to the draft of the

8   publication.

9          THE COURT:  How would you characterize what the

10  plaintiff claims is Mr. Butowsky's role that defines his

11  liability?

12         MR. HARRISON:  I think that the plaintiff vastly

13  exaggerates Mr. Butowsky's role in --

14         THE COURT:  Well what do they claim he did?

15         MR. HARRISON:  Well they -- for the record, the claim

16  of defamation requires that he actually had published these

17  statements.

18         THE COURT:  That's why I asked you from your point of

19  view.

20         MR. HARRISON:  There isn't a single allegation

21  actually in the complaint that he had anything to do with the

22  creation of the quotes.

23         THE COURT:  From your perspective what is Mr. Butowsky

24  being accused of?

25         MR. HARRISON:  He's being accused of publishing these

1    quotations in this article.  That's what he's being accused of.

2    He's being accused of having a substantive role in the drafting

3    of this article and the drafting of the quotes which is

4    factually inaccurate but, beyond that, it's not even alleged in

5    the complaint.

6              It's important to keep in mind that this article --

7    Mr. Wheeler is on record as saying the article is substantively

8    true.  He didn't actually dispute the contents of the article.

9    In fact, he's on record after it was published as saying it was

10   substantively true.

11             THE COURT:  So what do you think this complaint

12   alleges against him?

13             MR. HARRISON:  There is a single allegation in the

14   complaint, and I can read it for --

15             THE COURT:  Which paragraph?

16             MR. HARRISON:  I don't actually have the paragraph on

17   me.  But I can read the article which --

18             THE COURT:  I do have a paragraph 137.

19             MR. HARRISON:  The paragraph states --

20             THE COURT:  Or 136.

21             MR. HARRISON:  Zimmerman working with Butowsky and

22   under the supervision of her editors at Fox fabricated the two

23   quotations and attributed them to Wheeler.

24             Now, that is, as far as I can tell, the only

25   allegation that actually attempts to connect Mr. Butowsky to

1    the quotations themselves.  And the reason that that's

2    important is this is not a case where they're alleging that the

3    entire article is defamatory.  They're actually only alleging

4    that these two quotations are defamatory.  And there isn't a

5    single allegation that would support the fact that Mr. Butowsky

6    had anything to do with the drafting of the quote itself, the

7    creation of the defamatory quote.

8         They make a lot of allegations very generally about

9    Mr. Butowsky's involvement and his encouragement of the

10   article, the article's publication.  But the law is clear that

11   encouragement is not enough.  You have to be actively involved

12   in the creation of the defamatory statement.

13        THE COURT:  But the way you characterize his role is

14   more limited than what's alleged and more limited than what his

15   actual role was.  The plaintiff alleges that Butowsky and

16   Zimmerman both had a role in this article.

17        MR. HARRISON:  Correct.  Generally.  That's correct.

18        THE COURT:  Well, he says Butowsky orchestrated the

19   substance and message of the article.  Butowsky was also

20   intimately involved in the timing of the publication and the

21   push to get the article out as soon as possible after President

22   Trump fired Director Comey.  And then it says:  Very shortly

23   after the article was published Wheeler called Butowsky and

24   demanded an explanation for the false statements about him in

25   Zimmerman's article.  Butowsky stated that the quotes were

1    included because that is the way the president wanted the

2    article, referring to President Trump.  And then Mr. Wheeler

3    contacted Butowsky with the complaint about the false

4    statements in the article because Mr. Wheeler knew that

5    Butowsky was the primary force behind the article's content and

6    influence on Fox to publish.

7            So it's clearly a much greater -- I won't say role but

8    greater activity with regard to Mr. Butowsky other than months

9    ago he paid Wheeler's bill.

10           MR. HARRISON:  Just to address all of those

11   allegations, none of them actually go to the creation of the

12   quotation in question.  Mr. Butowsky's encouragement or

13   involvement or coordination or even meetings or discussions

14   about generally about the article being published are not

15   relevant to whether or not these quotes were misattributed to

16   Mr. Wheeler.

17           They are claiming that Mr. Wheeler was intentionally

18   defamed by the misattribution of these quotations.  And there

19   is not a single allegation in this complaint that states that

20   Mr. Butowsky had anything to do with the creation of those

21   quotes.  Not one.

22           We're not disputing today the allegation in the

23   complaint that they make this big story about Mr. Butowsky's

24   involvement in the publication or his encouragement or

25   inspiration of the publication in the complaint.  That's not at

1    issue today, nor is it I think relevant to whether or not these

2    quotes were defamatory.

3              THE COURT:  All right.

4              MR. HARRISON:  If I just might get back to

5    jurisdiction for a second, your Honor.

6              We don't believe there's a basis for general

7    jurisdiction.  But plaintiffs have also asserted that there is

8    specific jurisdiction here under the New York long-arm statute.

9    And under the New York long-arm statute, as relied upon by

10   plaintiff, Mr. Butowsky has to have transacted business in the

11   state and this cause of action had to have a substantial

12   connection to that transaction of business.

13             Now the only transaction of business that plaintiffs

14   have cited in their complaint, in their brief on this issue are

15   limited interactions that Mr. Butowsky had with Fox News

16   editors and Fox News producers prior to the publication, I

17   think, of two to three e-mails.

18             Under the law, that limited type of interaction, calls

19   and e-mails into a forum state are not sufficient for the

20   transaction of business.  But beyond that, as you have alluded

21   to here, the complaint makes a lot about the interactions that

22   Mr. Butowsky had with Mr. Wheeler and Ms. Zimmerman.  But none

23   of those interactions had anything to do with the forum state.

24   Ms. Zimmerman was writing the article from California.

25   Mr. Butowsky was in Texas.  Mr. Wheeler was in Maryland and

1   Washington, D.C.   None of those people were anywhere near

2   New York during the creation of the article and the ultimate

3   publication.   So.

4           THE COURT:   Ms. Zimmerman -- remind me.   Ms. Zimmerman

5   works for whom?   Does she freelance?

6           MR. HARRISON:   I don't know if I can speak to that,

7   your Honor.

8           MR. STERN:   Your Honor, Mr. Stern for Ms. Zimmerman.

9   She works for Fox News.

10          THE COURT:   She works for Fox News itself.   All right.

11  Go ahead.

12          MR. HARRISON:   So certainly there is not a substantial

13  relationship between Mr. Butowsky's involvement here and the

14  cause of action which is defamation based on these mistreated

15  quotes which were created and written by Ms. Zimmerman in

16  California.

17          I'd like to very briefly touch upon some of the

18  technical arguments that we had in our briefing with respect to

19  defamation, and I don't want to overlap too much with Fox's

20  counsel, but I do want to address them.

21          The first is truth, the truth of the statements

22  themselves.   We believe it's clear that from the pre- and

23  postpublication statements by Mr. Wheeler, the sentiments that

24  he was expressing, both publicly and privately, to various

25  parties demonstrate that the substance of the quotations in the

1    article were, in fact, true; they were not false.

2          Plaintiffs have conceded that Mr. Wheeler is a limited

3    purpose public figure, which means he has to show actual

4    malice.  Actual malice under the law requires scienter, that

5    Mr. Butowsky knew or recklessly disregarded the fact that he

6    had never made these statements.  But it is not -- it is --

7    defies reasoning that Ms. Zimmerman would implore Mr. Wheeler

8    to review the article prior to publication, not once, not

9    twice, but three times before publishing it if she had intended

10   to defame him.  She clearly went out of her way to get his

11   approval for these statements.  So it defies reason that she

12   would be intentionally defaming him or Mr. Butowsky would be

13   intentionally defaming him after having asked him several times

14   to review the article before it was published.

15          I just want to briefly address the Twitter messages

16   that are alleged to be defamatory against Mr. Butowsky, these

17   Twitter messages that were posted by Mr. Butowsky describing

18   conduct of Mr. Wheeler that was, you know, contradicted some of

19   the things he had said and some of the things he had done prior

20   to the publication.  I just -- I can read them for you.

21          The first is:  Fox News story was pulled because Rod

22   Wheeler said he didn't say the quote, dot, dot, dot.  How much

23   did the DNC pay him?

24          Now this is not a statement of fact.  It is clearly an

25   opinion of Mr. Butowsky's.  It's an observation that he's

1   making.  Not only that.  It's clearly sarcastic in tone and

2   hyperbolic.  It is not a defamatory statement of fact.

3   Therefore --

4           THE COURT:  Well, the basic premises of that statement

5   is that he is indicating that Mr. Wheeler was paid.  He doesn't

6   say:  Was Mr. Wheeler paid?  He said:  How much was he paid?

7           MR. HARRISON:  That's right.  But it's purely sarcasm.

8   It's clearly hyperbolic and not intended to be accepted by the

9   general public.

10          THE COURT:  It's kind of difficult for me to try to

11  figure out what's hyperbolic and what's supposed to be real in

12  this world.

13          MR. HARRISON:  Understood.

14          And then the second statement, if I just -- actually

15  it's a question.

16          Beyond that, the second statement:  This shows that

17  Rod Wheeler -- now, Mr. Butowsky posted or retweeted an audio

18  that somebody else had tweeted, which was an audio recording of

19  Mr. Wheeler discussing some of the things that are the

20  substance of the quotations in the Fox News article.

21  Mr. Butowsky states:  This shows that Rod Wheeler has a major

22  battle with the truth.  Everyone needs to hear this.  He says

23  the precise words he swears he didn't say.

24          Clearly, he's forming his own judgment about what this

25  audio says.  But beyond that he's telling whomever is reading

1    this that they need to check it out for themselves.  He's

2    asking the question:  What do you all think about this?  He's

3    not making a definitive statement about what it actually means.

4          THE COURT:  Well he's making a clear statement that

5    Mr. Wheeler has lied.

6          MR. HARRISON:  But he's forming his own opinion about

7    that, your Honor.  He's actually asking the people that he's

8    speaking with or the Twitter --

9          THE COURT:  I don't know whether that's an opinion or

10   whether he has facts for that or what the reader would take

11   from it.  You say that he lays out the evidence -- I don't

12   remember the extent of the statement -- that he lays out what

13   he considers to be the clear evidence that Mr. Wheeler said one

14   thing on one occasion and said something different on a

15   different occasion.

16         MR. HARRISON:  Beyond that he's asking people to form

17   the judgment for themselves.

18         THE COURT:  That's not a judgment.  That's either a

19   fact or not a fact.  He either said something on one

20   occasion -- he either had a statement and a prior inconsistent

21   statement or he didn't.  That's not a judgment call.  That's

22   not an opinion.  It's either true or not true.

23         MR. HARRISON:  If I may read the quote that's on the

24   audio recording from Mr. Wheeler.  He says:  It kind of makes

25   sense in a way because with everybody pushing back on this

1    e-mail thing, the family and they're so protective of the

2    e-mail, it leads me to think that perhaps there was some

3    communication between Seth Rich and WikiLeaks.

4              So Mr. Butowsky is putting --

5              THE COURT:  But that's not the entire quote.

6              MR. HARRISON:  Well, that's the quote from the audio

7    recording.  That is the relevant quote from the audio

8    recording.

9              THE COURT:  But that's not the substance of the quote

10   that we're just talking about in which he says that, as you

11   say, in his opinion Mr. Wheeler is a liar.

12             MR. HARRISON:  But he forms the judgment from the

13   quote on the audio which I just read to you.  The audio --

14             THE COURT:  Quote to me what -- how he expressed that

15   judgment.

16             MR. HARRISON:  He says; this shows that Rod Wheeler

17   has a major battle with the truth.  Everyone needs to hear

18   this.  He says the precise words he swears he didn't say.

19             THE COURT:  So why is that an opinion?

20             MR. HARRISON:  I think it's his own judgment about

21   what is said.  But then he's asking --

22             THE COURT:  Why is that an opinion about whether or

23   not he has the actual proof that he said something that wasn't

24   true?

25             MR. HARRISON:  I mean --

1             THE COURT:  That's not an opinion.

2             MR. HARRISON:  It's his judgment.  You're right, your

3    Honor.

4             THE COURT:  It's not his judgment.  There is such

5    proof or there isn't such proof.

6             MR. HARRISON:  But I think the important part of the

7    statement is that he's asking people to read it for themselves.

8    So he's making a statement about it, but asking people to

9    confirm for themselves what it actually means.

10            THE COURT:  No.  He tells them what it means.  And he

11   says if you read it for yourself you will see that it does mean

12   that.  He's not asking them to come to their own conclusion.

13   He's asking them to come to the conclusion that he's reached.

14            MR. HARRISON:  The statement, if I had it in front of

15   you, it actually has question marks at the end of it.  He does

16   ask it -- it's framed as a question.  Everybody needs to see

17   this.

18            THE COURT:  I'm not sure how a question marks turns

19   that into a question.  Everybody needs to see this.

20            MR. HARRISON:  I think in any event, your Honor, I

21   think based on the recording itself it's factually true that

22   there is a contradictory statement between what Mr. Wheeler is

23   saying and what is said on the recording.

24            THE COURT:  All right.

25            MR. HARRISON:  That's all I have.

```
 1              THE COURT:  Thank you.

 2              (Recess)

 3              THE COURT:  Yes, sir.

 4              MR. WILLEMIN:  Thank you, your Honor.

 5         Good afternoon, your Honor.  My name is Michael

 6    Willemin with Wigdor LLP for plaintiff Rod Wheeler.

 7              When Mr. Baine started his argument today he stated

 8    that this is an unusual case.  And I think from our perspective

 9    we certainly agree, although for different reasons.

10              This case is unusual.  This case may be one of the

11    first cases in which not one but both of the individuals who

12    are alleged to have authored a fabricated quotation have both

13    admitted that the plaintiff did not make the statements that

14    were attributed to them.  And this is not something that we

15    have to take Mr. Wheeler's word for, nor something that we just

16    have to accept as true because the allegations are in a

17    complaint.  These admissions are on recordings.

18              THE COURT:  Let me -- before you go beyond those

19    factual assertions let me -- is there any allegation or could

20    you make any allegation that your client didn't receive a copy

21    of the article with essentially this information in it?  It

22    will not say that this is untrue or don't print this, but

23    simply added to those statements by the quote that he -- the

24    additional information to buttress those statements by the

25    e-mails.
```

1            MR. WILLEMIN:  Yes, your Honor.  The documents that

2    were provided by defense counsel were three articles that were

3    e-mailed to Mr. Wheeler on May 15 of 2017.  And what defense

4    counsel did not present to the Court is that Mr. Wheeler had

5    previously been provided with copies of the article in the days

6    prior that did not have the statements at issue.  And on the

7    day, on May -- this is -- well, this is alleged in the

8    complaint, this first part.  On the day of May 15, as

9    Ms. Zimmerman was sending these e-mails to Mr. Wheeler,

10   Mr. Wheeler told Ms. Zimmerman that he was not going to be able

11   to be reviewing his e-mails because he was in transit.

12            THE COURT:  But he clearly reviewed the e-mail.

13            MR. WILLEMIN:  What happened --

14            THE COURT:  Because he added to the contents of what

15   was already asserted in the e-mail.

16            MR. WILLEMIN:  What happened, your Honor, and what

17   discovery will show in this case, which is a reason that we

18   need to have discovery in this case, is that when Mr. Wheeler

19   wrote that he is reading it now, he was writing in a text

20   message -- which is important because, again, he's already told

21   Ms. Zimmerman that he can't get to his e-mail.  He's writing in

22   a text message that he's reading it now because Ms. Zimmerman,

23   not in response to receiving an e-mail, but because

24   Ms. Zimmerman texts him:  Can you read the story now?  He is

25   then reading the copy of the story that he -- the only one that

1    he has at that point, because he's told Ms. Zimmerman that he

2    cannot get to his e-mail, a copy of the story that does not

3    have the quotes in it.  And he does --

4              THE COURT:  But that doesn't make sense because he

5    asks her -- he didn't ask her to change something, or he didn't

6    say that well let me read the article before I have any

7    suggestions.  He gave her specific language to add.  And that

8    specific language is not even relevant unless those statements

9    were read.

10             MR. WILLEMIN:  Your Honor, I respectfully disagree

11   that it doesn't make any sense.  And I respectfully disagree

12   that the statements are not pertinent or relevant outside of

13   the context --

14             THE COURT:  Well, in what context would he say add

15   that I do strongly believe that the answers to who murdered

16   Seth sits on his computer?

17             MR. WILLEMIN:  So this goes back to --

18             THE COURT:  What could that possibly be a reference to

19   other than the fact that there's an e-mail chain?

20             MR. WILLEMIN:  What it's in reference to, your Honor,

21   is that -- and actually this goes to the whole point, is that

22   Mr. Wheeler, in his investigation, as Butowsky and Zimmerman

23   were well aware, never had access to the computers at issue in

24   this case.  And what he's saying in this quotation is that, in

25   the broader context of both the article and his communications

with Butowsky and Zimmerman, is that he had made efforts to try
to have access to this computer and ultimately he wasn't able
to access it.  And so, to him, that led him to believe that the
computer perhaps provided some answers to the questions in this
case.  But it is not -- it is not the same as saying that his
investigation showed that there were e-mail communications
between Seth Rich and WikiLeaks.  This quotation is very
speculative.  It is not a definitive statement of fact that he
had discovered that there were e-mails between Seth Rich and
WikiLeaks.

        THE COURT:  Let me ask you just a direct question,
particularly if I find that the complaint is insufficient and
would consider whether or not that you should have an
opportunity to amend.

        Are you asserting here in good faith that your client
can allege in a complaint that he never read this article
before it was published?

        MR. WILLEMIN:  That is what our client's --

        THE COURT:  I'm asking you.  You think you can, you
can in good faith truthfully allege in this complaint that
Mr. Wheeler never read any of these versions of this article or
the article as it was to be published?

        MR. WILLEMIN:  Your Honor, without getting into my
attorney-client communications, the answer to that question is
that, yes, I expect that that is something that could be

1   alleged in an amended complaint.

2          THE COURT:  That he didn't read any of these articles

3   with these quotations in them prior to its publication?

4          MR. WILLEMIN:  That is correct.

5          THE COURT:  Even though he's saying he's reading it

6   now?

7          MR. WILLEMIN:  Well, your Honor, this gets back to --

8   this is precisely why discovery is necessary in this case.

9          THE COURT:  I'm not asking about discovery.  I'm

10  asking about what good faith allegation you can make.  Because

11  given the fact that we know that he received these articles

12  and -- these drafts, and that he was communicating with her

13  about these drafts, and he was at least saying when he got the

14  first of the drafts that had this information in it, that he

15  was reading it, and he asked her to edit it in a way to add

16  this statement, on what basis do you -- can you allege that he

17  didn't know what was in the article?

18         MR. WILLEMIN:  Your Honor, what I expect that the

19  allegations would be, if we were to amend the complaint, is

20  that our client had a version of the article that was given to

21  him a few days prior by Ms. Zimmerman that did not have the

22  defamatory quotations in them.

23         THE COURT:  Okay.  But he was given -- but what's the

24  difference between the article that you say he was given that

25  didn't have it in it and the article that he was given that did

1    have it in it when we know he had in his hand the article that

2    did have it in it when he was text messaging and he wanted to

3    add to that article.  He wasn't adding to a previous article.

4    He was adding to that article, right?

5              MR. WILLEMIN:  No, your Honor.  That's where -- this

6    is the point that I'm trying to get to, is that he had a

7    version of the article with no defamatory quotes in them at

8    all.  This is the article that he had in his possession --

9              THE COURT:  In front of him when he wrote this text

10   message?

11             MR. WILLEMIN:  That's correct.

12             THE COURT:  Which is alleged under oath?

13             MR. WILLEMIN:  That is correct.

14             THE COURT:  That he never saw these statements in any

15   draft?

16             MR. WILLEMIN:  Before they were published, that's

17   correct.  Because what happened, your Honor, is -- and he told

18   Ms. Zimmerman this.  This is why -- I understand that --

19             THE COURT:  What does he tell Ms. Zimmerman?  Not in a

20   text message.

21             MR. WILLEMIN:  No, no.  In the allegations in the

22   complaint he states that he advised Ms. Zimmerman -- and, in

23   fact, well let's take one step at a time.

24             The allegations in the complaint, he said that he

25   advised Ms. Zimmerman that he was going to be unable to access

 1   e-mail because he was in transit.  And she --

 2          THE COURT:  But that's not true.  He wasn't unable to

 3   access e-mail.  He did have e-mails in front of him.  He didn't

 4   say I don't know what you're talking about.  He doesn't say I

 5   don't have your e-mail.

 6          MR. WILLEMIN:  He had --

 7          THE COURT:  Is it your representation again, a good

 8   faith representation that he didn't even have access to this

 9   draft of the article when he wrote this text message?

10          MR. WILLEMIN:  Your Honor --

11          THE COURT:  He didn't even have it in front of him?

12          MR. WILLEMIN:  Your Honor, my understanding --

13          THE COURT:  Whether he read it or not.

14          MR. WILLEMIN:  My understanding is that at the time

15   that he wrote this text message what he had in front of him was

16   a hard copy version of the article without the defamatory

17   quotations that had been previously provided to him.  And there

18   is no e-mail at the time 3:59, 3:58, 4 o'clock from Mr. Wheeler

19   to anyone.

20          THE COURT:  So when do you claim that he got a

21   previous e-mail?  When is the latest that he got the previous

22   e-mail that didn't have this language in it?

23          MR. WILLEMIN:  May 11 is the time where he got a draft

24   of this document before May 15.  And May 11 he did not have --

25          THE COURT:  Was there any communication between

1   May 11, between Ms. Zimmerman and Mr. Wheeler, until May 16 at

2   3:59?

3          MR. WILLEMIN:  Nothing -- there were communications,

4   but there were no communications between them --

5          THE COURT:  About the article.  The substance of the

6   article.

7          MR. WILLEMIN:  In which Mr. Wheeler provided any

8   information to Ms. Zimmerman that possibly could have led her

9   to include new quotes in the article, particularly the ones

10  that are at issue.

11         So what Mr. Wheeler will testify to -- again, this is

12  a proffer, is my understanding -- is that he receives the

13  article on May 11.  Nothing happens in his mind that could

14  possibly result in a situation where some new article is going

15  to have new quotations that he never made about something that

16  he could never say.

17         THE COURT:  You say that the draft that he received on

18  May 11 did not have these two quotes in it?

19         MR. WILLEMIN:  That is correct, your Honor.

20         THE COURT:  And so they're texting each other at 3:59

21  and she says can you read the story now.

22         MR. WILLEMIN:  Correct.

23         THE COURT:  What is that supposed to be a reference

24  to?

25         MR. WILLEMIN:  Well he has, this is from Ms. Wheeler's

1    perspective, he has with him a hard copy version of the May 11

2    story.

3            THE COURT:  But he already read that.

4            MR. WILLEMIN:  Understood.

5            THE COURT:  So why would she be saying can you read

6    this version now?

7            MR. WILLEMIN:  In his mind he's not sure.  That's the

8    case.

9            THE COURT:  He says I'm reading it now.

10           MR. WILLEMIN:  Correct.  In a text message.

11           THE COURT:  So when she sent him something -- if she

12   sent him something a minute before that and he says I'm reading

13   it now, your position is that he will truthfully under oath

14   allege that the only draft he had in front of him was not the

15   draft that was -- is Exhibit 2 but a previous draft that had no

16   references to this information in it and he said add this

17   language to that previous draft.

18           MR. WILLEMIN:  That is what I expect him to testify

19   to.

20           THE COURT:  So what is this language that he wants

21   added supposed to mean?

22           MR. WILLEMIN:  Again, your Honor, this language is in

23   reference to the fact that Mr. Wheeler -- and this is stated in

24   some of his other statements.  Again, these statements are

25   materially different than what he is alleged to have stated.

1  And what this language is referencing is the fact that he was

2  unable to get his hands on the computer.  And that to him

3  raised the suspicion that the computer may have some answers to

4  the secrets behind this whole situation here.  And that proves

5  the point that he would never have said, without having access

6  to the computer, and without having actually seen any e-mails,

7  he never would have said that his investigation showed that

8  there was e-mail communications.

9        THE COURT:  So your position is that she sent him at

10  least three drafts of this article before it was published that

11  had these quotes in it and he never read any one of those

12  drafts?

13        MR. WILLEMIN:  That is what I expect him to testify

14  to, your Honor.

15        THE COURT:  Okay.

16        MR. WILLEMIN:  And it's not inconsistent ultimately --

17  this is the bigger picture here --

18        THE COURT:  But did he know he had these drafts?

19        MR. WILLEMIN:  His communications --

20        THE COURT:  Because it wouldn't make any sense if he

21  gets a new draft for him to be relying on the old draft.

22        MR. WILLEMIN:  What I am -- what I am aware of in

23  terms of what I expect our client to testify to is that he

24  advised Ms. Zimmerman that he wouldn't be able to review his

25  e-mail during this period of time and that it wasn't until he

1    saw the article published the next day that he recognized that

2    there were misquotations in the article.

3            THE COURT:  But that's not what the text message said.

4            MR. WILLEMIN:  I'm sorry?

5            THE COURT:  That's not what his text message says.

6    His text message says he's reading it now.

7            MR. WILLEMIN:  But he's referring to the May 11

8    version.

9            THE COURT:  That's what I'm asking.  You're saying

10   that he's referring to the May 11 version; that that's the only

11   version that he ever read.

12           You're not contending he was never sent these drafts?

13           MR. WILLEMIN:  No.

14           THE COURT:  And you're not contending that he didn't

15   have these drafts?

16           MR. WILLEMIN:  If you mean that they were sitting in

17   his inbox, your Honor, we do not contest that.  We're not

18   contending that it went into his spam or it got bounced by some

19   blocker.  My understanding, again, through --

20           THE COURT:  Is that it was on his e-mail but he never

21   printed it out or he never reviewed it.

22           MR. WILLEMIN:  Correct.  Which he advised

23   Ms. Zimmerman at the time he wasn't going to be able to.

24           Add Ms. Zimmerman -- this gets back to my original --

25           THE COURT:  He advised her when?

1              MR. WILLEMIN:  That day.

2              THE COURT:  What day?

3              MR. WILLEMIN:  On May 15 he advised Ms. Zimmerman that

4    he was traveling and he wouldn't be checking his -- he would

5    not be able to be looking at his e-mails.

6              THE COURT:  By what?  How did he advise her of that?

7              MR. WILLEMIN:  By telephone.

8              THE COURT:  And he advised her of that when, before

9    one of these three drafts or in between one of these drafts or

10   after these drafts?

11             MR. WILLEMIN:  Your Honor, that is something that I

12   would -- I don't know the precise answer to.  But the

13   allegation in the complaint is that Ms. Zimmerman on that day

14   knew he was not going to be reviewing e-mails and, in fact,

15   later when Ms. Zimmerman asks him for another quote about Donna

16   Brazil, Mr. Wheeler said I'm going to have to do talk to text,

17   on a text message, again, because he's not e-mailing.  If

18   Mr. Wheeler had received the e-mail that Ms. Zimmerman sent

19   him, he would have responded to that.  He would have responded

20   to that e-mail.  Instead, what he receives is a text message

21   from Ms. Zimmerman saying can you read the story now.  And he's

22   responding to her text message, because he gets just the text

23   message.  And the document that he has with him is the May 11

24   version.

25             THE COURT:  And you're saying that even the May 11

1      version, he never read before 4 o'clock on that day?

2            MR. WILLEMIN:  No.  I'm not saying that, your Honor.

3            THE COURT:  But that's what it says.  He says I'm

4      reading it now.  It doesn't make sense that he's referring to

5      something that he's already read.

6            MR. WILLEMIN:  Your Honor, it is possible that it

7      might have been more clear if he had written that he is

8      rereading it now.

9            THE COURT:  I'm asking you because it does -- you can

10     understand my question about that.  I mean it says I'm reading

11     it now.  It doesn't say I -- it doesn't make sense that he

12     would say I'm reading it now if he had already read it.

13           MR. WILLEMIN:  Your Honor, I think respectfully I

14     think what we're doing here is making the arguments that are

15     ultimately going to be made to a jury in this case because

16     that's exactly what the defendants are going to argue.  Look,

17     Mr. Wheeler -- this is crazy, how could you believe that he

18     wasn't talking about this story.

19           But our allegations are that he specifically told

20     Ms. Zimmerman he was not going to be reviewing his e-mail.  So

21     that's, of course, the contention, that he wouldn't be

22     reviewing the story that she sent him.  And this is of such

23     critical importance, Ms. Zimmerman admits on recording that

24     Mr. Wheeler did not give her the stuff about the WikiLeaks.

25     This is after the fact.  Fox retracted this article because of

1    the fact -- I mean our argument is because of the fact that

2    they recognized that these were fabricated quotations.

3          THE COURT:  Well let me ask you this.  Because I asked

4    them the same question and it's a more appropriate question to

5    ask you.  There are two questions.  The first one is -- let me

6    take the second one rather than the first one.  One has to do

7    with in what way that this is defamatory.  And the second

8    question has to do in what way are these quotes not true.

9          So, is it your position that -- I assume it's your

10   position that Mr. Wheeler's claim is that he never gave her

11   these quotes.

12         MR. WILLEMIN:  That is correct, your Honor.

13         THE COURT:  Is it your position that the substance of

14   what's in the quotes is untrue?

15         MR. WILLEMIN:  That is correct, your Honor.

16         THE COURT:  In what way is it -- let's start with the

17   first quote.  He basically -- she basically says that his

18   investigation shows some degree of e-mail exchange between Seth

19   Rich and WikiLeaks.  You say that that statement is not true.

20         MR. WILLEMIN:  Correct.

21         THE COURT:  And so he had -- his investigation didn't

22   show any degree of e-mail exchange between Seth Rich and

23   WikiLeaks.

24         MR. WILLEMIN:  Correct.  And, if your Honor -- I would

25   refer your Honor to paragraph 129 of the complaint.

1        THE COURT:  Okay.

2        MR. WILLEMIN:  Your Honor can see that the quotation

3    that's at issue is quoted in the second and third lines down in

4    129 and the complaint alleges as follows:  Mr. Wheeler did not

5    provide this quote or make this statement.  This statement is

6    false.  Butowsky, Zimmerman and the Fox editors knew that

7    Mr. Wheeler had never stated that his investigation established

8    an e-mail exchange between Seth Rich and WikiLeaks.  To the

9    contrary, Mr. Wheeler had informed Butowsky and Zimmerman that

10   he was denied access to Seth Rich's personal devices, including

11   his cellphones, laptops, and e-mail accounts.

12       THE COURT:  So then why would he make the statement on

13   May 15 before the article came out to -- on Fox 5 that when

14   they questioned him:  But you have sources at the FBI saying

15   that there is information that could link, and he says --

16   before they finished the question:  For sure.  And the question

17   is continued:  Seth Rich to WikiLeaks.  And he responds:

18   Absolutely.  Yeah.  That's confirmed.

19       You say that that is an untrue statement.

20       MR. WILLEMIN:  No, your Honor.  What we're saying --

21       THE COURT:  So what is that referencing that's

22   different than what was attributed to him in the article?

23       MR. WILLEMIN:  There are two ways in which that

24   statement is materially different than what's attributed to him

25   in the article.  The first is that in the article he is falsely

accused of having stated that his investigation, his

investigation showed something.

THE COURT:  Well that's part of his investigation,

isn't it?

MR. WILLEMIN:  Well, there's --

THE COURT:  In what way are you defining

investigation?  Investigation can mean anything.  It could mean

that he pulled together some information and he came to certain

conclusions.  It could mean that he got direct evidence.  It

could mean that he has circumstantial evidence.

In what way does the word investigation take it out of

the context of his saying that he has information that connects

Seth Rich to WikiLeaks?

MR. WILLEMIN:  Well, your Honor, I think your Honor's

point that this statement can potentially -- defamatory

statement can potentially be viewed in -- susceptible to

different interpretations.

THE COURT:  Well what's the different interpretation?

He says that his investigation shows some degree of e-mail

exchange between Seth Rich and WikiLeaks.  The only thing

that's different from this statement and the statement that he

made before that is the word e-mail exchange.

MR. WILLEMIN:  Your Honor --

THE COURT:  Right?  If it said his investigation shows

some communication between Seth Rich and WikiLeaks, you

1    wouldn't say that that would be a false statement.

2            MR. WILLEMIN:  Correct, your Honor.

3            THE COURT:  So you just say the false statement is, is

4    that they said that he attributes this to e-mails.

5            MR. WILLEMIN:  Your Honor, it's not just that.  It's

6    also --

7            THE COURT:  So what part of it is false other than

8    that?

9            MR. WILLEMIN:  In the Fox 5 interview --

10           THE COURT:  Just tell me first that statement.  It

11   says he did an investigation.  That's true, right?

12           MR. WILLEMIN:  Correct.

13           THE COURT:  And his investigation shows some things.

14   That's true?

15           MR. WILLEMIN:  Well, his investigation cannot show --

16           THE COURT:  I didn't say that.  I didn't get that far

17   yet.  He did an investigation and his investigation showed some

18   things.

19           MR. WILLEMIN:  Correct.

20           THE COURT:  And his investigation leads him to

21   conclude that there is some relationship between Seth Rich and

22   WikiLeaks.  That's not false, right?

23           That part of it is not false; that his investigation

24   shows him, some degree of communication between Seth Rich and

25   WikiLeaks.  That's not false.

1        MR. WILLEMIN:  That's not how Mr. Wheeler has ever put

2    it outside of the --

3        THE COURT:  I'm asking.  That's not false, right?

4        MR. WILLEMIN:  Well as phrased that way, your Honor,

5    that would be false.

6        THE COURT:  That would be false?

7        MR. WILLEMIN:  What he says on Hannity, which is the

8    critical distinction, then I'll speak about the Fox 5 interview

9    as well.  But what he says on Hannity, and I'm quoting from the

10   piece:  Now where did the information come from in terms of

11   knowing or believing I should say that Seth Rich could have

12   been in communication with WikiLeaks.

13        Every statement he makes --

14        THE COURT:  What are you quoting from?

15        MR. WILLEMIN:  An appearance that he had on Hannity

16   the night of --

17        THE COURT:  On Hannity he says that it's very

18   consistent for a person with my experience to begin to think,

19   quote, well perhaps there are some e-mail communications

20   between Seth and WikiLeaks.

21        That statement is -- in what way is that statement

22   inconsistent with the statement:  Investigation shows some

23   degree of e-mail exchange between Seth Rich and WikiLeaks?

24        MR. WILLEMIN:  Because the statement that he made on

25   Hannity, in the entire context is, first of all, he stated that

1   he believes something, not that something was true and was

2   shown; second of all, he said that there could be a

3   communication or connection.  And every statement that he

4   made --

5          THE COURT:  No.  He doesn't say that.  Because the day

6   before that he says for sure, there's absolutely a connection

7   between Seth Rich and WikiLeaks.

8          MR. WILLEMIN:  That, your Honor, is incorrect.  Again,

9   the day before the Fox 5 interview he says that he was aware of

10  a source that could link Seth Rich to WikiLeaks.

11         THE COURT:  Right.  And that would be consistent with

12  saying that he learned that through his investigation, right?

13         MR. WILLEMIN:  Your Honor --

14         THE COURT:  That's not a different statement.  He has

15  a source and he did an investigation.  You don't claim that

16  that's the defamatory part.

17         MR. WILLEMIN:  The statements are materially

18  different.

19         THE COURT:  Tell me what part of this first statement

20  that you claim is untrue.  Tell me the words that you say are

21  untrue.

22         MR. WILLEMIN:  The entire statement --

23         THE COURT:  No.  Tell me the exact word that is

24  untrue.

25         MR. WILLEMIN:  That his investigation showed.

 1              THE COURT:  Okay.  You don't claim that he didn't do

 2      an investigation.

 3              MR. WILLEMIN:  Correct.

 4              THE COURT:  And you don't claim -- do you claim that

 5      his investigation didn't show some degree of link between Seth

 6      Rich and WikiLeaks?

 7              MR. WILLEMIN:  I do, yes, your Honor, as a fact.

 8              THE COURT:  But that's what he said the day before.

 9              MR. WILLEMIN:  The word showed is materially different

10      than saying that his investigation showed.

11              THE COURT:  Well, as a matter of fact, that's true but

12      it's just the opposite of what you just argued.  As a matter of

13      fact, the statement he made on May 15, the day before the

14      article came out, is stronger than the statement that he

15      made -- they attributed to him in the article.  They said he

16      said, when they asked him was there information that could link

17      Seth Rich to WikiLeaks, he says for sure, absolutely.

18              MR. WILLEMIN:  But, your Honor, in that article he is

19      referring specifically to a source.  He's not referring to

20      something that he --

21              THE COURT:  Right.

22              MR. WILLEMIN:  -- that he did in terms of his own

23      investigation.

24              THE COURT:  He's not referencing any source in the

25      article.

1      MR. WILLEMIN:  Precisely the point, your Honor.  He is

2   now --

3      THE COURT:  If you have sources at the FBI saying that

4   there's such information, doesn't that -- isn't that part of

5   the investigation?

6      MR. WILLEMIN:  I would disagree, your Honor.  And I

7   would say --

8      THE COURT:  You would say that's not part of his

9   investigation?

10      MR. WILLEMIN:  Your Honor, what I would --

11      THE COURT:  How could he have conversations with --

12   and have a source at the FBI and pursue that source and then

13   publicly say he has that source that's giving him that

14   information?  And you say it has nothing to do with his

15   investigation.  It's not part of the investigation.

16      MR. WILLEMIN:  To step back on the source.  The source

17   that's as issue here, as Butowsky and Zimmerman at Fox knew and

18   know, is a source that -- is Butowsky.

19      THE COURT:  No.  Butowsky is not a source at the FBI.

20      MR. WILLEMIN:  Butowsky and Zimmerman both advise

21   Mr. Wheeler that there was a source in a law enforcement agency

22   that has seen --

23      THE COURT:  Why does that matter?  That doesn't

24   matter.  He said that he got that information.

25      MR. WILLEMIN:  Understood.

1           THE COURT:  He didn't say where he got it from.  As a

2    matter of fact, he doesn't say that somebody told me that

3    somebody told them that the FBI has a source.  He says they

4    asked him you have sources at the FBI saying that there's

5    information that could link Seth Rich to WikiLeaks.  He says

6    for sure, absolutely.  Yeah.  And that's confirmed.

7           You think that that's a weaker statement than:  My

8    investigation shows some degree of e-mail exchange between Seth

9    Rich and WikiLeaks?

10           MR. WILLEMIN:  It is a far more credible statement.

11    If a reader is reviewing something and listening to the words

12    of a solo private investigator with much, much fewer resources

13    than an agency like the FBI or the Baltimore Police Department

14    or the Maryland Police Department or the D.C. Homicide

15    Department and he says someone told me that there could be a

16    connection, that is something that someone could read and say

17    oh, okay someone -- it's reasonable to believe that someone

18    could have told him that.

19           THE COURT:  Right.

20           MR. WILLEMIN:  The next statement.

21           THE COURT:  So why is that different than some degree

22    of information.

23           MR. WILLEMIN:  Because the implication in the article,

24    particularly because -- well, the implication in the article is

25    that he cracked the case not that he got some information.

1          THE COURT:  Where does it say he cracked the case?

2          MR. WILLEMIN:  It says that his investigation showed

3     that there was e-mails.  It's a definitive statement.

4          THE COURT:  Isn't everything he's referencing on Fox 5

5     and Hannity information that he got during his investigation?

6          MR. WILLEMIN:  Well but each of these things are

7     qualified.  Always qualified.  So each of the things on Hannity

8     and the things on Fox --

9          THE COURT:  Well, isn't this statement qualified?  It

10     says his investigation shows some degree of e-mail.

11          MR. WILLEMIN:  That's not qualified.  That is a

12     definitive statement that he, his investigation, that he was

13     able to determine that e-mails existed.  He didn't say I have a

14     hearsay source that says this.  He says -- he doesn't say this,

15     but they attribute it to him, that he was able to determine

16     that there were e-mails exchanged between WikiLeaks and Seth

17     Rich.  And that's not something that he was able to determine,

18     nor is it something that he ever said in that kind of context

19     or even at all in any of the other statements he made.  And

20     there are cases, your Honor --

21          THE COURT:  Well he says the next day well perhaps

22     there are some e-mail communications between Seth and

23     WikiLeaks.

24          Let's be logical about this.  I assume, and you can

25     correct me if I'm wrong and I shouldn't assume anything, but

1    logic would dictate that when he made this statement to Hannity

2    on the 16th the article had already been published.

3              MR. WILLEMIN:  That's correct, your Honor.

4              THE COURT:  And he didn't deny anything in the

5    article.

6              MR. WILLEMIN:  Your Honor, he -- every step --

7              THE COURT:  On the 16th when he was in front of

8    Hannity he didn't say well, you know what, I have

9    information -- I have -- my experience to begin with tells me

10   that perhaps there's some e-mail communication between Seth

11   Rich and WikiLeaks.  He doesn't say well I'm making this

12   distinction now, it leads me to believe that, but I'm not

13   saying that my investigation shows some degree of e-mail

14   exchange between Seth Rich and WikiLeaks.

15             You're making that fine distinction between the truth

16   and what is defamatory and not true?

17             MR. WILLEMIN:  Your Honor is quoting from one portion

18   of the Hannity interview.

19             THE COURT:  You want to quote from a different portion

20   that's supposed to give it a different meaning?

21             MR. WILLEMIN:  I would like to quote from the portion

22   where he says specifically that he talks about the source,

23   which is, just like he talked about in Fox 5.  This is not --

24             THE COURT:  And he references the federal investigator

25   that's referenced in the article.

1          MR. WILLEMIN:  Correct.  But that -- this is almost to

2     the whole point again, is that this was his -- his, Butowsky's

3     and Zimmerman's -- source.  And from what Fox did was they took

4     a source that they knew -- Wheeler's only source for any of

5     this information was this source that Butowsky and Zimmerman

6     provided.

7          THE COURT:  So how does that make that untrue, an

8     untrue statement by him?

9          MR. WILLEMIN:  Because they quoted the source in the

10    article and then the statement that they attributed to

11    Mr. Wheeler was one that would read as confirming that

12    Mr. Wheeler independently confirmed what this unnamed FBI

13    source said.

14         THE COURT:  It doesn't say he confirmed it.  It says

15    his investigation showed some degree of e-mail exchange.

16         MR. WILLEMIN:  And he was able to confirm that.

17         THE COURT:  Wait a minute.  He says that his

18    investigation, it is very consistent for a person with my

19    experience to begin to think well perhaps there's some e-mail

20    communications between Seth and WikiLeaks.

21         MR. WILLEMIN:  Which one is this, your Honor?

22         THE COURT:  That's the Hannity article.

23         MR. WILLEMIN:  Again, on Hannity, he makes very clear

24    that he is not talking about something that he has established,

25    not something --

1        THE COURT:  Where does it say he's established that in

2  this quotation?

3        MR. WILLEMIN:  The word shows, your Honor, I

4  believe --

5        THE COURT:  Shows some degree means that he's

6  established it?

7        MR. WILLEMIN:  Has established that there was some

8  degree.

9        THE COURT:  And what degree is that supposed to be

10  that takes that out of the realm of truth?

11        MR. WILLEMIN:  Any e-mail, one e-mail, 50 e-mails, 100

12  e-mails, he has not established any e-mail communication in

13  connection with his investigation between Seth Rich and

14  WikiLeaks.

15        THE COURT:  Wouldn't the information that he gave

16  Hannity which he said led him to conclude that perhaps there is

17  some e-mail communications between Seth Rich and WikiLeaks, why

18  is that in any way inconsistent with saying my investigation

19  shows some degree of e-mails between Seth Rich and WikiLeaks?

20        MR. WILLEMIN:  Well to begin, your Honor, it's all

21  qualified by words like could have been some communications,

22  that there is a belief --

23        THE COURT:  But the Fox 5 article is not qualified.

24        MR. WILLEMIN:  It is qualified --

25        THE COURT:  The Fox 5 article says there is absolutely

1    information that links Seth Rich to WikiLeaks.

2              MR. WILLEMIN:  Well, your Honor, the Fox 5 --

3              THE COURT:  What kind of information could there

4    possibly be other than e-mails?

5              MR. WILLEMIN:  Your Honor, the Fox 5 article does,

6    quote, use the word could.  It's not as definitive as the

7    statement in the article.  And, again, the Fox 5 article

8    Mr. Wheeler is clear to at least state that he is relying on a

9    source.

10             THE COURT:  So how does that make one true and the

11   other false?

12             What's true about saying that the information that I

13   have absolutely for sure could link Seth Rich to WikiLeaks?

14   That's what he says.

15             MR. WILLEMIN:  With regard to the source, he is not --

16   he is saying that someone has told me that there are e-mails

17   between Seth Rich and WikiLeaks.

18             THE COURT:  So?

19             MR. WILLEMIN:  That doesn't mean --

20             THE COURT:  How is that inconsistent with saying my

21   investigation?

22             MR. WILLEMIN:  Because that does not establish, and

23   I'm using the word establish --

24             THE COURT:  You can say establish but don't say he

25   established it.

 1           MR. WILLEMIN:  But in the context, your Honor, the

 2  word shows most certainly indicates --

 3           THE COURT:  That he did what?

 4           MR. WILLEMIN:  It is not a guess.

 5           THE COURT:  What are you saying shows is saying

 6  factually that is incorrect?

 7           MR. WILLEMIN:  That he could assert with a factual

 8  certainty that there were e-mail exchanges between Seth Rich

 9  and WikiLeaks, which he cannot assert based on hearsay from a

10  source.  He does not assert when he qualifies it with words

11  like could, or potentially, or maybe, or belief.  And during

12  this --

13           THE COURT:  So you say that his investigation did not,

14  in his mind, lead to the reasonable conclusion that there were

15  e-mail exchanges between Seth Rich and WikiLeaks?

16           MR. WILLEMIN:  That's a different --

17           THE COURT:  Why is that different?

18           MR. WILLEMIN:  Because whether you lead to a

19  reasonable conclusion or not -- whether you believe something

20  or you have concluded something is a different assertion than

21  saying that you have -- that you have shown something or

22  established something.

23           THE COURT:  But saying that an investigation shows

24  some degree of e-mail exchange is different than saying I got

25  the e-mail.  Right?  It doesn't say I have the e-mail.

1          MR. WILLEMIN:  Your Honor, I think in this context the

2     average reader of this article would believe, based on the way

3     that Mr. Wheeler was misquoted, that he did.

4          THE COURT:  You think -- let me put it this way and

5     we're probably going to have to continue after lunch because I

6     have a board of judges meeting.

7          You say you think that saying an investigation shows

8     some degree of e-mail exchange between Seth Rich and WikiLeaks

9     is a statement that he has the e-mail?

10          MR. WILLEMIN:  That he has seen the e-mails, that he

11     has factual proof evidence that the e-mails exist; not hearsay,

12     not that it's potential, not that it could be, not that it's

13     based on a source; that he is asserting, he can assert based on

14     his own personal firsthand knowledge that e-mails exist.

15          THE COURT:  So what part of this statement is he now

16     denying?  The part of the statement.  Tell me the part of the

17     statement.  Don't interpret it for me.  Tell me what part of

18     this statement that he is denying as being true.

19          MR. WILLEMIN:  He is denying that his investigation

20     showed some degree of e-mail exchange between Seth Rich and

21     WikiLeaks.

22          THE COURT:  We'll you've just given me the whole

23     statement.  Is he denying -- he's not denying that he had an

24     investigation.

25          MR. WILLEMIN:  Correct.

1          THE COURT:  He's not denying that it led him to

2    certain conclusions, right?

3          MR. WILLEMIN:  That's correct.

4          THE COURT:  He's not even denying that it led him to

5    the conclusion that there were communications between Seth Rich

6    and WikiLeaks, right?

7          MR. WILLEMIN:  Incorrect.

8          THE COURT:  How is that incorrect?  That's what he

9    said the day before and the day after.

10         MR. WILLEMIN:  The conclusion -- the day before

11   he's -- he's saying what a source told him the day before.  The

12   day after he is saying on Hannity that there could potentially

13   have been some communications based on what a source told him.

14         THE COURT:  Where could he possibly have gotten that

15   conclusion?

16         MR. WILLEMIN:  He says both before and after that it

17   was from a source.

18         THE COURT:  Right.  During his investigation.

19         MR. WILLEMIN:  But in the article it does not

20   attribute anything to a source.  It attributes it to him, his

21   investigation.

22         THE COURT:  Wait a minute.  That's not an argument you

23   can make.  We know he wasn't there.  We know he has no

24   firsthand knowledge of this.  So nobody is attributing this

25   fact as a fact that he has some independent knowledge of.

1        MR. WILLEMIN:  A reader most certainly could given the

2   way that this is --

3        THE COURT:  That he has independent knowledge that

4   there was communication between Seth Rich and WikiLeaks?

5        MR. WILLEMIN:  That he has a personal knowledge.

6        THE COURT:  So what is he trying to make the reader

7   believe by saying that perhaps there are some e-mail

8   communications between Seth and WikiLeaks that it's very

9   consistent for a person with his experience to think that, and

10  that for sure, absolutely he has sources at the FBI.  He

11  doesn't say he got this from Butowsky.  He says I have

12  sources -- they said you have sources at the FBI saying there

13  is information that could link Seth Rich to WikiLeaks.  He says

14  for sure, absolutely.

15       By your statement that is a statement that is being

16  misinterpreted because you're saying:  Oh, well, he didn't mean

17  he had a source at the FBI.  He meant to say well Butowsky told

18  him there was a source at the FBI.

19       MR. WILLEMIN:  Your Honor, I'm not basing any sort of

20  argument on liability on trying to distinguish whether in the

21  Fox 5 interview he was talking about a source that he could

22  attribute to him or Butowsky or Zimmerman or whoever.  It is

23  the case, and defendants know this, that that's what happened.

24       THE COURT:  So I'm trying to figure out what's the

25  falsity of the statement.  The falsity of the statement you

1   claim is that -- I would have to accept your argument that the

2   statement is saying he has the e-mail, or he saw the e-mail.

3   That's the only falsity of the statement that you're arguing,

4   as I hear it.

5          Right?

6          MR. WILLEMIN:  That's correct.

7          THE COURT:  So I'd have to interpret this statement as

8   being a statement that they say that he personally saw the

9   e-mail.  That's the falsity that the reader is going to get

10  from that.

11         MR. WILLEMIN:  Correct, your Honor.

12         THE COURT:  Okay.

13         MR. WILLEMIN:  And the basis -- and the significant

14  reason the reader will get to that point is because there is

15  an -- this article in its entirety is all about the fact that

16  now they've cracked -- Fox News has cracked the case and

17  determined that there's e-mail exchanges between Seth Rich and

18  WikiLeaks.

19         THE COURT:  But that article does not say that.  That

20  article does not say they have the e-mails.  The article does

21  not say that he has the e-mails.  The article doesn't say he

22  saw the e-mails.

23         As a matter of fact, what he has said, what he added

24  to that statement, and that's why it's a little -- it's a

25  little difficult to, in logic, to accept the fact that he

1    didn't know that that was in the statement.

2           What he added to the statement is that the answers to

3    who murdered Seth Rich is on his computer.

4           What could that possibly mean other than he believes

5    that the e-mail exchanges that he's concluded that link Seth

6    Rich and WikiLeaks is not in his hands, but the investigation

7    makes him believe that it happened, and that if they had the

8    computer that the authorities are trying to withhold, that it

9    would show those e-mails?

10          What else is it trying to say other than if you looked

11   at his computer you would see the e-mails?

12          MR. WILLEMIN:  What the statement means, your Honor,

13   is that he's never had the computer.  He never saw the e-mails.

14   He doesn't have the e-mails.

15          THE COURT:  Tell me in what way he is trying to imply

16   that the answers to who murdered Seth Rich sits on his

17   computer.  What could that possibly be a reference to other

18   than the e-mails that he has continuously said that he believes

19   that there's evidence of?

20          MR. WILLEMIN:  Your Honor, I'm not saying it's in

21   reference to something different than that.  What I'm saying,

22   your Honor --

23          THE COURT:  So he must have known and he must be

24   trying to give some impression that there are probably e-mails

25   on the computer, on Seth Rich's computer, that if he had

1    access, if everyone had access to that computer they would see

2    those e-mails.  Isn't that what he's trying to say by adding

3    this language?

4              MR. WILLEMIN:  Your Honor, what the language, if a

5    reader reads that language --

6              THE COURT:  I'm talking about his language.

7              MR. WILLEMIN:  I understand.  His language.  And a

8    reader reading that language would read that and say there's a

9    lot of loose ends here.

10             THE COURT:  If there was a witness deep throat, that

11   wouldn't be on the computer.  That's not -- he's not

12   referencing evidence that's not on the computer.  The only kind

13   of evidence that's on the computer is some communication.

14             MR. WILLEMIN:  But it's evidence --

15             THE COURT:  And logically some e-mail communication

16   because that's the context in which he talks about the

17   communication.

18             MR. WILLEMIN:  But the statement is explicit in that

19   he does not have these e-mails or this proof that the statement

20   that is attributed to him in the Fox News article that his

21   message --

22             THE COURT:  But isn't that made clear by his addition

23   of this language that he strongly believes that the answers to

24   who murdered Seth Rich sits on his computer on a shelf at the

25   D.C. police or FBI headquarters?

```
 1              Isn't he clearly by qualifying any statements that
 2   he's made previously or that are made in the article about an
 3   e-mail, isn't he clearly qualifying that by saying I haven't
 4   seen the e-mail, I strongly believe that it sits on his
 5   computer?
 6              Is there any other way to interpret that statement?
 7              MR. WILLEMIN:  Your Honor, I would contend that it's
 8   the reverse.  I mean --
 9              THE COURT:  What's the reverse?  I don't know what the
10   reverse is.
11              MR. WILLEMIN:  The statement on its own that he
12   believes that some computers in some D.C. Homicide could have
13   the answers to Seth Rich's murder.
14              THE COURT:  No.  Seth Rich's computer.
15              MR. WILLEMIN:  Seth Rich's computer.  Excuse me.
16              THE COURT:  That the evidence is on Seth Rich's
17   computer.
18              Tell me what possible evidence could he be referring
19   to that's possibly on Seth Rich's computer.
20              MR. WILLEMIN:  Possibly.
21              THE COURT:  Give me an example.
22              MR. WILLEMIN:  The e-mails.
23              THE COURT:  Right.  Exactly.
24              So he's clearly saying that he -- his investigation
25   leads him to believe that there are e-mails between Seth Rich
```

1    and WikiLeaks, he said that previously, and he said that

2    afterwards, and he wants to put in the article that if we had

3    his computer that could be verified and that's the evidence

4    that he believes, strongly believes exists.

5           How is that different than my investigation shows some

6    degree of e-mail exchange between Seth Rich and WikiLeaks?

7           MR. WILLEMIN:  Your Honor, what someone believes is a

8    completely distinct and separate issue and question than what

9    someone can show.  This is what we see in the courtroom all the

10   time.  We have plaintiffs or defendants that believe that they

11   acted in a certain way or that they believe that the law was

12   something that --

13          THE COURT:  He doesn't say I can show you the e-mails.

14   He says his investigation shows that some degree of e-mail

15   exchange.  Now that investigation could be the e-mails

16   themselves.  There could be some reference to the e-mails.  It

17   could be somebody who said that there were e-mails.  That

18   doesn't tell me that he actually has seen the e-mails.  As a

19   matter of fact, just the opposite.  By him adding this language

20   to the article, that he's qualifying that by saying this is

21   what I strongly believe, I believe it's on the computer.

22   Obviously, he wouldn't have said I strongly believe that the

23   answers are on the computer if he, in fact, had that evidence

24   in his hand.

25          MR. WILLEMIN:  Your Honor, where a statement is

1    susceptible to multiple means, as your Honor just listed

2    multiple ways in which that statement can be viewed, that is

3    always an issue for the jury to decide.

4              THE COURT:  But I asked you that.  What is the

5    multiple ways it could be read?  The only way you told me it

6    could be read is he's referring to e-mails.

7              MR. WILLEMIN:  With regard to the fabricated --

8              THE COURT:  What else could it possibly be a reference

9    to other than e-mails?

10             MR. WILLEMIN:  Your Honor, I'm referring to the

11   fabricated statement.  So if the fabricated statement -- your

12   Honor, we contend that the fabricated statement would lead a

13   reader to believe that Mr. Wheeler had proof, established

14   evidence, that e-mails existed between Seth Rich and WikiLeaks.

15             THE COURT:  Well proof and established evidence are

16   two different things.

17             MR. WILLEMIN:  More --

18             THE COURT:  He does have proof.  His investigation

19   shows that he's got a source -- there's a source at the FBI.

20   His investigation leads him to believe that there were e-mails.

21   His investigation leads him to believe that if they had the

22   computer that there would be actual proof of what he is

23   already -- his investigation has already shown.

24             MR. WILLEMIN:  But none of that is in the article.

25   None of that is in the article.  This is the point, is that

1    standing on its own none of what your Honor just mentioned is

2    in the article.  The only thing that's in the article is that

3    his investigation shows something.

4              THE COURT:  Right.  His investigation shows some

5    degree of e-mail exchange.

6              MR. WILLEMIN:  And the average reader could certainly

7    read that and believe that Mr. Wheeler was saying that he had

8    come upon proof that e-mails were exchanged between Seth Rich

9    and WikiLeaks.

10             THE COURT:  All right.  So even if that was the

11   possible interpretation, let me just move to the other issue

12   and then I have to take a break because I'm late for a meeting.

13             Even if I get past that, how does that defame him?

14   How does it defame him for them to say that his investigation

15   shows some e-mail exchanges if everything he says about this

16   before or afterwards is his giving the public the impression

17   that there were e-mails, that he believed strongly that there

18   were e-mails?

19             How does that make it defamatory to say that his

20   investigation showed some degree of e-mails?  What makes it

21   defamatory?

22             If you asked him about that statement, he would say to

23   you:  Yeah, my investigation leads me to believe that there

24   were e-mails between them.  And I think if you got the computer

25   it would show that.  I have concluded from my investigation

1   that they had e-mail exchanges.

2           You're not going to say he would deny that.

3           MR. WILLEMIN:  Your Honor, what I will say is that

4   there is, again, a huge distinction between someone expressing

5   a belief based on listed pieces of information such as a source

6   and making sure to qualify something as being potential and

7   someone stating something as a fact that they had proof of

8   something.

9           THE COURT:  Well it doesn't say as a fact that I have

10  proof of something.  The big distinction you have to draw is

11  between the first part of what you said and saying my

12  investigation shows some degree of e-mails.

13          MR. WILLEMIN:  Understood.  But without --

14          THE COURT:  So that -- you're saying that by -- if

15  they said about him that he had sources at the FBI saying that

16  there's information that could link Seth Rich to WikiLeaks and

17  he was absolutely sure that, for sure that there was such

18  information, and then they said in the article, and his

19  investigation has led him to believe that perhaps there's some

20  e-mail communications between Seth Rich and WikiLeaks, in

21  conjunction with the language that he added, that he strongly

22  believes that the answers to who murdered Seth Rich would be on

23  the computer, obviously clearly implying that if you got the

24  computer you would -- you could verify the e-mails.  None of

25  that would be defamatory, would it?

1          MR. WILLEMIN:  As phrased, to the extent that the

2     article contained -- if they quoted him as saying, which I

3     think is what your Honor just said, I did an investigation, I

4     talked to a source in connection with my investigation at the

5     FBI --

6          THE COURT:  Why does he have to say I talked to a

7     source?

8          MR. WILLEMIN:  Because this is where the information

9     in every other interview that he gives is coming from.  This is

10    what he makes clear.  It's not his information.

11         THE COURT:  So then why would somebody misinterpret

12    that if he's already said that -- well, he hasn't said that.

13    He said he did have a source at the FBI.

14         MR. WILLEMIN:  Correct.

15         THE COURT:  He said he had a source at the FBI.

16         MR. WILLEMIN:  He said on Fox 5 --

17         THE COURT:  So what is the reader supposed to take

18    from that?

19         MR. WILLEMIN:  That's not what's put in the article.

20         THE COURT:  No.  But that's what he said.

21         MR. WILLEMIN:  But the reader is not reading --

22         THE COURT:  So what makes it defamatory to say that

23    he -- his investigation shows a connection, shows that there

24    were communications by e-mail between the parties?

25         MR. WILLEMIN:  Because it's not true.

1          THE COURT:  So what makes that defamatory?  The

2     distinction you're drawing about whether or not he really saw

3     the e-mails or really didn't see the e-mails, that's a possible

4     interpretation from the language you say they use.  But how

5     does that make it defamatory by their saying -- if he says that

6     my investigation made me conclude that there are e-mails and I

7     think if we can get those -- his computer, and I say that the

8     authorities are not cooperating and they want me -- they want

9     to kill this investigation, how is their saying that his

10    investigation shows some e-mails, even if it wasn't true, how

11    does that make it defamatory in the context of everything that

12    he's saying about what he has, in fact, concluded?

13         MR. WILLEMIN:  Because, your Honor, this -- this is

14    getting to the issue of defamation per se and, I believe, and

15    here, although I believe you have special damages and we can

16    talk about that.

17         THE COURT:  I'm not sure I either know defamation per

18    se or defamation per quod.  What is it about that that makes

19    him into a terrible person?

20         MR. WILLEMIN:  Because the Seth Rich murder and

21    fallout from the murder was one of the most politically

22    charged -- the news spin on this were just some wild conspiracy

23    theories in every which direction.

24         THE COURT:  And you agree that his position was that

25    there were communications -- he has concluded that there were

1   communications -- his investigation has led him to conclude

2   there were communications between Seth Rich and WikiLeaks that

3   the authorities have his computer, that if we got access to the

4   computer that it would verify that, and that the authorities

5   are obstructing the further investigation that would reveal the

6   truth.

7           What is it about -- if that's his position and that's

8   not -- you think I don't want to defame him.  You think I've

9   characterized it in a way that defames him when I characterized

10  it just now?

11          MR. WILLEMIN:  Your Honor, I'm not -- defamed or not,

12  I'm not going in that direction.

13          THE COURT:  It is in that direction.  I need to know

14  because that's what he is saying.

15          So I need to know whether -- if that's not -- and I

16  think you would concede, those statements aren't defamatory,

17  they're neither untrue or defamatory.  So the question is what

18  has been laid out in the article, how does that cross the line

19  from being truthful, accurate and, even if it's not truthful

20  and accurate, not defamatory?

21          You wouldn't say that if it turns out -- maybe you

22  would -- you wouldn't say that if it turns out that they said

23  that he had information -- well maybe you would -- if they said

24  that he had information that linked Seth Rich to WikiLeaks and

25  then he came out the next day and he denied that he had such

1    information, would it be your position that that statement in

2    an article would be defamatory?

3            MR. WILLEMIN:  If he said both of those things?

4            THE COURT:  No.

5            If the article said that he had information linking

6    Seth Rich to WikiLeaks and he says I never told them that, you

7    think that that would in and of itself would be defamatory?

8            MR. WILLEMIN:  That's a little bit of a gray area.

9            THE COURT:  That's not a gray area.  That's pretty

10   much what we have here.  You have him saying that I didn't

11   say -- the only thing you have him saying is that I didn't say

12   that I had the e-mails, right?

13           MR. WILLEMIN:  That the way that the reader would

14   review that statement in the article is something different

15   than what is the truth.

16           THE COURT:  The only way you're arguing that it's

17   defamatory, that they could read it in a defamatory way, is to

18   read it that it is saying that he saw the e-mail, right?

19           MR. WILLEMIN:  Correct.  Or somehow had proof --

20           THE COURT:  Well he does say he somehow has proof.  He

21   says he has a source at the FBI.  He says it's probably on the

22   computer.

23           MR. WILLEMIN:  Your Honor and --

24           THE COURT:  There's direct evidence and there's

25   circumstantial evidence.  He's claiming that he has strong

```
1    circumstantial evidence that there were communications between

2    Seth Rich and WikiLeaks and that those communications were by

3    e-mail.

4            If that was what the article said, would you say that

5    that would be defamatory, to attribute that to him?

6            MR. WILLEMIN:  What is true --

7            THE COURT:  Well answer that question yes or no first.

8    If that's what the article said, if the article said --

9            MR. WILLEMIN:  That he had circumstantial evidence?

10           THE COURT:  If the article said that I have evidence

11   of a link between Seth Rich and -- that he says that he has

12   evidence of a link between Seth Rich and WikiLeaks and that

13   that evidence leads him to believe -- he believes that that

14   evidence is in the form of e-mails between Seth Rich and

15   WikiLeaks, and that if you got his computer that the

16   authorities have, you could verify that, you wouldn't say that

17   that statement, consistent with what his position publicly had

18   been, and I assume continues to be, you wouldn't say that that

19   statement alone would be defamatory.

20           MR. WILLEMIN:  I think, your Honor just stated that

21   the statement was that he had evidence in the form of e-mails

22   which I would say would be defamatory.  Maybe I misunderstood

23   what your Honor was saying.

24           THE COURT:  No.  I said he had evidence that led him

25   to believe that there were e-mails.
```

1          MR. WILLEMIN:  That -- if you phrase that that there

2     could potentially be, or but there might be, or but there could

3     be, which is the way that he has phrased this outside of the

4     context of this article, then I would say that that is not

5     defamatory.

6          THE COURT:  But you don't say that they say that he

7     has the e-mails.  You're saying that that's a way somebody

8     might interpret the way they said it, and that's what makes it

9     defamatory.

10          MR. WILLEMIN:  Verbatim that's not what they say, but

11     I think that that's the obvious interpretation if you're a

12     reader in an article that's all about how Fox has cracked the

13     case, how there's a federal investigation --

14          THE COURT:  It doesn't say Fox cracked the case.

15          MR. WILLEMIN:  The entire article is about breaking

16     news that these e-mails that we once thought were hacked by

17     Russia, we now have, we're issuing this article to tell the

18     world that it wasn't by Russia it was by Seth Rich.

19          THE COURT:  Well Fox News and all the other networks

20     say things that they think are true and they may not be true.

21     But the question is how are they defamatory.  And

22     particularly -- you say they're defamatory in a way that -- he

23     says that his conclusion has led him to believe that there's a

24     connection between Seth Rich and WikiLeaks, that he's gotten

25     this based on some sources at the FBI and that, consistent with

1    his experience and all the evidence that he's gathered during

2    this investigation, it leads him to believe that perhaps

3    there's some e-mail communications between Seth Rich and

4    WikiLeaks and if we had his computer he believes it would

5    verify this.  That's what he's saying, right?

6              MR. WILLEMIN:  Perhaps.  That's correct, your Honor.

7    Perhaps.

8              THE COURT:  You're saying even if he's saying all of

9    that publicly, that for them to say that he said his

10   investigation shows some degree of e-mail exchange, that in and

11   of itself in that context is a defamatory statement?

12             MR. WILLEMIN:  Yes.

13             THE COURT:  And it's defamatory in what way?

14             MR. WILLEMIN:  There is no perhaps.  There is no --

15             THE COURT:  Tell me in what bad way it's defamatory.

16             MR. WILLEMIN:  Because an average reader would read

17   this in the context of the entire article, which is breaking

18   news about how Seth Rich gave e-mails to WikiLeaks, that a

19   reader would read this and believe that Mr. Wheeler was

20   essentially boasting that he had gotten to the bottom of this,

21   that he had established that there were e-mails between Seth

22   Rich and WikiLeaks, and half the readers reading this, if not

23   more, would think that that's a preposterous position for a

24   solo investigator to take where this entire -- which is one of

25   the most politically charged conspiracy theories in the last

1    number of years.  And there are cases, your Honor --

2              THE COURT:  But isn't it clear that by the language

3    that he added that he was making it clear that he didn't have

4    the e-mails.

5              MR. WILLEMIN:  No.  I would say the opposite.

6              THE COURT:  And they put that language in at his --

7    they added that language to the statement at his insistence.

8              MR. WILLEMIN:  That if this language were the only

9    language, we wouldn't be here today, in all likelihood, your

10   Honor.  That language is the true language.

11             THE COURT:  So if I say my investigation shows some

12   degree of e-mail exchange between Seth Rich and WikiLeaks and I

13   strongly believe that the answer to who murdered him sits on

14   his computer, how is that -- any reasonable person to interpret

15   that I do have, in fact, those e-mails?

16             MR. WILLEMIN:  Because the context of the article is

17   that Mr. Wheeler is being used to confirm what an FBI person

18   has already, without being named as a source, stated that these

19   e-mails exist and that this FBI person has seen them.  And then

20   the very next thing is this is confirmed by Mr. Wheeler, who

21   says --

22             THE COURT:  Because Mr. Wheeler says his investigation

23   leads him to believe --

24             MR. WILLEMIN:  Not leads him to believe.

25             THE COURT:  -- leads him to the same conclusion.

1          MR. WILLEMIN:  No.  It does not same leads him to

2    believe or leads him to the same conclusion.  It says it shows

3    him the same thing.  It shows a degree of e-mail exchange

4    between Seth Rich and WikiLeaks.

5          And, your Honor, there are a number of cases.  This is

6    hardly a novel issue.  There are a number of cases that involve

7    situations even where someone is correctly quoted but to the

8    extent that it is in a different context, such as I would say

9    the Fox News and the Hannity articles, if you look at the

10   surrounding context is different than the context of that

11   article.  So in Franklin v. Daily Holdings, it's a First

12   Department case, the First Department held that even a

13   correctly verbatim quoted statement taken out of the correct

14   context can be defamatory.  In Masson --

15         THE COURT:  So, again, I don't know what you say

16   you're not articulating for me what the defamation is.  What

17   are they saying about him that is defamatory?

18         MR. WILLEMIN:  It's not what -- a reader would read

19   this and review the interpretation that we've laid out and

20   believe that this individual is not telling the truth, that he

21   is incompetent with regard to his job.

22         THE COURT:  I know.  But I don't know of any -- maybe

23   you've cited some cases -- and we'll take a break because I

24   need -- I'm not sure that you've cited any cases that say that

25   defamation is determined by what is the possible interpretation

1   that somebody who reads this might give.

2           MR. WILLEMIN:  Your Honor, if I may very --

3           THE COURT:  That's not what defamation makes it about.

4           First, most defamation cases are you make a statement

5   about this individual and that statement denigrates this

6   individual and that statement is untrue.  If I say you're a

7   bank robber, that's a defamatory statement about you.  If I say

8   that you're a child molester, that's a defamatory statement

9   about you.  If I say you're a prostitute, that's a defamatory

10  per se statement about you.

11          You're not arguing any of that.  You're not saying

12  that they said anything about Mr. Rich.  They don't say

13  Mr. Rich is a liar.  They don't say Mr. Rich is a bad

14  investigator.  This statement doesn't say that he is

15  fabricating evidence.  They don't say any of that -- they don't

16  say anything in these statements derogatory about Mr. Wheeler.

17          MR. WILLEMIN:  Your Honor, may I have 30 seconds

18  before the break.

19          There are two cases that I'd like to draw your Honor's

20  attention to.  One is Masson v. New Yorker Magazine.  It's a

21  Supreme Court, 501 U.S. 496.  And it's a misattribution case.

22  It's a case where someone is purported to have said that he's

23  the greatest analyst that there ever was.

24          THE COURT:  Yeah, but that's a statement about him.

25          What do you say that the defamatory statement is in

1    that case?  I'll look at it before we come back.

2            MR. WILLEMIN:  One of the defamatory statements was

3    that he boasted that he was the greatest analyst whoever lived.

4    And the Supreme Court states -- and this is analogous to our

5    circumstance because someone who is a solo investigator who has

6    cracked the Russian mystery and determined that Putin didn't

7    hack our servers and that Seth Rich did --

8            THE COURT:  They didn't say Seth Rich was the greatest

9    investigator there ever was or the worst investigator there

10   ever was.

11           MR. WILLEMIN:  Well a reader reading that would view

12   Mr. Wheeler to have that view of himself to the extent that he

13   believes that he's done this.  And what the Supreme Court says

14   is one need not determine whether a petitioner is or is not the

15   greatest analyst whoever lived in order to determine that it

16   might have injured his reputation to be reported as having said

17   he was.

18           THE COURT:  So you say that the untruth of the

19   statement is within the interpretation that somehow they're

20   saying that Mr. Wheeler has an unseen e-mail?  Is that the

21   essence of the argument on that statement?

22           MR. WILLEMIN:  Correct.

23           THE COURT:  And the second line of that statement, the

24   investigation shows someone in D.C. government, DNC, or Clinton

25   team is blocking the murder investigation and Seth Rich's

1    murder is unsolved as a result of that, isn't that totally

2    consistent with the other statements that he has been making

3    about the case, about the cooperation, about the -- about

4    they're trying to kill the investigation, about they're trying

5    to intimidate the Rich family, about them keeping the evidence,

6    the computers and the other evidence that they won't make

7    available.

8              MR. WILLEMIN:  Again, your Honor, it's context and in

9    this case --

10             THE COURT:  Right.  It is context.

11             MR. WILLEMIN:  But it is particularly egregious, the

12   second fabricated statement, because Ms. Zimmerman asked

13   Mr. Wheeler specifically for a quotation with regard to what

14   Donna Brazil was doing in connection with Mr. Wheeler's

15   investigation.  Mr. Wheeler provided Ms. Zimmerman a quotation

16   that simply stated that Ms. Brazil and other members of the DNC

17   had called up the Rich family and asked what is Wheeler doing

18   here.  That's the sum and substance of the statement.

19             THE COURT:  That's not the sum and substance of the

20   statement.

21             His statement in conjunction with that, his position,

22   his expressed public statements were that the police department

23   nor the FBI have been forthcoming.  That's the first thing he

24   said.  Then he says we were told to stand down on this case and

25   I can't share any information with you.  And then he says I do

1    believe that there is a correlation between the Mayor's Office

2    and the DNC and that's the information that's going to come out

3    tomorrow.  That's what he says on the 15th.

4          And then on the 16th he says:  I learned yesterday

5    from the family of Seth Rich the police department did not call

6    me back because someone, a high ranking official at the DNC,

7    called the Rich family wanting to know why I was snooping

8    around.  The person, they called the father after I called the

9    police to get information.  That's the person that Seth was

10   having problems with at the DNC.  So, you know, connect the

11   dots here.  It's starting to all come together.

12         So what part of this second statement do you say is

13   untruthful and is inconsistent with those statements that he

14   publicly made on his own?

15         MR. WILLEMIN:  It's a different statement.  The other

16   statements reference -- your Honor, did not reference the

17   Clinton team.  They were not --

18         THE COURT:  It does reference -- which statement

19   doesn't reference?

20         MR. WILLEMIN:  The fabricated statement does reference

21   it.

22         THE COURT:  Right.

23         MR. WILLEMIN:  I don't believe your Honor stated

24   another sentence that references the Clinton team.  If I'm

25   incorrect, I apologize.

1          THE COURT:  It says investigation shows someone in

2  D.C. government, DNC, or Clinton team is blocking the murder

3  investigation.  Seth Rich's murder is unsolved as a result of

4  that.

5          What part of that does Mr. Wheeler not believe?

6          What part of that has he not concluded from his

7  investigation?

8          MR. WILLEMIN:  What he is unable -- what he does --

9          THE COURT:  What part of that is he -- has he not

10  concluded?

11          MR. WILLEMIN:  Your Honor, I can make -- I can compare

12  only what the other statements.

13          THE COURT:  No, you can't.  You can't do that.

14  Because that's not how you prove this case.  You prove this

15  case by showing that this statement is false and defamatory.

16          So how does this -- the first question is logically

17  what part of this statement does he deny?

18          MR. WILLEMIN:  That he said it.

19          THE COURT:  No.  Not that he said it.  I'm asking you

20  about the substance of what's attributed to it.

21          I understand your argument that he says -- they said I

22  said certain things and I didn't say certain things.  But if I

23  say to you:  Well, they quoted me as saying my mother will be

24  88 years old on her next birthday.  And if I say I never told

25  them that, that's not a defamatory statement if my mother truly

1    is going to be 88 years old on her next birthday, is it?

2              MR. WILLEMIN:  If they accused you of saying that your

3    mother was going to be 95.

4              THE COURT:  That's different because that's a false

5    statement.

6              MR. WILLEMIN:  Well let's say you believe that.

7              THE COURT:  No.  That's what I'm asking you.  I'm

8    asking you exactly that point.

9              What is false about this statement?  What is false and

10   defamatory about this statement?  What part of this statement

11   does he not agree with?

12             MR. WILLEMIN:  He does not come to the conclusion that

13   these three entities as a point of fact have -- come to the

14   conclusion, factual conclusion that he can prove and establish

15   and that he would articulate in the way that's articulated that

16   that statement is true in its entirety.

17             THE COURT:  Well what do you think he's referring to

18   when he says on the 15th:  I do believe there is a

19   correlation between the Mayor's Office and the DNC and that's

20   the information that's going to come out tomorrow, what do you

21   think he's referring to when he says that information is going

22   to come out tomorrow if he is not referring to this article?

23             MR. WILLEMIN:  That Donna Brazil -- this is what I

24   started with -- is that he provided quotations to Ms. Zimmerman

25   at her request about Donna Brazil.

1      THE COURT:  So what is he referring to that's going to

2  come out tomorrow?

3      MR. WILLEMIN:  Those quotations.

4      THE COURT:  In that article.  He's talking about that

5  article, right?

6      MR. WILLEMIN:  Correct.

7      THE COURT:  So he's saying, Look, I believe there's a

8  correlation between the Mayor's Office and the DNC and that's

9  the information that's going to come out in the article they're

10  going to publish tomorrow.

11      MR. WILLEMIN:  But that's not the information that

12  came out in the article because he gave Ms. Zimmerman --

13      THE COURT:  It is the information.  They said the

14  investigation shows someone in DNC -- in D.C. government, DNC,

15  or Clinton team is blocking the murder investigation.  Seth

16  Rich's murder is unsolved as a result of that.

17      What part of that do you say he says is not true?  Is

18  not true?  What part of that statement do you say is not true?

19      MR. WILLEMIN:  He would I believe say that his

20  investigation did not establish --

21      THE COURT:  It doesn't say establish.  It says shows.

22      MR. WILLEMIN:  Your Honor, I believe --

23      THE COURT:  So you're saying that he's saying that it

24  is false that his investigation showed that someone in D.C.

25  government, the DNC, or Clinton team was blocking the murder

investigation?

Isn't that exactly what he's been consistently saying, that someone in one of those or more than one of those groups is blocking the investigation?

Isn't that what he said before the article came out and isn't that what he said after the article came out?

MR. WILLEMIN:  Your Honor, no.  What he said before the article came out to the Fox 5 reporter was that there was some -- you have the exact quote in front of you, connection between the Mayor's Office and the DNC.

THE COURT:  No.  He says the police department nor the FBI have been forthcoming.  They haven't been cooperating at all; that we were told to stand down on this case and I can't share any information with you.  I do believe there is a correlation between the Mayor's Office and the DNC and that's the information that's going to come out tomorrow.

So this is a statement he makes a day before the article comes out and you acknowledge that what he's referring to, the information that's going to come out to verify his statement is the article that's going to come out tomorrow, right?

MR. WILLEMIN:  Your Honor, the information that --

THE COURT:  What I just said is true though, right?

MR. WILLEMIN:  No.  Your Honor, with regard --

THE COURT:  Which part of that is not true that I just

said?

 MR. WILLEMIN:  The second defamatory statement is not what Mr. Wheeler was referring to in the Fox 5 article.  Not.

 THE COURT:  What --

 MR. WILLEMIN:  He was referring to a statement that he provided to Ms. Zimmerman that she did not include in the article that related to Donna Brazil.

 THE COURT:  He says there's a correlation between the Mayor's Office and the DNC and that's the information that's going to come out tomorrow.

 MR. WILLEMIN:  And the second fabricated quote says nothing about the Mayor's Office.  What occurred was --

 THE COURT:  It says D.C. government.

 MR. WILLEMIN:  Your Honor --

 THE COURT:  You don't think that includes the Mayor's Office, particularly in the context he's talking about the police department and the Mayor's Office?  That's D.C. government, right?

 MR. WILLEMIN:  Your Honor, it is my belief that when Mr. Wheeler testifies in this case he is going to testify that he provided -- and I know that he provided it because it's in the text message -- a long quotation as to what he actually believed.

 THE COURT:  I know, but you still haven't answered my question -- and I'm going to miss this meeting altogether --

1    but does he -- does he believe -- does he disagree with the

2    statement that his investigation shows that someone in the D.C.

3    government, the DNC, or the Clinton team is blocking the murder

4    investigation?  Does he disagree with that statement?

5             MR. WILLEMIN:  Yes.

6             THE COURT:  In what way does he disagree with that

7    statement?

8             MR. WILLEMIN:  Because, again, the reader would view

9    that as -- switching the word again show for establish -- I

10   understand that, but I think that the reader will view it that

11   way.

12            And what he would not be able to tell anyone here and

13   what he would never tell anyone here is that he was able to

14   establish this.  And he never would have made that statement --

15            THE COURT:  At the time, and I'm not even concerned

16   about now, but at the time when he was making these other

17   statements that are consistent with that, did he or did he not

18   believe that someone in D.C. government, the DNC, or the

19   Clinton team is blocking the murder investigation?  Is that

20   what he believed or is that not what he believed?

21            MR. WILLEMIN:  He believed it was possible --

22            THE COURT:  Wait a minute.  I didn't ask you about

23   possible.

24            Does he believe that someone in the D.C. government,

25   did he believe at the time, consistent with all the statements

1   he was making, that someone in the D.C. government, the DNC or

2   Clinton team was blocking the murder investigation?  Did he

3   believe that?

4        MR. WILLEMIN:  Your Honor, I genuinely don't know how

5   to answer that question.

6        THE COURT:  Why not?

7        MR. WILLEMIN:  Because you could --

8        THE COURT:  Because you could answer the question by

9   telling me no, he doesn't believe that and so to say that is

10  not true or you could say to me the statements that he made

11  before that or after that is either consistent or inconsistent

12  with that belief.

13       You can't tell me whether or not there is a record for

14  you to conclude that on May 15th or 16th of 2017 that

15  Mr. Wheeler didn't believe that someone in D.C. government,

16  DNC, or Clinton team was blocking the murder investigation.

17  You think he believes that if you said -- if you asked him is

18  that what's going on here, do you believe he would say yes or

19  no?

20       MR. WILLEMIN:  I believe he would say --

21       THE COURT:  Yes or no.

22       MR. WILLEMIN:  I believe he would say I think that's

23  possible.

24       THE COURT:  Yes or no.  Would he say yes or no?

25       MR. WILLEMIN:  Your Honor, there is no certainty.  So

1    if you're asking him if he is certain that this was

2    occurring --

3            THE COURT:  I didn't use the word certain.  You want

4    to put the word certain in here.

5            I just asked you whether if I asked him on one of

6    those two dates, consistent with all the public statements that

7    he's made, whether or not someone in D.C. government, DNC, or

8    Clinton team is blocking the murder investigation, would he say

9    based on his investigation that that's true or that's not true?

10           MR. WILLEMIN:  He would say that there's evidence to

11   suggest that.

12           THE COURT:  So he would not -- clearly he would not

13   say that's not true.

14           MR. WILLEMIN:  I agree with that.

15           THE COURT:  Okay.  All right.  So you want to say well

16   he would qualify that that's his belief.

17           MR. WILLEMIN:  That's what he does in every other

18   statement.

19           THE COURT:  But he would not disagree with that

20   conclusion.  Right?

21           MR. WILLEMIN:  I think your Honor is correct.  I think

22   to the extent --

23           THE COURT:  Because you want to characterize it as he

24   would say well I think that's possibly what would have

25   occurred.  That's not what he would say.  You know that's not

1    what he would say.  That's not what he said.  He never said --

2    he would say:  Yes, my investigation leads me to believe that

3    that's what's going on here.  And you know why I do believe

4    that, I will give you the information that makes me believe

5    that, because the police department hasn't been forthcoming,

6    the FBI hasn't been forthcoming.  We were told to standdown and

7    I can't share any information with you.  And I -- and the part

8    he says he believes, I do believe there is a correlation

9    between the Mayor's Office and the DNC and that's the

10   information that's going to come out tomorrow.  The information

11   that's going to come out tomorrow is not his belief.  That

12   article is not going to print what he believes.  That's not

13   what he's referencing.  He's saying the article is going to

14   present the facts that support that conclusion.

15          MR. WILLEMIN:  I agree, your Honor.

16          THE COURT:  And that's the article that you say is

17   defamatory.

18          MR. WILLEMIN:  Your Honor what the article printed

19   were facts that were not facts that Mr. Wheeler articulated to

20   them.

21          THE COURT:  Not in these two statements.  What facts

22   in this statement did they print that he didn't -- that was not

23   his position?

24          MR. WILLEMIN:  That entire statement is something that

25   he didn't say.

1          THE COURT:  But that is his position though, isn't it?

2          MR. WILLEMIN:  He would say that it may be the case,

3    and so his position --

4          THE COURT:  No.  He would say --

5          MR. WILLEMIN:  His position would be that he would

6    qualify it.

7          THE COURT:  If I asked him:  Is there someone in the

8    D.C. government or the DNC or the Clinton team that's blocking

9    the murder investigation not only would he say yes, he did say

10   yes.  Right?  He did make that statement, didn't he?

11         MR. WILLEMIN:  That he believed --

12         THE COURT:  No.  He didn't say he believed it.  He

13   said the police department nor the FBI had been forthcoming.

14   That's not an I believe.

15         MR. WILLEMIN:  I agree with that statement, your

16   Honor.  But I think there's a distinction --

17         THE COURT:  And they haven't been cooperating at all.

18         MR. WILLEMIN:  But there's a very far leap from that

19   statement to say that the Clinton team is blocking an

20   investigation.

21         THE COURT:  So the only thing you're disputing is the

22   fact that they say he said that about the Clinton team.

23         MR. WILLEMIN:  No, your Honor.  What we're

24   disputing --

25         THE COURT:  And you don't think the DNC qualifies as

1    the Clinton team?

2            MR. WILLEMIN:  Your Honor --

3            THE COURT:  You think that it could -- that it would

4    be reasonable to say the DNC was doing this but the Clinton

5    team wasn't involved in this?

6            MR. WILLEMIN:  Your Honor, I think --

7            THE COURT:  And that would be what he would have said?

8    He didn't say that.

9            MR. WILLEMIN:  Your Honor, he wouldn't have said what

10   the article quoted him as saying.  And the problem with this is

11   that there's a record here that's obviously not fully developed

12   yet but there's a record that's developed enough in the

13   complaint which is that on this exact point Ms. Zimmerman asked

14   Mr. Wheeler to provide her with a statement as to what he

15   actually leaked, how would he put it.  And he provided her a

16   long text message as to how he would put it.  And that text

17   message was not -- none of the quotes in there were included in

18   the article.  Instead, Ms. Zimmerman took maybe her

19   interpretation of what --

20           THE COURT:  So when did he send that -- when did he

21   send that text?

22           MR. WILLEMIN:  The night before, the 15th.

23           THE COURT:  On the 15th?

24           MR. WILLEMIN:  Correct.

25           THE COURT:  The same -- after he sent this text?

1          MR. WILLEMIN:  After the 4 o'clock text.

2          THE COURT:  After the four o'clock text.

3          MR. WILLEMIN:  Correct.

4          THE COURT:  And is it your position -- because -- do I

5    have that text in front of me?  No.

6          Is it your position that that text indicates that he

7    had not read the article?

8          MR. WILLEMIN:  No.  It doesn't indicate anything about

9    the article.

10          THE COURT:  No.  I'm asking you.  It's got to indicate

11    something.  It's got to give you the impression that he has

12    seen the article and knows what's in it or gives you the

13    impression he hasn't seen the article and doesn't know what's

14    in it, because you're telling me he never read the article.

15          MR. WILLEMIN:  On that day, your Honor, he received

16    information about Donna Brazil.  He then, at Ms. Zimmerman's

17    request, provided that information to Ms. Zimmerman to be put

18    into the article.

19          THE COURT:  Okay.

20          MR. WILLEMIN:  That has nothing to do --

21          THE COURT:  So why is that inconsistent with saying

22    the DNC is blocking the murder conviction.

23          He believed that, didn't he?  He concluded that the

24    DNC was attempting to block a murder investigation, didn't he?

25    He said that.

1              MR. WILLEMIN:  He believed it was possible, but

2    it's --

3              THE COURT:  No.  He didn't say -- he didn't say I

4    believe it's possible that the DNC is blocking the

5    investigation.

6              MR. WILLEMIN:  He didn't say --

7              THE COURT:  He never said it.

8              MR. WILLEMIN:  He didn't say anything in that regard.

9    He said that the police department was not being forthcoming.

10   He provided a statement to Ms. Zimmerman about what he

11   actually --

12             THE COURT:  So what does it mean that that the police

13   department is not being forthcoming?  That means they're

14   blocking the investigation, doesn't it?

15             MR. WILLEMIN:  Your Honor, that would be tremendous

16   speculation to try to figure out what that means.

17             THE COURT:  Doesn't have to speculate.  That's your

18   client.  He said it.  Don't have to speculate.  You tell me

19   what he meant by it.  You tell me that he meant something

20   different and how that's different from what's in the

21   statement.

22             If the statement says his investigation shows someone

23   in the DNC is blocking the murder investigation and he's making

24   similar comments, what -- it's not speculation to try to figure

25   out whether that's a true or not true statement.  It can't be a

1    not true statement if he says, yeah, that's exactly what I

2    believe, that's exactly what I said, and there's nothing that's

3    untrue about that statement.

4              Even to this day he's not saying that's an untrue

5    statement, is he?

6              He's not saying that it's untrue that the D.C. -- that

7    someone in the D.C. government or the DNC or the Clinton team

8    was blocking the murder investigation.  He does not say that

9    that's not true.

10             MR. WILLEMIN:  He can't say it didn't happen.

11             THE COURT:  So how is he saying it's false if he can't

12   say it didn't happen?

13             MR. WILLEMIN:  Because he can't establish that it did

14   and this article is saying that he established that it did.

15             THE COURT:  No.  It doesn't say that.  It says the

16   investigation shows.

17             MR. WILLEMIN:  Your Honor, again, I would respectfully

18   insist that an average reader of this article could certainly

19   and would likely interpret that as him stating that he's

20   established something.

21             THE COURT:  No.  Because then he wouldn't make the

22   qualifying statement that it's probably on the computer that

23   Seth Rich's murder is unsolved as a result of they're

24   noncooperation.  He has established that they were blocking the

25   investigation.  He said the police department nor the FBI had

1    been forthcoming and they haven't been cooperating at all.

2          You think that that is a different statement than that

3    they're blocking the investigation?

4          MR. WILLEMIN:  That the police department is not being

5    forthcoming.

6          THE COURT:  The police department nor the FBI have

7    been forthcoming.  They haven't been cooperating at all.

8          MR. WILLEMIN:  That is a completely different

9    statement.

10         THE COURT:  Again, he says I believe that the answer

11   to solving his death lies on that computer which I believe is

12   either at the police department or either at the FBI.  I've

13   been told both.  Okay.

14         So it's not as if I believe.  He specifically said he

15   was told that.

16         MR. WILLEMIN:  Understood.

17         THE COURT:  Not he just came to that conclusion.  Even

18   if that was -- even if he just came to that conclusion based on

19   the investigation he did that would be -- that -- you would

20   still have a hurdle.  But he says that's what I was told.  And

21   he's clearly referencing that that's what I was told because I

22   was hired to do an investigation.  I did an investigation.

23   During this investigation this is what I was told.

24         You think that saying that he was told that is somehow

25   different than saying that the investigation shows that?

1            MR. WILLEMIN:  They are actually substantively

2    different things altogether.  He's saying that he was told that

3    a computer was in a police station somewhere.  He's not -- he's

4    not even saying in this article anywhere, which is the whole

5    point, that he was told by a source that these e-mails existed

6    somewhere.  He's saying that he was told --

7            THE COURT:  This isn't a reference to the e-mails.

8            MR. WILLEMIN:  Exactly.

9            THE COURT:  No.  The second comment that you say is

10   defamatory is not a reference to the e-mails.

11           MR. WILLEMIN:  I understand that but the fact that he

12   was told --

13           THE COURT:  So I'm trying to understand in what way

14   you say that that is a false and defamatory statement if that

15   statement is consistent with all the other statements he's been

16   publicly making, and the only distinction you're drawing is

17   that you want to argue that by using the language, the

18   investigation shows, that that's going to be reasonably

19   interpreted as if to say he has in his possession the direct

20   evidence, even though throughout all of his comments he says he

21   doesn't have the direct evidence and nothing in the article

22   says that he has the direct evidence.

23           MR. WILLEMIN:  Your Honor, in all of the comments he's

24   made outside of the article you are correct, that he makes

25   clear that he does not have the direct evidence and that is the

1    point.

2             THE COURT:  So how does that make this false?  And how

3    does that make this defaming him by saying that his

4    investigation shows that someone in the D.C. government, the

5    DNC or the Clinton team was blocking the murder investigation?

6             He clearly believes that, doesn't he?

7             MR. WILLEMIN:  It insinuates -- the reason it's false

8    is because it insinuates that he does have the evidence to

9    establish that.

10            THE COURT:  Where does it insinuate that?

11            MR. WILLEMIN:  The word show is different than the

12   word I was told.  That is the same in this courtroom.  If

13   someone were to set up on the stand and start talking about

14   what they were told by someone else we would say -- forget

15   about the legal point of it, of course, is hearsay -- we would

16   say that's not really that reliable.

17            THE COURT:  But I would say that about somebody saying

18   his investigation shows that.  Because I still don't know what

19   that means.  I don't know what that means in terms of -- I

20   can't say that that means he got somebody who confessed to it

21   or that he just, as they say, in his other statement he just

22   connected the dots.

23            Why are you saying that the investigation shows is

24   somehow inconsistent with the statement that he's connected the

25   dots?

1              MR. WILLEMIN:  Because that statement -- we're

2       cherry --

3              THE COURT:  No.  You're cherrypicking.  That's the

4       point.  I'm not cherrypicking I'm saying what part of it is

5       false.

6              And you're not saying to me that there's any direct

7       statement that's attributed to him that is actually false.  You

8       say that the way it is worded, that someone might interpret it

9       as he has more information and he has a stronger -- he has

10      stronger evidence of this than he actually has.

11             That's all you're saying.  You don't say anything here

12      is actually false.  You don't say anything here actually

13      accuses him of fabricating evidence, or accuses him of doing a

14      sloppy job, or accuses him of saying things that weren't true.

15      You're not saying any of that.

16             You're just saying well by their using the phrase the

17      investigation shows that could possibly be interpreted by

18      somebody to mean that he has proven -- well, I mean -- you've

19      got to tell me which defamation case you cite for that

20      proposition.  Because I don't know any defamation case that

21      stands for that proposition that the way we're supposed to

22      determine defamation is to determine what possibly somebody

23      might interpret the words to mean if the words could be

24      interpreted reasonably and fairly to mean no more than what it

25      says.

1              MR. WILLEMIN:  Your Honor, I would -- a couple of

2     points.  Your Honor, I would contend that the word show is

3     not -- you don't have to transform that word into a new

4     meaning.  It is a synonym for demonstrate, for establish, for

5     these words that I'm talking about.  It is the only reasonable

6     interpretation of this article if you're a reader.

7              THE COURT:  No.  That's not a synonym for that.  It's

8     not a synonym for that.

9              If I say my experience in life shows that, how do you

10    interpret that to mean that I have hard evidence that I'm going

11    to tick off that, that that's what I mean?

12             If I say I've done -- if I say that I've done an

13    investigation of you and my investigation shows that you're a

14    highly intelligent, competent lawyer, what else can you read

15    into that?  You're supposed to read into that that I gave you

16    an IQ test?  You can't -- that's not an argument I've ever

17    heard made.

18             MR. WILLEMIN:  Your Honor, in this case it is a very

19    specific -- the entire article in this case, the proposition

20    that the article stands for is that it is now established --

21    the article --

22             THE COURT:  Where does it say that?  It doesn't say

23    it's established.  It says that they have a federal

24    investigator who has found this evidence and to the extent that

25    it has been corroborated Mr. Wheeler's investigation

1  corroborates that evidence.  What else does it say other than

2  that?

3          MR. WILLEMIN:  The fact that Mr. Wheeler can

4  corroborate that evidence or the fact that his -- that is the

5  defamatory statement.

6          THE COURT:  Mr. Wheeler's investigation does support

7  that evidence, doesn't it?

8          And if he was asked under oath at the time does your

9  investigation support that evidence he would say yes, wouldn't

10 he?

11         MR. WILLEMIN:  He would not say shows.

12         THE COURT:  He would not say no.

13         MR. WILLEMIN:  He would not say it shows that there

14 was some degree of e-mail exchange.

15         THE COURT:  So your critical point is I have to

16 interpret shows to mean that that means he has what?

17         MR. WILLEMIN:  That this is something that he's been

18 able to establish, which he never would have said, which was

19 never established.

20         THE COURT:  What do you mean by established?  What do

21 you mean by he was able to establish?

22         MR. WILLEMIN:  That this is not something unlike what

23 he said on Fox 5 and unlike what he said on Hannity that he

24 learned some information from a source after which point --

25         THE COURT:  Has he -- I'm sorry.  Go ahead.

1          MR. WILLEMIN:  -- after which point he believed that

2     there potentially could be some communications between Seth

3     Rich and WikiLeaks.

4          THE COURT:  Has he been able to establish that the

5     police department nor the FBI has been forthcoming?  Or that

6     they haven't been cooperating at all?  Has he established that?

7          MR. WILLEMIN:  As a matter of personal knowledge, yes.

8          THE COURT:  Okay.  So how has he established that?

9          MR. WILLEMIN:  Because he has communications with the

10    police department.  He is literally --

11         THE COURT:  So how did he establish that they weren't

12    forthcoming?

13         You're going to say that he established that in a way

14    that's different than what he's referencing -- they're

15    referencing when they say his investigation shows.

16         MR. WILLEMIN:  Yes.  Because in his personal

17    observations and experience in communicating with the detective

18    in charge of trying to resolve this case he, through his own

19    determinations, based on his own work, is able to establish

20    that he was not being given all the information that they had.

21         Now if --

22         THE COURT:  How has he been able to establish that?

23    He doesn't give any -- he doesn't state any evidence that would

24    support that claim.  He doesn't say well I asked them for a

25    report and they told me the report didn't exist.  And then I

1      found the report some place else.

2            He doesn't make any further statement about those

3      allegations that are different than the statements that are

4      made attributed to him in the --

5            MR. WILLEMIN:  But those statements are true.

6            THE COURT:  Wouldn't it be a fair statement to say

7      that his investigation showed that the police department nor

8      the FBI had been forthcoming and that they haven't been

9      cooperative?  Wouldn't that be a fair statement?

10           MR. WILLEMIN:  Yeah.  He's not suing for defamation on

11     that.  He made that statement.

12           THE COURT:  So if that's a fair statement, why isn't

13     it a fair statement that the investigation shows that someone

14     in the DC government and the DNC or the Clinton team was

15     blocking the murder investigation?

16           MR. WILLEMIN:  Because his investigation didn't show

17     that.

18           THE COURT:  So on what basis is he saying that, if his

19     investigation didn't show it?

20           MR. WILLEMIN:  There are various different pieces of

21     information that he learned that led him to -- from other

22     outside, third sources, and some of his own, that led him to

23     believe that it's possible that there was some outside force

24     trying to stifle the investigation.

25           THE COURT:  And it's a mischaracterization of that to

1      say that his investigation shows that?

2              MR. WILLEMIN:  That is correct, your Honor.

3              THE COURT:  Well his investigation didn't show

4      something different.

5              MR. WILLEMIN:  But he's not saying his

6      investigation --

7              THE COURT:  Of course his investigation showed that.

8      How could he conclude that reasonably if he's not basing that

9      on what he learned during the investigation?

10             MR. WILLEMIN:  It's a degree of -- again, these are

11     terms that I think we raise in the court, degrees of personal

12     knowledge versus information from third parties --

13             THE COURT:  But this doesn't say anything about his

14     degree of personal knowledge.

15             MR. WILLEMIN:  Exactly.

16             THE COURT:  Wait a minute.  Then it can't be a

17     defamatory statement.

18             MR. WILLEMIN:  But the whole problem is that in the

19     context that this statement was made, and which he never made

20     it, and beyond the fact that he never made it, to the extent

21     that he even believed it or could potentially have believed it

22     he would never have articulated it in the way that it was

23     articulated in this article.

24             THE COURT:  Because somehow that defames him?

25             MR. WILLEMIN:  Because he would never have said it.

1          THE COURT:  Because somehow that defames him?  It

2     doesn't matter whether he would have not said it.  The question

3     here whether or not saying it that way defames him.

4          MR. WILLEMIN:  Absolutely.

5          THE COURT:  In what way does saying that the

6     investigation shows this, even if you could say a reasonable

7     person might interpret that different ways, how does that

8     defame him?

9          MR. WILLEMIN:  Because the average reader in this

10    context, in this particular conspiracy theory, in this

11    particular high profile murder that has been investigated up

12    and down, left and right, for a solo person to come out and say

13    that not only has he established --

14         THE COURT:  He didn't say he established it.  No one

15    said he said he established it.

16         MR. WILLEMIN:  Not only does what he learned show --

17         THE COURT:  He said his investigation shows that.

18         So you think that it is a false statement to say his

19    investigation shows this?

20         MR. WILLEMIN:  Correct.

21         THE COURT:  So what -- on what basis does he think

22    that he could conclude this other than that his investigation

23    shows it?

24         MR. WILLEMIN:  The evidence that he would point to, to

25    what helps form his belief.  Not something that he can

1   establish or show, but his belief.

2        THE COURT:  Would come from the investigation.  So

3   you're not arguing about whether or not the reference that it's

4   as a result of his investigation it is false or defamatory.

5   You don't claim that that part of it is false or defamatory.

6        You seem to solely hang your hat on and that I have to

7   agree with for this case to go forward is that the fact that

8   they use the word shows behind investigation that that makes

9   the statements false and defames him?

10       MR. WILLEMIN:  That is one of the ways in which this

11   case moves forward.

12       THE COURT:  What's the other way?

13       MR. WILLEMIN:  The other and, your Honor, I mentioned

14   this case before, is a First Department case Franklin v. Daily

15   Holdings, Inc.  And also the Supreme Court case in Masson v.

16   New Yorker Magazine, that even to the extent -- and this is

17   from Masson.  Let me start with this one.

18       Even to the extent that the misquotation constitutes a

19   rational interpretation of something that the person actually

20   said, so someone says something, someone else rationally

21   interprets it in a way that's not exactly what's said and puts

22   quotes around it, that is still defamatory.  That can still be

23   actionable.  That's the Supreme Court.

24       THE COURT:  So you think wording it that the

25   investigation shows that a rational reader, reading that in

1   this article, in the context of the information that he added

2   and in the context of all of the information that's cited, that

3   that is going to make the reader believe that he did what?

4           MR. WILLEMIN:  The reader reading just the article --

5           THE COURT:  Right.

6           MR. WILLEMIN:  -- will believe that Mr. Wheeler has

7   determined as a matter of fact, he's proven, he's been able to

8   establish that Seth Rich had some degree of communications with

9   WikiLeaks.  That's what the average reader is going to think.

10  Because it's not, unlike his other statements, qualified.

11          THE COURT:  But he does say that.  He does say that.

12  He doesn't qualify that.  He says that his -- it's his

13  conclusion, opinion, determination, based on his investigation

14  that there is a connection between Seth Rich and WikiLeaks.  He

15  says that absolutely.

16          Doesn't he?

17          MR. WILLEMIN:  No, your Honor.  He says, and I cite

18  back to Hannity, he says -- he uses words like potentially --

19          THE COURT:  No.  Citing back to Fox, he says for sure,

20  absolutely.

21          MR. WILLEMIN:  Based on a source.

22          THE COURT:  It doesn't matter what it's based on.  He

23  says that that is for sure, absolute.  What is one supposed to

24  take from that?  Isn't that a stronger statement than my

25  investigation shows?

1          MR. WILLEMIN:  Your Honor, he's not saying --

2          THE COURT:  If I say absolutely, for sure, that

3    there's -- that there's information that could link Seth Rich

4    to WikiLeaks, absolutely for sure.  You don't think that that's

5    a stronger statement than my investigation shows some degree of

6    e-mails or a stronger statement than that my investigation

7    shows someone in D.C. is blocking the murder investigation.

8          MR. WILLEMIN:  It isn't and here's why.  In the Fox 5

9    statement he's not saying that absolutely for sure Seth Rich

10   sent e-mails to WikiLeaks.

11         THE COURT:  No.  He says absolutely for sure there's

12   information that could link Seth Rich to WikiLeaks.  That's

13   what he's says.

14         MR. WILLEMIN:  A source has information.  He's

15   confirming that there's a source.  He's confirming that there's

16   a source and that the source --

17         THE COURT:  Well that's exactly the kind of

18   information you say is missing out of the article.

19         MR. WILLEMIN:  Exactly.

20         THE COURT:  So behind the article what he claims is

21   that he has a source at the FBI that's giving him this

22   information.  That's not their misstatement.  If that's a

23   misstatement, that's his misstatement.

24         MR. WILLEMIN:  We're not suing over this statement.

25         THE COURT:  I know you're not.  But you're claiming

1   that somebody is going to interpret it that way.  Even if

2   someone were to interpret it that way, that's exactly what he

3   said.

4           Right?

5           MR. WILLEMIN:  No, your Honor --

6           THE COURT:  He says he has a source at the FBI that's

7   saying that there's information that could link Seth Rich to

8   WikiLeaks.

9           Now you would say, if they publish that in this

10  article, you wouldn't say that would be defamatory, would you?

11          MR. WILLEMIN:  Correct.

12          THE COURT:  Okay.  So why is that -- why is that not a

13  more definitive statement that he actually has verified this by

14  speaking to somebody -- by speaking to a source at the FBI

15  rather than a more general statement that his information shows

16  this.

17          MR. WILLEMIN:  Because in the article it's not one

18  step removed.  It is less verified when you're talking about

19  what a source told you than when you're asserting that your

20  investigation showed something.

21          THE COURT:  Why?

22          You don't think that if I have a source at the FBI

23  that's saying there's information that could link Seth Rich to

24  WikiLeaks, you think it would be a mischaracterization to say

25  that my investigation shows.

1           MR. WILLEMIN:  I would agree with that.

2           THE COURT:  You would agree with that, that that's a

3  mischaracterization to show my investigation shows that, that

4  there's a connection between the two when I am, in fact,

5  otherwise saying that I have a source at the FBI that's saying

6  that there's information that could link Seth Rich to

7  WikiLeaks?

8           MR. WILLEMIN:  If those two things were put

9  together --

10          THE COURT:  But those two things are put together.

11  One of them you say in the article and the other you say he's

12  saying publicly, he's making that affirmative statement.

13          MR. WILLEMIN:  But he didn't make the statement --

14          THE COURT:  So you can't say -- in what way -- if he

15  says that he has a source at the FBI saying that there's

16  information that could link Seth Rich to WikiLeaks, in what way

17  is saying that the investigation shows that there's a

18  connection, in what way is that false if I'm otherwise saying I

19  got a source at the FBI who says that there's information that

20  could link it to.  How is the phrase my investigation shows

21  false in light of that statement?

22          MR. WILLEMIN:  The article stands on its own.

23          THE COURT:  No.  It doesn't stand on its own.  It

24  doesn't stand on its own at all.  Because you're saying -- if

25  it stands on its own, then I have to just read the words of it

1   and say is that false or is that defamatory.  That's not what

2   you want me to do.

3       You want me to say that somebody else is going to

4   interpret it a different way in a context.  And so you're not

5   saying it stands on its own.  If it stands on its own, you

6   lose.

7       You could only allege a claim if it doesn't stand on

8   its own, if somebody who is either knowledgeable or not

9   knowledgeable about this circumstance and has some interest in

10  this issue might interpret it the way you say it might be

11  interpreted.  That's not the words standing on its own.  I mean

12  the words standing on its own would be them accusing him of

13  something that he didn't do.  It doesn't stand on its own.

14          MR. WILLEMIN:  The context --

15          THE COURT:  Right.  The context means it's not

16  standing on its own.  Because you say you've got to put it in a

17  context that you say would make somebody think that he has more

18  evidence than he really does in order for this to be a false

19  and defamatory statement.  So that doesn't mean it stands on

20  its own.

21          MR. WILLEMIN:  The article is the context.  The

22  entirety of the article.  Not his Fox 5 the next day.  Not his

23  Hannity the next day.

24          THE COURT:  So is there any place in this article that

25  it attributes more information to him or more proof to him than

1   is laid out in his public statements or laid out in the rest of

2   the article?

3        MR. WILLEMIN:  The phrasing of the fabricated

4   quotation insinuates more information than what is in his other

5   public statements.

6        THE COURT:  And what is the false information that it

7   insinuates factually?

8        MR. WILLEMIN:  The word, again, it really comes down

9   to the word shows.

10       THE COURT:  Yeah, I agree.  I circled that now because

11  that's the only thing that you're telling me that makes this

12  false.  If he used a different word, if he says my

13  investigation leads me to believe, or my investigation could

14  indicate, or my investigation supports the conclusion, you

15  would say that those aren't false and defamatory statements.

16  You say it's only a false and defamatory statement because the

17  word shows, you say in the context could reasonably be

18  interpreted as attributing information to him that he does not,

19  in fact, have.

20       What information are you saying that one could

21  interpret that is attributing to him that he does not, in fact,

22  have?

23       MR. WILLEMIN:  That he actually has an opportunity to

24  establish through his own observations --

25       THE COURT:  Well what observations?  What observation

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    would that be?

2         MR. WILLEMIN:  Whether it would be reviewing records

3    in terms of communications records, e-mails.

4         THE COURT:  So give me a specific example of what you

5    say that a reasonable reader might interpret this to mean that

6    would be false.

7         MR. WILLEMIN:  That he had actually seen e-mails

8    between Seth Rich and WikiLeaks.

9         THE COURT:  So you say that -- what you say is

10   defamatory is that they are saying in one or these combined

11   statements?

12        So you say -- what is it that you're saying

13   specifically, what evidence that you're saying specifically

14   that a reasonable reader in this context might assume, what

15   fact might they assume based on the way this is worded.

16        MR. WILLEMIN:  That Mr. Wheeler is claiming, in

17   completely ridiculous fashion, that he has solved the mystery

18   and seen the e-mails and determined that there is e-mail

19   communications between Seth Rich and WikiLeaks.

20        THE COURT:  So the only thing you've said is that a

21   reasonable reader from this statement would conclude that he's

22   saying that he's seen the e-mails, right?  Anything else?

23        Other than you're saying that I have to determine that

24   this is false and defamatory because this wording would lead

25   the reasonable reader to conclude that he has, in fact, seen

139 of 218

1    the e-mails.  Anything else?

2              MR. WILLEMIN:  That is the primary issue.

3              THE COURT:  Okay.  Is there any -- clearly there is no

4    place that he says or they say that he's seen the e-mails,

5    right?

6              MR. WILLEMIN:  Not verbatim.

7              THE COURT:  Not at all.  Right.  Nobody says he's seen

8    the e-mail, right?

9         As a matter of fact what the article reasonably

10   indicates and what his adding to the article reasonably

11   indicates is that he hasn't seen the articles.  He hasn't seen

12   the e-mails, right?

13        Because he specifically added to the article to say

14   that he doesn't have the computer and if he saw the computer he

15   believes that those answers would be on the computer.  So how

16   could anybody interpret that article to mean that he has seen

17   the e-mails?  Wouldn't in the context of this article if it was

18   supposed to have the meaning that you want it to have, wouldn't

19   it be real easy for the article to say that he said he saw the

20   e-mails?

21        What language -- is there any other language or

22   comment in this article that could reasonably be interpreted

23   that he saw the e-mails?

24             MR. WILLEMIN:  Your Honor, yes.

25             THE COURT:  Okay.  Tell me what it is.

1          MR. WILLEMIN:  It is in that this statement --

2          THE COURT:  Tell me other than this statement, what

3    else in the article can be interpreted to mean that he, in

4    fact, saw the e-mails.

5          MR. WILLEMIN:  It follows the description of what an

6    unnamed FBI --

7          THE COURT:  Tell me.  Show me the language.  Show me

8    what language you're saying could be reasonably interpreted

9    that he saw the e-mails.  Because you have to acknowledge that

10   they don't say he saw the e-mails.

11         MR. WILLEMIN:  I agree --

12         THE COURT:  And he adds information that would lead to

13   the opposite conclusion that they put in there, not would

14   further that conclusion that he actually personally saw the

15   e-mails.

16         What part of this, other than those two lines that

17   you're relying upon, what other part of this is a statement or

18   can be interpreted that he, in fact, saw the e-mails?

19         MR. WILLEMIN:  So the first paragraph and the second

20   paragraph of the article describe the findings of this FBI --

21   unnamed FBI source.

22         THE COURT:  So where does it say that Mr. Wheeler saw

23   the e-mails?

24         MR. WILLEMIN:  Your Honor, if I may this is the

25   connection that makes that point.

```
 1              THE COURT:  Okay.  But I want to make sure -- those
 2    are two different questions.  I assume the answer to my
 3    question, first question, there is no where in this article
 4    that says that he saw the e-mails, right?  Nowhere in the
 5    article --
 6              MR. WILLEMIN:  The words do not appear in the article.
 7              THE COURT:  So what is the language in this article
 8    that would lead one to believe that he, in fact, saw the
 9    e-mail?
10              MR. WILLEMIN:  So the paragraph that you're looking
11    at, I'm using the exhibit.
12              THE COURT:  I'm going to underline it as you give it
13    to me.
14              MR. WILLEMIN:  This is two -- it has to be read in
15    context, I apologize, your Honor, but --
16              THE COURT:  You've got to tell me what the context is.
17    I know what the context is.  The context is the rest of the
18    article.
19              So tell me what line, given the entire article, that
20    would lead one to believe that the author of this article is
21    saying -- wants the reader to believe that he saw the e-mail.
22              MR. WILLEMIN:  Is your Honor on the page with the
23    photograph of Mr. Rich and the American flag?
24              THE COURT:  Which exhibit are you looking at?
25              MR. WILLEMIN:  It's the actual article.
```

```
1              THE COURT:  I have it.  Which page?

2              MR. WILLEMIN:  It's the second page of the document.

3              THE COURT:  With the flag.  Yes.

4              MR. WILLEMIN:  So the top of that page, this is now

5    quoting an unnamed FBI source, this is the transition that's

6    important for the context.

7              THE COURT:  Go ahead.

8              MR. WILLEMIN:  I have seen and read the e-mails

9    between Seth Rich and WikiLeaks.

10             THE COURT:  Right.

11             MR. WILLEMIN:  The next --

12             THE COURT:  The federal investigator told Fox News.

13             MR. WILLEMIN:  Understood.

14             THE COURT:  So let's start right there.  Now whether

15   or not that's true or false, or whether or not that defames the

16   federal investigator is a different issue.  But clearly they've

17   said that the federal investigator says he saw the e-mails,

18   okay.  So, one would naturally reasonably interpret -- one

19   would naturally reasonably believe that if they were trying to

20   say that Mr. Wheeler saw the e-mails they could say exactly the

21   same thing about Mr. Wheeler.  They do not say that about

22   Mr. Wheeler.  They say that the federal investigator said he's

23   seen and read the e-mails between Seth Rich and WikiLeaks.

24   Okay.

25             MR. WILLEMIN:  And now what --
```

1          THE COURT:  So where does it say that he --

2          MR. WILLEMIN:  Your Honor, there is no --

3          THE COURT:  Well give me something you're relying on.

4          MR. WILLEMIN:  What I'm relying on, in addition to the

5     statement itself, is that the next paragraph, where it says

6     that this revelation, which is that this FBI guy saw these

7     e-mails, is consistent with the findings of Rod Wheeler, a

8     former D.C. homicide detective.

9          THE COURT:  Is that true or false?  Is that consistent

10    or inconsistent with his findings?

11         MR. WILLEMIN:  Inconsistent.

12         THE COURT:  How is that inconsistent with his

13    findings?

14         MR. WILLEMIN:  Because these revelation that e-mails

15    were seen and read are not consistent with what Mr. Wheeler --

16         THE COURT:  No, no, no, no, no, no.  Wait a minute.

17    He says -- it doesn't say he corroborated it.  It says it's

18    consistent with it.  It's either consistent with, when you read

19    Wheeler's -- when you read what Wheeler says he found, either

20    that's going to be consistent with what the investigator said

21    he saw or that's going to contradict what the investigator says

22    he saw.  It's going to be inconsistent with that.

23         How is that a statement, when he says that what the

24    investigator saw is consistent with that, you're saying that

25    that's a statement to be interpreted that he also saw the

1    e-mails?

2          MR. WILLEMIN:  These statements don't stand alone.  So

3    in connection with the first statement about what the FBI

4    investigator did, the second statement that Wheeler's findings

5    were consistent --

6          THE COURT:  So what findings is that referring to?

7    It's not referring to any finding that he has seen the e-mails.

8          MR. WILLEMIN:  It is referring to this false statement

9    that his investigation showed that there was some degree of

10   e-mail exchange between Seth Rich and WikiLeaks.  And any

11   individual, respectfully, in my view, that reads this, would

12   come away, at least many individuals would come away with the

13   conclusion that Mr. Wheeler was able also to confirm through

14   his own separate investigation that he could establish that

15   there were e-mails exchanged between Seth Rich and WikiLeaks.

16         THE COURT:  All right.  I don't want to beat a dead

17   horse.  I just want to make sure I understand fully your

18   argument.

19         But that's not what that paragraph says.  You say you

20   want to take it in context.  It says that my investigation up

21   to this point shows there was some degree of e-mail exchange

22   between Seth Rich and WikiLeaks, Wheeler said.  I do believe

23   that the answers to who murdered Seth Rich sits on his computer

24   on a shelf at the D.C. police or FBI headquarters.

25         So you're saying that -- and then it says the federal

1    investigator who requested anonymity said 44,053 e-mails and

2    17,761 attachments between Democratic National Committee

3    leaders spanning from January 2015 through late May 2016 were

4    transferred from Rich to McFadden before May 21.

5           Okay.  And then when we get back to Wheeler, it says

6    Wheeler believes powerful forces are preventing the case from a

7    thorough investigation.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  You don't claim that that is either false

2    or defamatory.  You don't claim that that statement is part of

3    your falsity or part of the statement is defamatory, right?

4              MR. WILLEMIN:  Your Honor, the quotation is

5    defamatory.

6              THE COURT:  Right.  You are not answering my question.

7    You do not claim that any portion of the statement that they

8    say Wheeler believes powerful forces are preventing the case

9    from a thorough investigation, you don't believe any portion of

10   that sentence is untrue or defamatory?

11             MR. WILLEMIN:  We are not asserting defamation in

12   connection with that sentence.

13             THE COURT:  What is the difference between saying

14   Wheeler believes powerful forces are preventing the case from a

15   thorough investigation and saying my investigation shows

16   someone within the D.C. government, Democratic National

17   Committee, or Clinton team is blocking the murder investigation

18   from going forward Wheeler told Fox News, that is unfortunate

19   Seth Rich's murder is unsolved as a result of that.?

20             I'm not sure I understand the distinction you draw

21   between Wheeler affirmatively acknowledging that he believes

22   powerful forces are preventing case from a thorough

23   investigation and that that belief is based on his statement

24   that his investigation showed that someone within the D.C.

25   government, the DNC, or the Clinton team is blocking the murder

1   investigation.

2           MR. WILLEMIN:  Because it isn't based on that

3   statement and he didn't make that statement.

4           THE COURT:  How is that?  It comes right after the

5   statement that he believes powerful forces are preventing the

6   case from thorough investigation.

7           MR. WILLEMIN:  He did not make that statement.  The

8   statement that he made was the one that he sent --

9           THE COURT:  I know.  How is that statement false?  You

10  keep saying he did not make that statement.  You cannot base a

11  defamation claim on the fact that I say you said something and

12  you say you didn't say it.  You would have to acknowledge that

13  that is insufficient for a defamation claim.  What you need is

14  that the falsity has to be the falsity of the statement that I

15  am either making about you or the falsity of the statement that

16  I am attributing to you.

17          You don't claim that they are making a false statement

18  about him.  You claim that they are making a false statement

19  because they are saying he said something, just like the

20  example I gave you, my mother's example.  That's what you are

21  arguing.  You're saying it doesn't matter whether or not what

22  they are attributing to me is true or not, what matters is

23  whether or not I said it, and that's not true.  That's not a

24  defamation claim.

25          if I say you say that you came into court today with

1    two colleagues and you say I never said that, that's not a

2    defamation claim if in fact you came in the court with two

3    colleagues, right?

4         MR. WILLEMIN:  Your Honor, I would disagree,

5    respectfully.

6         THE COURT:  You would disagree with that?

7         MR. WILLEMIN:  First of all, this is a First

8    Department case, Franklin v. Daily Holdings, where there is a

9    holding that even in circumstances where there is an accurate

10   verbatim quotation of someone that someone actually said --

11        THE COURT:  That's not what we are dealing with.

12   You're not saying this is an accurate verbatim quotation.

13        MR. WILLEMIN:  I understand.

14        THE COURT:  You're saying that that case stands for

15   the proposition that even if it's an accurate verbatim

16   statement, the fact that they attributed it to him and he made

17   the statement but he didn't give it to them, that would get you

18   past first base on defamation.  That's what that case stands

19   for?

20        MR. WILLEMIN:  It stands for the proposition that if a

21   statement is used in a context that is different than the

22   statement that was actually made --

23        THE COURT:  That is the falsity of the statement.

24   That is not the falsity of the attribution, right?  You're not

25   relying on what you claim is a false attribution.  You're

1   relying on what you say is the false statement that is being

2   attributed to him.

3           MR. WILLEMIN:  It's both.  It's falsely attributed to

4   him.  This is an analogy --

5           THE COURT:  I don't know of any case in the cases you

6   are citing to me, unless you want to quote language to me,

7   which stands for the proposition that even if the content of

8   the statement is true, you could establish the falsity of the

9   statement in order to go to the defamatory nature by simply

10  saying no, I didn't say it even though I know it's true.

11          MR. WILLEMIN:  Your Honor --

12          THE COURT:  You're not arguing that are you?  Or are

13  you?  I want to understand.  If you are arguing that, that

14  makes it easier for my analysis because I will look for a case

15  that says that.  But I'm not aware of any case that says that.

16          And I don't know that you could reasonably make the

17  argument that I could say that I'm relying on the falsity of

18  the statement that you are attributing to me because even

19  though I believe the statement is true that you said I said it

20  to you and I never said it to you, you think that that could be

21  the basis for establishing falsity under a defamation claim?

22          MR. WILLEMIN:  In certain circumstances, yes.

23          THE COURT:  In what circumstances?  I don't know of

24  any circumstances that is true if the underlying statement that

25  you attribute to me is true and I believe it to be true.

1          MR. WILLEMIN:  To the extent that I have a closely

2     held belief that I haven't expressed to anyone and would have

3     put out there in the world and would have put it in certain

4     contexts or out there on Fox News and you take that statement

5     and you accurately -- when you put in there you accurately

6     believe but you surround it in a context and you don't include

7     all the qualifiers and the maybes and this and the sources and

8     everything else.

9          THE COURT:  Let me ask you a very simple question.  I

10    am not asking you for that complicated scenario.  If Mr.

11    Wheeler says I believe that the investigation shows some degree

12    of email exchanges between Seth Rich and WikiLeaks and I've

13    done an investigation and that investigation leads me to

14    believe that, do you think that he could sue for defamation

15    simply on the basis that Zimmerman said I said it to her but I

16    never said it to her?  Yes or no.  The answer is no.  It is not

17    a trick question.  You know the answer is no, right?

18         MR. WILLEMIN:  I would say no.  That is not our theory

19    in this case.

20         THE COURT:  Right.  If you had him in a deposition now

21    and you said is it true that your investigation shows some

22    degree of email exchange between Seth Rich and WikiLeaks and he

23    says yes, and you asked him also did your investigation show

24    someone in the D.C. government, DNC, or Clinton team is

25    blocking the murder investigation, and ultimately Seth Rich's

1   murder is unsolved as a result of that, if you say is that a

2   false statement or a true statement and he says that is a true

3   statement, you know that he would not have a defamation claim

4   by simply claiming I never told Zimmerman that.

5          MR. WILLEMIN:  That is certainly not the theory of our

6   case.

7          THE COURT:  You know that that can't be the theory,

8   right?  You know that that is not even possible under the law,

9   that I could say that I said I said it to you and even though

10  it is a true statement -- unless you want to -- well, I take

11  that back.  There may be a circumstance.

12         For example, if I'm criticizing the President of the

13  United States and I'm saying that privately, and Zimmerman

14  hears it from somebody else and she decides she wants to print

15  it in her article and say that I told her this bad thing about

16  the president, maybe, maybe there is a possible argument that

17  the falsity of that can be the basis of a defamation claim

18  because that is not a statement that I would publicly make and

19  she said I publicly made that statement.

20         By your theory, by her saying that I publicly made

21  that statement, that defames me, at least in the eyes of all

22  the people who love the president, because now she is saying I

23  said all this bad stuff against the president.  It doesn't

24  matter whether I privately believed that, I never said that,

25  and I would never say that in public.  That may be a possible

1  theory, but that is not your theory.

2          MR. WILLEMIN:  Certainly not.

3          THE COURT:  Not your theory at all.

4          MR. WILLEMIN:  He didn't say that, not Zimmerman or

5  anyone else, and he wouldn't say that because his investigation

6  didn't show this.

7          THE COURT:  So the only thing he didn't say is the

8  investigation showed.  Everything else you say is what he has

9  concluded as a result of his investigation.

10          MR. WILLEMIN:  The two quotations of what we say he

11  didn't say.  Everything else he said on Hannity and Fox 5 are

12  different.

13          THE COURT:  Do you think that from his investigation

14  it is a false statement to say that he has concluded that there

15  were email exchanges between Seth Rich and WikiLeaks as a

16  result of his investigation, that he has concluded that?  You

17  think that would be a false statement?

18          MR. WILLEMIN:  As a definitive matter, yes.

19          THE COURT:  I didn't say as a definitive matter.  You

20  can't do that.  You have to answer the way I give it to you.

21  If he said -- I don't want to characterize it.  He said exactly

22  what I will give you he said.  If he would say that my

23  investigation leads me to believe that there were email

24  exchanges between Seth Rich and WikiLeaks, do you think that

25  would be a false statement that is attributed to him?

1          MR. WILLEMIN:  That there are --

2          THE COURT:  I didn't say that.  I said my investi-

3     gation leads me to believe that there are email exchanges

4     between Seth Rich and WikiLeaks.  If that was the statement,

5     you would not claim that that would be a false and defamatory

6     statement?  Is that true or not true?

7          MR. WILLEMIN:  Your Honor, I'm thinking for a moment.

8     I do find it to be a very difficult question to answer.

9          THE COURT:  Why?  It's an easy question.

10         MR. WILLEMIN:  Because, your Honor, every single time

11    he made these statements he always said "potentially."

12         THE COURT:  I didn't ask you about that.  I didn't ask

13    you about what he said, what he didn't say.  I gave you a

14    hypothetical.  I said to you if what was attributed to him was

15    that his investigation led him to believe that there were email

16    exchanges between Seth Rich and WikiLeaks, you would not claim

17    that that is a defamatory false statement, is that true or not

18    true?

19         MR. WILLEMIN:  I would outside of the context of the

20    source of qualifications of potential, of could, and all the

21    things --

22         THE COURT:  I just said it to you exactly the way --

23         MR. WILLEMIN:  I would say that would be defamatory.

24         THE COURT:  That would be defamatory to say that his

25    investigation leads him to believe that there were email

1    exchanges between Seth and WikiLeaks?

2           MR. WILLEMIN:  That statement on its own is inconsis-

3    tent with anything he said.  Based on that.

4           THE COURT:  Wait a minute.  You said that he would say

5    that was a false statement, that his investigation leads him to

6    believe that there are email exchanges between Seth Rich and

7    WikiLeaks?  Do you believe that he would say that that is a

8    false statement, the way you just phrased it: Judge, that is a

9    false statement, my investigation does not lead me to believe

10   that there were email exchanges between Seth Rich and

11   WikiLeaks?

12          There are only two choices: either that accurately

13   characterizes, what I said is an accurate characterization, or

14   what I said is not an accurate characterization because he

15   doesn't believe that based on his investigation.

16          I'm just trying to figure out how candid you're going

17   to be about this.  As I say, the most effective advocacy is to

18   be consistently reasonable.  Give me a reasonable response to

19   that question.  The question is would Mr. Wheeler say that his

20   investigation leads him to believe that there were email

21   exchanges between Seth Rich and WikiLeaks, would he say that

22   that is a true statement or a false statement?  Isn't it clear

23   that he would say that is a true statement?

24          MR. WILLEMIN:  Your Honor, if I may explain why I'm

25   having trouble with the question?

1          THE COURT:  Sure.  I don't see any reasonable reason

2     to struggle with it.

3          MR. WILLEMIN:  I certainly agree either you believe

4     something or don't believe something.  But the issue with the

5     question is what the something is.

6          THE COURT:  I said it exactly the way I wanted to say

7     it.  I said it exactly.  I'm not adding anything to it and I'm

8     not taking anything away from it.  I asked you a very simple

9     question.  If someone made a statement that said Mr. Wheeler

10    believes based on his investigation that there were email

11    exchanges between Seth Rich and WikiLeaks, would that be a true

12    statement or a false statement?  That statement only, would

13    that be a true statement or a false statement?  You can't

14    answer that?

15         MR. WILLEMIN:  I don't think, your Honor, that he

16    would put it that way.

17         THE COURT:  I didn't ask you how he would put it.  I'm

18    asking you whether he would say that's a true statement or

19    that's a false statement.  If I said that his investigation

20    leads him to believe that there were email exchanges between

21    Seth Rich and WikiLeaks, would he say that is a true statement

22    or a false statement?

23         MR. WILLEMIN:  I'm willing to speculate that he --

24         THE COURT:  You don't have to speculate.  You know

25    what he said.

1          MR. WILLEMIN:  Your Honor, that is the point, that I

2     do know what he said.  That's not what he said.

3          THE COURT:  If someone said that Wheeler, as a result

4     of his investigation, has concluded that there were email

5     exchanges between Seth Rich and WikiLeaks, that he believed

6     that there were email exchanges between Seth Rich and WikiLeaks

7     based on his investigation, you think you could reasonably and

8     candidly say to me that he would have said no, that's untrue,

9     that based on my investigation I don't reasonably believe that

10    there were email exchanges between Seth Rich and WikiLeaks or I

11    don't believe that based on my investigation?

12         MR. WILLEMIN:  I think I can answer that question.

13         THE COURT:  That's the question I have been giving you

14    five times.

15         MR. WILLEMIN:  I agree with you he would not say that

16    he definitely does not believe that there aren't email

17    exchanges.  He is not going to disavow the possibility that

18    there are email exchanges.

19         THE COURT:  Again you are voiding the question.  The

20    question was would he say that the way I just phrased it is a

21    false statement or a true statement.

22         MR. WILLEMIN:  It is not accurate as phrased, is what

23    I think he would say.

24         THE COURT:  What is inaccurate about saying based on

25    his investigation he believes that there were email exchanges

1    between Seth Rich and WikiLeaks?  Do you think he doesn't

2    believe there were email exchanges between Seth Rich and

3    WikiLeaks?

4              MR. WILLEMIN:  I think he believes that there could be

5    emails.

6              THE COURT:  You don't think he believes that there

7    were email exchanges between Seth Rich and WikiLeaks based on

8    the public statements that he has made and based on his

9    investigation?

10             MR. WILLEMIN:  I think he believes it is a strong

11   possibility, which is what he said, and that is what I believe

12   because that is what he said.

13             THE COURT:  I'll phrase it this way.  If an article

14   said Mr. Wheeler's investigations show that there is a strong

15   possibility of email exchanges between Seth Rich and WikiLeaks,

16   would you say that that is a false statement?

17             MR. WILLEMIN:  Yes.

18             THE COURT:  How is that a false statement?  You just

19   told me that's what you want to be put in a statement and it

20   would be true.

21             MR. WILLEMIN:  The distinction is between the word

22   "believe" and "shows."  That is what the issue is.  If you said

23   that Mr. Wheeler believes that there is a strong likelihood

24   that there are emails between Seth Rich and WikiLeaks, I

25   wouldn't argue with you on that.  But what his investigation

1    shows is a different question.

2              THE COURT:  That's the word, "shows."

3              MR. WILLEMIN:  Correct.

4              THE COURT:  If I said based on his investigation, as a

5    result of his investigation, he believes that there are email

6    exchanges between Seth Rich and WikiLeaks, would that be a

7    false statement?

8              MR. WILLEMIN:  We lost the strong possibility clause

9    there.

10             THE COURT:  We did.  I'm trying to figure out whether

11   you say that takes it into the category of being false or not.

12   I don't know why that takes it into the category of being

13   false.  Would you say that was false?

14             MR. WILLEMIN:  I'm not trying to hide the ball here.

15             THE COURT:  You're not giving me a reasonable answer

16   here.  You are avoiding the question.  The question is not that

17   complicated.  And you're right, it may not be a relevant

18   question and it may not be your case.  But it seems like a very

19   simple question with a very simple answer.  It seems like

20   everybody in this room knows what the answer to that question

21   is except you.  Even the people at your table have to know what

22   the answer to that question is.

23             He would not say that it's a false statement, that

24   based on his investigation he has concluded that he believes

25   that there are email exchanges between Seth Rich and WikiLeaks.

1   He would not say that that was a false statement, right?

2   You're not going to concede that?

3          MR. WILLEMIN:  Your Honor, it's just not the way he

4   put it.

5          THE COURT:  I didn't ask you how he put it.  That's

6   the way I put it.  I asked you whether or not that would be a

7   false statement.

8          MR. WILLEMIN:  My knowledge of what he believes or

9   doesn't believe --

10          THE COURT:  I didn't ask you what he believes or what

11   he doesn't believe.  I asked you whether he would say what I

12   just said was a false statement.  I'll give you one more chance

13   to answer that.  But I can tell you the way I work.  If you

14   can't answer my question yes or no, I usually pick the one

15   that's against you.  So you had better give me a yes or no and

16   give me a reason for it or I'm going to take the answer that

17   hurts you because I can't ask you ten times and you not want to

18   give me a straight answer.

19          MR. WILLEMIN:  I think as phrased he would say that is

20   false.

21          THE COURT:  In what way is that false?  What part of

22   that is false?

23          MR. WILLEMIN:  The definitiveness of the belief.

24          THE COURT:  Do you listen to yourself?  The

25   definitiveness of a belief?  There is no such thing as a

1  definitiveness of a belief.  There is a definitiveness of facts

2  and then there are beliefs.  There is no such thing as a

3  definitive belief.

4        MR. WILLEMIN:  Your Honor, the subject of the belief

5  in the hypothetical is the belief that there are these emails.

6        THE COURT:  You don't think he believes that?  You

7  don't think he has made public statements that indicate that

8  that is his belief?

9        MR. WILLEMIN:  I think his public statements --

10        THE COURT:  You don't think that he has made public

11  statements that give you a reasonable basis to say that is what

12  he believes after having done his investigation?

13        MR. WILLEMIN:  I don't think his public statements say

14  that.

15        THE COURT:  I didn't ask you that.  I'm not going to

16  try to do this anymore.  I asked you a question and then you

17  want to give me some other question.  I just asked you a very

18  simple question.  I'm not trying to trick you.  This isn't a

19  trick question.  I'm just trying to get a straight answer.  I

20  know what the answer is and everybody else knows what the

21  answer is.

22        Wheeler would not say that it is false to say that as

23  a result of his investigation he believed that there were email

24  exchanges between Seth Rich and WikiLeaks.  Why would he not

25  say that that is false?  Because that is in essence the

1    statements that he has already made elsewhere.

2           That doesn't determine this issue, but I don't know

3    why that is not a simple answer for you.  I don't know why you

4    were going to avoid that answer when you know that that is the

5    answer.  He wouldn't say that that is a false statement.  Based

6    on his investigation, everything he said does not lead to the

7    conclusion that there was no connection between Seth Rich and

8    WikiLeaks.  Everything that he said leads to the conclusion

9    that based on his investigation there was such a connection.

10   Not only does it lead to that, but he has specifically said

11   that.

12          So to say to me that you don't know whether he would

13   say that that is a false statement or not a false statement, to

14   say that his investigation leads him to believe that there were

15   email exchanges between Seth Rich and WikiLeaks, you have no

16   reasonable basis to say that.  There is no reasonable basis to

17   say that.

18          Quite frankly, if you said that under oath, that would

19   be -- well, I don't want to characterize it if you would say

20   that under oath because that is the opposite of what he said

21   every time he has discussed this issue.  He has not said my

22   investigation leads me to believe there is no connection or my

23   investigation leads me to believe that there are no emails.

24          He just affirmatively said that as a result of his

25   investigation, regardless of what you want to say the evidence

1    is, whether it's definitive or not, it leads him to believe

2    that there were email exchanges between Seth Rich and

3    WikiLeaks.

4           And you know if he was asked that at the time, and

5    probably if he was asked that now, he would say yes, as a

6    result of my investigation, that's what I was led to believe.

7    He would say that.  I don't see anything that would give me an

8    indication that he would say no, that's not what I believe.

9           If someone said to him is it a true or false statement

10   that your investigation leads you to believe that someone in

11   the D.C. government, the DNC, or the Clinton team was blocking

12   the murder investigation and Seth Rich's murder is unsolved as

13   a result of that, if someone were to say that that's what you

14   believe based on your investigation, would you say that that

15   would be a false statement or that would be a true statement?

16   What is your answer to that?  Or you don't have an answer to

17   that either, since you haven't given me an answer to the other?

18          MR. WILLEMIN:  That statement I think I would concede

19   he would --

20          THE COURT:  Say it's true rather than not true?

21          MR. WILLEMIN:  Correct.

22          THE COURT:  I'm glad that you can at least understand

23   what I'm asking you and understand where I'm going with it.

24          You say that the fact that it says "investigation

25   shows," that has a definition that means he's come up with the

1    evidence and that he has definitively established that.  That's

2    what you interpret the word "shows" to be, and you say that

3    would be the reasonable interpretation of "shows" in this

4    article even though the article does not say that he ever saw

5    any emails and even though the article does not definitively

6    establish that someone in the D.C. government, DNC, on or about

7    the Clinton team was blocking the investigation?

8              MR. WILLEMIN:  Correct.

9              THE COURT:  All right.  What you cite to me as the

10   context, is there anything more than the context of the first

11   two statements on that flag page?

12             MR. WILLEMIN:  In terms of why we read it that way?

13             THE COURT:  Right.

14             MR. WILLEMIN:  Yes: the title of the article.

15             THE COURT:  The title of the article is Seth Rich, DNC

16   staffer, Had Contact with WikiLeaks Say Multiple Sources."

17   Does it ever identify your client Mr. Wheeler as one of those

18   sources?

19             MR. WILLEMIN:  Yes.  There are two sources in here.

20   One is the FBI unnamed person and one is Mr. Wheeler.

21             THE COURT:  You say that a statement by your client,

22   attributed to your client, that Seth Rich had contact with

23   WikiLeaks, you say that that is a false statement, your client

24   doesn't believe that?

25             MR. WILLEMIN:  No, that's not what I'm saying.

1          THE COURT:  That's what's important.  You're saying he

2     didn't say it but you don't say he doesn't believe it.

3          MR. WILLEMIN:  I'm not saying he doesn't say the

4     title.  I'm saying the title informs how the reader would view

5     the --

6          THE COURT:  I'm not asking you about the title.  I'm

7     asking you about whether or not it would be a false statement

8     to say that your client has concluded that Seth Rich had

9     contact with WikiLeaks.

10         MR. WILLEMIN:  We are going back to the old question

11    again.

12         THE COURT:  No, we are not.  All you have to do is

13    give me the same simple answer: yes or no.

14         MR. WILLEMIN:  I do not think that that is correct.

15         THE COURT:  You think that it is a false statement to

16    say that Mr. Wheeler believes or has concluded that Seth Rich

17    had contact with WikiLeaks?

18         MR. WILLEMIN:  As phrased, I would say that that is

19    false.

20         THE COURT:  That is the only way I phrased it.

21         MR. WILLEMIN:  Understood.

22         THE COURT:  You think that's consistent or inconsis-

23    tent with the Fox 5 statement, but you have sources at the FBI

24    saying that there is intimation that could link Seth Rich to

25    WikiLeaks, and his answer: for sure, absolutely, yeah, and

1   that's confirmed?

2          MR. WILLEMIN:  That's consistent --

3          THE COURT:  Do you think that he could say that and at

4   the same time you could say to me that if I said that he

5   concluded or believes that Seth Rich had contact with

6   WikiLeaks, that that would be a false statement in the context

7   that you are laying this out?

8          MR. WILLEMIN:  Correct.  The source can tell me

9   anything.  It doesn't mean that is what I now believe.  He is

10  confirming that he has a source that says something.  To be

11  candid, I am trying to be candid, he would probably tell you

12  that he strongly believes that there were communications

13  between Seth Rich and WikiLeaks.

14         THE COURT:  Okay.

15         MR. WILLEMIN:  I'm not trying to hide the ball on

16  that.  I think he would qualify it this way, to say strongly

17  believe or potential, because that's what he did in his Hannity

18  appearances and everywhere else.  That's what I believe.

19         THE COURT:  Isn't it pretty clear to every reader that

20  that is pretty much the only thing, that's the only position

21  that he could have, that he strongly believes?  He doesn't know

22  it for sure.  He wasn't there.  Nobody said he's seen the

23  emails.  He wants to see the computer because he doesn't have

24  the emails.  He says that other people are telling him this.

25         Why would any reasonable reader conclude from that

1   that he has gone somewhere, seen the emails, and verified that

2   there was such contact when he is specifically saying he's

3   getting that information from somebody else?

4           MR. WILLEMIN:  Because that is not said in this

5   article.  That information is not in this.  Everything you just

6   described that does save the day is not in this article.  To

7   the point if Fox included all that in this article and then

8   misquoted him, maybe you cold look at the article and read it a

9   little bit different.  But that is not the way the reader is

10  going to read this when all that purported contextual

11  information, the actual things that Mr. Wheeler said, are not

12  in here.

13          THE COURT:  But what is in here is the quote that you

14  say is false: my investigation up to this point shows there was

15  some degree of email exchange between Seth Rich and WikiLeaks.

16  You say that he never said that and that that was not a

17  reasonable conclusion for him to have drawn from his

18  investigation?

19          MR. WILLEMIN:  Those are two different questions.

20          THE COURT:  I know it's a different question.  I'm

21  asking you more than once to see if you come up with the same

22  answer.

23          MR. WILLEMIN:  He never said that.  That was the first

24  question, your Honor.  The second question is, that is correct,

25  he would not characterize his investigation as having shown

1    that there was an email exchange.  Whether he believes there

2    probably was is a different question.  I hope I have answered

3    that.  I think he would say that he believes there probably

4    was.  But that is a different question than whether his

5    investigation showed it.

6              THE COURT:  But you would agree that it would not have

7    been a false statement if, instead of saying "showed," if he

8    said my investigation to this point leads me to believe that

9    there was some degree of email exchange between Seth Rich and

10   WikiLeaks?  You would say that that would not be an actionable

11   defamatory false statement if it was phrased that way?

12             MR. WILLEMIN:  We wouldn't be here if it was phrased

13   that way.  I don't think that is the way he phrased it, but we

14   wouldn't be here if it was phrased that way.

15             THE COURT:  You wouldn't be here because he wouldn't

16   have such a claim.

17             MR. WILLEMIN:  It certainly wouldn't be as strong.

18             THE COURT:  I didn't ask you how strong it was.  I'm

19   not asking you now how strong it is.  I'm asking you whether or

20   not you would have told your client to file a complaint based

21   on that language because he and you would agree that the

22   statement as it was made in the context that it was made was

23   false and it was defamatory.  You would come to that legal

24   conclusion?

25             MR. WILLEMIN:  No, that's what I just said.

1           THE COURT:  All right.  Then I guess you wouldn't
2     bring that lawsuit on his behalf.
3           MR. WILLEMIN:  That's what I said.  We wouldn't be
4     here.
5           THE COURT:  That's not exactly what you said.
6           MR. WILLEMIN:  I said we wouldn't be here.
7           THE COURT:  I said you would not have.  That means you
8     would not have such a claim.
9           (Continued on next page)

1            MR. WILLEMIN:  I would agree with that in this

2     context.

3            THE COURT:  Right.  If you wouldn't be here, you

4     wouldn't be here because you couldn't make such a claim.

5            MR. WILLEMIN:  Right.

6            THE COURT:  That's all I'm asking.  Let me wind up.

7     Obviously, the important thing is for me to try to understand

8     the nature of the falsity, the nature of the defamation.

9            And you would agree that despite the arguments that

10    both of you have made about special damages, that you can't

11    establish special damages by saying, the guy who defamed me no

12    longer wants to do business with me.  That wouldn't be a claim

13    for special damages.

14           MR. WILLEMIN:  I would say it would be.

15           THE COURT:  It would be?

16           MR. WILLEMIN:  Yes.  I actually heard that from

17    defense counsel.  I'm not sure why that wouldn't be the case.

18           THE COURT:  Because obviously, if they don't want to

19    do business with you, it's not because you were defamed.

20           MR. WILLEMIN:  It's the result --

21           THE COURT:  No, it's not.  It's the result of your

22    being defamed.  They're the ones that defamed you.

23           MR. WILLEMIN:  The result of the defamation --

24           THE COURT:  How is that the result?  If you and I are

25    in business together and I say that, you know what.  I think

1    you're a lying cheat, and you know what.  I don't want to do

2    business with a lying cheat.  So we're not going to do business

3    anymore, you're going to say to me that you could demonstrate

4    special damages because I don't want to do business with

5    somebody that I think is a lying cheat?

6            MR. WILLEMIN:  Not in this circumstance.

7            THE COURT:  How is this different?

8            MR. WILLEMIN:  Because in this circumstance, Fox was

9    hoping that this defamation was going to make wheeler a hero.

10           THE COURT:  No.  Say that again.

11           MR. WILLEMIN:  They were hoping that Wheeler --

12           THE COURT:  They were hoping that by defaming Wheeler,

13   they would do what?

14           MR. WILLEMIN:  They were hoping that the result of

15   this would be that they would be able to promote this story and

16   have Wheeler as someone who they could continue --

17           THE COURT:  Doesn't it have to be the result of their

18   defaming Wheeler?

19           MR. WILLEMIN:  Well, what happened --

20           THE COURT:  Not as a result.  It has to be because

21   they defamed -- there is no case that I'm aware of that says

22   that you're alleging that the person who defamed you doesn't

23   want to do business with you anymore is a basis for

24   establishing special damages.

25           MR. WILLEMIN:  In this case what happened was the

1    defamation resulted -- and what I think was probably

2    unexpected -- is that Wheeler became a pariah and someone with

3    no credibility because of the way that he was misquoted.

4            So, in that circumstance, Fox said, we can't have this

5    guy on our shows anymore.  So, while they had a couple of shows

6    he was on after, if you look before and after at the amount

7    of --

8            THE COURT:  How could you even reasonably allege that

9    the reason he no longer has Fox Business is a result of the

10   defamatory statement they made about him?

11           MR. WILLEMIN:  I'm trying to frame it.  So, if the

12   article came out and that was the end of it, there was no

13   fallout for Mr. Wheeler, I think he'd still be on Fox.

14           Because of the way they defamed him, there was fallout

15   for Mr. Wheeler, and Fox said, we can't have this guy on our

16   show anymore.

17           THE COURT:  Do you know of any case that says that you

18   could establish special damages by the fact that the person who

19   defamed me no longer wants to do business with me?

20           MR. WILLEMIN:  I know of neither case in neither

21   direction.

22           THE COURT:  I know every case is just the opposite

23   that I'm aware of.  There is no case that I'm aware of -- and

24   there is no theory that I'm aware of and no commentary that I'm

25   aware of -- that says the way that you can establish special

1   damages -- if you can establish it through someone who heard

2   the defamatory statement as opposed to the person who made the

3   defamatory statement, that you can establish special damages

4   because even though I don't have any special damages as a

5   result of the people hearing the defamatory statement, I have

6   special damages because the person who defamed me doesn't want

7   to do business with me.

8           Not only do I not know a case that stands for that

9   proposition, I'm not even sure that makes sense in logic.  The

10  damages aren't as a result -- Fox not doing business with him

11  is not as a result of their believing or the result of somebody

12  saying something bad about your client.

13          MR. WILLEMIN:  I would say that it's the result of --

14  the problem in this case is it's two steps removed.  I agree.

15  If fox thought that our client was an imbecile or whatever they

16  want to say and they call him an imbecile and said, you're an

17  imbecile, and I don't want to work with you anymore, obviously

18  the motive for not wanting to do work with our client is not

19  the fact that that was uttered.

20          THE COURT:  Right.

21          MR. WILLEMIN:  It's the fact that that was a held

22  belief.

23          THE COURT:  Right.

24          MR. WILLEMIN:  In this case it's different because the

25  reason that Fox doesn't want to do work with Wheeler anymore

1    isn't because they believe he's a hack ball in terms of his

2    investigative skills.  It's because when they uttered what they

3    uttered about him, that destroyed his reputation and that he no

4    longer could be someone that Fox was going to associate with.

5           So it was directly the result not of what they

6    believed but of what they uttered that caused the problem that

7    made it so that Wheeler would not be back on Fox.  So that is

8    the distinction between the two circumstances.

9           THE COURT:  Again, I just can't get my mind around

10   that if I defame you, I say false and derogatory things about

11   you, that your damages are as a result of my saying false and

12   defamatory things about you, your special damages are that I'm

13   the only person that would ever want to do business with you

14   anymore.

15          Because the critical part -- it's not the making of

16   the statement.  It's the publication.  It's the publication to

17   other people and how it might falsely effect their relationship

18   with you, how it interferes with another relationship you have.

19   It's not how it interferes with our relationship.  Quite

20   frankly, if I defame you, we didn't have the greatest

21   relationship to begin with.

22          So, for you to say that the result, the reason your

23   damages are that the person who defamed you no longer wants to

24   do business with you -- I'm not even sure on what basis do you

25   allege that.

1          MR. WILLEMIN:  He worked as a contributor for ten

2     years for Fox.

3          THE COURT:  As a result of the article, what's the

4     evidence that when the article came out and this defamatory

5     statement was published that that was the reason and the time

6     when they decided that they were no longer going to do

7     business?

8          MR. WILLEMIN:  It wasn't at the moment the article

9     came out.  I think that's the point.  I think that's actually

10    the distinction between a circumstance where someone says

11    you're an imbecile.  You're out of here.

12         THE COURT:  After they got into the fight over this

13    between the two of them?

14         MR. WILLEMIN:  I don't have the exact date of the last

15    time he was on Fox.

16         THE COURT:  Not the date.  Are you claiming that

17    they -- you don't claim that they fired him as a result because

18    of the publication.

19         MR. WILLEMIN:  No.  They fired him because of what the

20    publication caused, which was the world to believe that

21    Mr. Wheeler was completely incompetent.  And so --

22         THE COURT:  What basis do you have to say that as

23    opposed to they fired him because while they were calling him a

24    liar, he was calling them a liar?

25              Did they fire him before or after he filed a lawsuit?

1          MR. WILLEMIN:  I do not believe -- and I'm sure that

2     Fox will tell me if I'm incorrect.  I do not believe that he

3     was on after the lawsuit.  I know that he was on after the

4     article was published.

5          THE COURT:  When you say "he was on," that doesn't

6     tell me that he was fired.

7          MR. WILLEMIN:  He's never been fired.

8          THE COURT:  That's even less of an argument.  You say

9     he was never fired.

10         MR. WILLEMIN:  No.  Because it's a contributor

11    contract.  The contract hasn't been --

12         THE COURT:  So your argument for special damages is

13    that they've never invited him back since that time.

14         MR. WILLEMIN:  Since the fallout from the defamatory

15    article.  Correct.

16         THE COURT:  And what right did he have to be called

17    back?

18         MR. WILLEMIN:  I wouldn't say he had a right to be

19    called back.

20         THE COURT:  He has to have that right.  You're not

21    going to allege special damages if they interfere with a

22    contract between him and some other entity he has the right not

23    to have them interfere with him.

24         That's why that shows special damages, because he has

25    the right to be free from that kind of interference in his

1     business relationships with others and not have it be

2     interfered with because they falsely accuse him of something

3     that's defamatory that makes them not want to do business with

4     him anymore when he had the right to do business with them and

5     he has the right to do business with them without their

6     interfering.

7          What right does he have to be called up?  When do you

8     claim that he had the right to be called up?

9          MR. WILLEMIN:  I think your Honor phrased it correctly

10    when your Honor said that he has the right to be free from

11    interference because of the defamatory statements.  And he was

12    called up, called up, called up, called up, called up,

13    defamatory statement, not called up.

14         So that obviously interfered.  The fact that this

15    defamatory statement was made and the fallout occurred -- that

16    interfered with him being called up, and that's the damage.

17         THE COURT:  The problem is in this analysis, the

18    question is not what motivated them.  The question is whether

19    or not the defamatory statement published by someone else

20    affected them in a way that if they hadn't made the defamatory

21    statement, that they would not have refused to do business with

22    you.

23         I just don't know of any theory -- if I commit a tort

24    against you and your special damages are that I don't want to

25    do business with you anymore because I committed that tort

1    against you --

2            MR. WILLEMIN:  I mean, your Honor, I would admit it's

3    a unique situation.

4            THE COURT:  It's more than unique.  It's an unknown

5    situation.

6            MR. WILLEMIN:  I would agree with that, but I think

7    the distinction here is that the damage that was caused to

8    Mr. Wheeler's reputation as a result of the defamation

9    ultimately --

10           THE COURT:  It didn't damage his reputation with Fox.

11           MR. WILLEMIN:  It did.

12           THE COURT:  Fox knew all of this about him.  As a

13   matter of fact, you claim Fox was the one that was making these

14   statements about him and knowingly making false statements

15   about him.

16           But your contention is not that they believed these

17   statements they were making.  Your contention is they knew the

18   statements were false and they were trying to defame him.  They

19   can't defame him in their own eyes.

20           MR. WILLEMIN:  I don't think the intent of Fox was to

21   turn Mr. Wheeler into a public pariah.  I think the intent of

22   Fox was to bolster their story and, in doing so, falsely

23   attributing quotes in a knowing way to Mr. Wheeler.

24           THE COURT:  But I understand -- you phrased it

25   correctly -- that the question is have they turned him into a

1    public pariah.  Their not wanting to do business with him

2    doesn't turn him into a public pariah.  It turns him into a

3    private pariah.

4         It's the one relationship between the person that is

5    being defamed and the person that is defaming you.  That's not

6    turning him into a public pariah.  It's like saying they

7    intentionally said false things about him to damage his

8    reputation.

9         And therefore, as a result of that, you claim that

10   your special damages are that as a result of their saying

11   defamatory things about him to ruin his reputation, they didn't

12   want to do business with him.  That's your theory.

13        MR. WILLEMIN:  Your Honor, I'm not saying that the

14   intent was to do damage to Wheeler in making these defamatory

15   statements.  They knew that they were false.  They knew that

16   they were false.  That's the actual malice.  But the actual

17   malice -- nor are we alleging that they did it in order to ruin

18   his reputation.

19        We're stating that they did it knowingly false.  As a

20   result, his reputation was ruined, and then Fox said, wait a

21   minute.  This guy's reputation is ruined now.  We can't do

22   business with him.

23        That's the theory.  I admit it's not -- it's novel I

24   suppose, but that's the theory of damage there.  And I would

25   also say it's not the only theory of damage we've alleged.

```
1          THE COURT:  What specific contract or relationship do
2     you claim that was damaged as a result of this defamatory
3     statement?
4          MR. WILLEMIN:  We have not alleged a specific person
5     or a particular entity.
6          THE COURT:  Do you think you're required to do that --
7          MR. WILLEMIN:  I think that we've alleged --
8          THE COURT:  -- to allege special damages.
9          MR. WILLEMIN:  I think in connection with the pleading
10    stage on a motion to dismiss -- and we've alleged sufficiently
11    and particularly given all the --
12         THE COURT:  What have you alleged?
13         MR. WILLEMIN:  We've alleged that the ruining of his
14    reputation has prevented potential clients from contracting --
15         THE COURT:  What's the evidence of that?  What gives
16    you a good-faith basis to say that?
17         MR. WILLEMIN:  I think Mr. Wheeler would tell you,
18    your Honor, that the amount of work that he has been receiving
19    through his private investigative services has drastically
20    dropped off since this article --
21         THE COURT:  So what clients does he claim that he used
22    to have or potentially would have that are no longer available
23    to him for which he wants to seek special damages?
24         MR. WILLEMIN:  I think it's more of a potential-client
25    situation.
```

1              THE COURT:  How can you prove special damages based on

2     a potential-client situation?  You can't even articulate what

3     the damages would be.  Right?

4              MR. WILLEMIN:  If it were the case that a potential

5     client did not do business with Mr. Wheeler because of what was

6     said about him --

7              THE COURT:  Then you should allege that.  If you say

8     you know of no such client, then on what basis can you

9     establish or even allege special damages?

10             For example, a very simple question would be, even at

11    this stage, how much business or what's the monetary value of

12    the business that he lost that you are alleging is a special

13    damage.  And the answer to that is you don't know.

14             MR. WILLEMIN:  That's correct.  What's correct is

15    that -- I can tell you what he's lost as a result of Fox.  As a

16    result of his private investigative services, we don't allege a

17    particular number.

18             If it were to be of benefit to the Court, I would

19    certainly try to calculate that number.

20             THE COURT:  Is it your position that if he had no

21    loss, no monetary loss of business with regard to any of his

22    other clients, that you would base special damages on the fact

23    that the defendant, you assume, isn't contacting you to do more

24    business because your allegation is that they're defaming your

25    client is the cause of their cutting off the income that they

1   would otherwise give?

2        MR. WILLEMIN:  That's one of the theories.  Correct.

3   Another theory is --

4        THE COURT:  Do you think you could make that theory

5   stick if he had no other loss with any other client?

6        MR. WILLEMIN:  Yes.  Again, I cited a couple of cases,

7   and we talked about the impact that this would have on a

8   reasonable reader reviewing this, but I also do believe that

9   special damages are not required in this case because it fits

10  within the category of defamation per se where someone reading

11  this would think that Mr. Wheeler is incompetent in terms of

12  his investigation skills, not objective, no integrity.

13       THE COURT:  This isn't defamation per se in a

14  situation where that kind of statement is affirmatively made

15  about the plaintiff.

16       What case do you say makes this defamation per se

17  based on what you characterize as a possible interpretation

18  that a reader might glean from?  I'm not sure I know of a case

19  that says that defamation per se in a context other than a

20  clear, direct accusation that reflects upon the business or

21  criminal reputation of plaintiff.

22       MR. WILLEMIN:  So there is a case, your Honor,

23  *Ben-Oliel v. Press Publishing Co.*, 251 N.Y. 250 (1929), where

24  an individual is -- an article was authored, and the article

25  was attributed to an individual who did not write the article.

1  And the contents of the article said a number of things about

2  culture, and things that were not true and that she would not

3  have said in an article.

4       Ultimately what the court held was that the damage

5  there was that the facts that are being asserted as coming from

6  a skilled traveler and observer, the reader would view her,

7  reading this, to be ridiculous, a fraud, a deceiver, and a

8  charlatan.

9       THE COURT:  And it characterized that as defamation

10  per se?

11       MR. WILLEMIN:  This case doesn't say damages per se or

12  not per se.

13       THE COURT:  Answer the question.

14       MR. WILLEMIN:  The case presumes this damage.  It

15  doesn't use the word "per se."  It's a very old case, but it

16  explains how a mere misquotation in a circumstance could cause

17  someone damage, just as the Supreme Court did in *Masson* which

18  again doesn't distinguish, in either direction, concededly on

19  pro se or not.

20       THE COURT:  I can understand that part of it.  I'm

21  just trying to understand that when you say you don't need to

22  establish special damages because you have defamation per se,

23  I'm not sure why this is defamation per se because it's not a

24  statement about his reputation.  It's not a statement about his

25  business reputation.  It's not a statement about his, as they

1   say, criminal activity or morals, the standard defamation or

2   liable per se.

3          You're saying, well, it's liable per se because even

4   though they didn't say those things about him, it reflects

5   badly on him.  And one would interpret that if he claimed that

6   he had certain evidence as an investigator that he never had,

7   that they claim that, that that puts him in the category of

8   definition per se even though they never said that he

9   fabricated any of this evidence.

10          MR. WILLEMIN:  It's always based on what the reader

11   would perceive had he read it.  So, to the extent, which we

12   argue, that the reader would read that and come to the

13   conclusion that our client is someone who is incompetent, lied,

14   not objective, had no integrity, political shield -- if that's

15   the conclusion that someone could come to reading this, and

16   that's one of the conclusions -- it doesn't mean it has to be.

17          If that's one of the ways in which this defamatory

18   statement could be viewed by a reader, that would fall right

19   within the definition per se category, even when the statement

20   is not as explicit as your Honor has noted.

21          THE COURT:  I'm going to look again at how you've

22   alleged it and how you've alleged your claimed position.  But

23   you believe that at a deposition under oath that your client

24   will be able to truthfully state that his investigation didn't

25   lead him to conclude that there was a relationship between Seth

1    and WikiLeaks and that that was an email relationship, and that

2    investigation didn't lead him to conclude that there was -- I

3    don't want to call it a coverup -- but didn't lead him to

4    reasonably conclude that some entity, either D.C. government

5    entity or Democratic National Committee or Clinton-related

6    entity, was attempting to block the investigation?

7            You think your client is going to say under oath that

8    his investigation did not lead him to believe those things?

9            MR. WILLEMIN:  I think he will say under oath that he

10   believes that those things are possible based on his

11   investigation.

12           THE COURT:  Is he going to say that those thing are

13   probable?

14           MR. WILLEMIN:  I think he believes -- again, this

15   is --

16           THE COURT:  Is he going to say that based on what he

17   was led to believe, that would be his conclusion?

18           MR. WILLEMIN:  Based on what he has been led to

19   believe based on the sources that he referred to, I think he

20   would say with regard to the emails, that he believes that

21   there were potentially some emails between Seth Rich and

22   WikiLeaks.

23           THE COURT:  You don't think he would say that in a

24   more affirmative manner other than there was a potential?

25           MR. WILLEMIN:  I don't believe so --

1          THE COURT:  You don't believe that being confronted

2     with his past statement and being asked directly what he

3     believed at the time, he's not going to affirmatively say that

4     he believed at the time there were communications between Seth

5     Rich and WikiLeaks and he believed that those communications

6     were by email?

7          MR. WILLEMIN:  I think, based on his statements, that

8     he will say that he believes that there were potentially some

9     emails between Seth Rich and WikiLeaks.

10         THE COURT:  Why do you say "potentially"?

11         MR. WILLEMIN:  Because that's what he said.

12         THE COURT:  He's never used that word ever in

13    describing what the conclusions of his investigation.

14         MR. WILLEMIN:  If he didn't say "potentially," he said

15    "perhaps."  It was one of those two words.

16         THE COURT:  He did say "perhaps."

17         MR. WILLEMIN:  So I think that's the word he would

18    use.  There is no other way for me to answer that question

19    better than that.  I think he would saying that, based on

20    everything he knows, there were some emails between Seth

21    Rich and WikiLeaks.

22         THE COURT:  What do you think your qualifying it be

23    "perhaps" is supposed to mean?

24         MR. WILLEMIN:  It's totally different than saying that

25    you know this.

1          THE COURT:  What do you think it's saying?  Are you

2     saying that "perhaps" is supposed to be "potentially?"

3          MR. WILLEMIN:  I think he was careful to qualify these

4     things because following the issuance of the article which made

5     his statement in such a definitive way, he wanted to make sure

6     to be clear about all the statements, that this is not

7     something that he knows.  So he's qualifying it in every way.

8          THE COURT:  He's not saying that perhaps it didn't

9     happen.  He's saying perhaps it did.

10         MR. WILLEMIN:  I think one implies the other.

11         THE COURT:  Why does one imply the other?

12         MR. WILLEMIN:  Because if something perhaps happened,

13    then naturally perhaps it might not have happened.

14         THE COURT:  He never says that he never came to any

15    conclusion that it didn't happen or there was anything that he

16    ever saw that would lead him to believe that that was the

17    potential, likely, probable conclusion based on his

18    investigation.

19         MR. WILLEMIN:  I agree he never said that he believed

20    it didn't happen.  I a hundred percent agree with that.  I'm

21    just saying that if someone says, this might have happened or

22    perhaps this happened, naturally that's not definitive.

23         So I would say that in that case, I don't know that

24    you have to say that perhaps it didn't after you say perhaps it

25    did.  Your Honor is correct that he did not say perhaps it

1    didn't.

2           THE COURT:  So you say that what's critical to your

3    defamation claim is the potential interpretation of the reader

4    of the article that the phrase, the two words the

5    "investigation shows" gives an impression that he has

6    conclusive evidence, direct evidence in his possession and that

7    was a false impression to give.

8           MR. WILLEMIN:  Correct.

9           THE COURT:  Okay.

10          MR. WILLEMIN:  Do you want to hear about the other

11   motions?

12          THE COURT:  It depends which one you want to argue.

13   Go ahead.

14          MR. WILLEMIN:  I'll be very, very brief.  In terms of

15   Mr. Butowsky's participation in this process, I think that

16   Mr. Harrison really grossly mischaracterized the allegations in

17   the complaint.

18          The key allegation in this regard is Butowsky's own

19   admission.  In an email he writes, the story is up or will be

20   up very early tomorrow morning.  "I am actually the one who has

21   been putting this together."

22          THE COURT:  So what does that say about his

23   involvement in what you claim is the false statements?  Because

24   that's a statement that your client could have made.  Right?

25   Your client could have made that same statement, and you

1    wouldn't be referring to what he claims now to be defamatory.

2          MR. WILLEMIN:  Well, two things.  In paragraph 134, we

3    state that Mr. Butowsky worked together to put together these

4    quotations with Zimmerman.

5          THE COURT:  There is no place that I read that you

6    said that Mr. Butowsky had anything to do with drafting the

7    defamatory statements.

8          MR. WILLEMIN:  It is.  In paragraph 134, your Honor.

9          THE COURT:  Where does it say that he drafted the

10   defamatory statement?  It says Butowsky, Zimmerman, and Fox

11   knowingly and maliciously defamed Mr. Wheeler by generating

12   false and untrue facts about what Mr. Wheeler had purportedly

13   uncovered as part of his private investigation on these issues

14   of national and internal importance, and then right in quotes

15   "to message these falsehoods and attribute them to Wheeler."

16   What you've done is you've given me a group pleading which is

17   not sufficient.

18          Who do you say wrote these quotes?  And what basis do

19   you have to say that these quotes were created by Butowsky,

20   Zimmerman, and/or Fox?

21          MR. WILLEMIN:  It's not and/or.  Our allegation is

22   that all three of these individuals worked together to write

23   these quotes.

24          THE COURT:  What do you claim Butowsky did?

25          MR. WILLEMIN:  Butowsky was involved every single step

1     of the way.

2            THE COURT:  So was your client.

3            What do you claim he did with regard to what you claim

4     was the defamatory statement?  You don't claim that he drafted

5     those statements, do you?

6            MR. WILLEMIN:  We do.

7            THE COURT:  On what basis are you claiming that

8     Butowsky was the one that drafted those statements?

9            MR. WILLEMIN:  The allegation and the basis for the

10    allegation is that Mr. Butowsky and Ms. Zimmerman worked

11    together to craft these statements to support an article that

12    they knew was false.

13           THE COURT:  What's your good faith to allege that

14    Butowsky had something to do with a knowing false statement?

15           MR. WILLEMIN:  First, again, he was involved in every

16    single step of the way through the story.  In terms of knowing,

17    he admitted on recording that Mr. Wheeler never said the things

18    that he is alleged to have said.  And Mr. Butowsky said, if I'm

19    under oath, I will testify that you never said that with regard

20    to the first statement in the article.

21           THE COURT:  So was that in conjunction with some

22    mission that he was the one involved in attributing these

23    statements to him?  Or was that in conjunction with his denial

24    that he had anything to do with it?

25           MR. WILLEMIN:  Your Honor, Mr. Butowsky denies he had

1    anything to do with it.

2            THE COURT:  I'm talking about in the context of the

3    conversation.  You're trying to rely upon where he says that if

4    I'm called under oath, I would have to say that you didn't say

5    these things.

6            MR. WILLEMIN:  I think your Honor had asked why it was

7    defamatory and how it was knowingly false.  So that's in terms

8    of how it was knowingly false.

9            In terms of the evidence that he did it, this is,

10   your Honor, at the pleading stage.

11           THE COURT:  It's not a question of -- the question has

12   to be how is it knowingly false known by him prior to the

13   publication.  Two, what did he have to do when knowingly

14   publishing what he knew to be a false statement that you want

15   to claim was drafted by him.

16           It seems to me that all the evidence that you have is

17   that it was drafted by Zimmerman, not that any of these

18   quotations were drafted by him.

19           MR. WILLEMIN:  Your Honor, at the pleading stage --

20   there's an email where Mr. Butowsky says that he's the one

21   putting the story together.

22           THE COURT:  Putting the story together.  So is your

23   client the one putting the story together.  So is Zimmerman the

24   one putting the story together.  That doesn't tell me that he

25   was aware of a particular falsehood or that he knowingly had

1    anything to do with putting a falsehood into the statement.

2            So your argument is that because he made a statement

3    that he was involved in helping to put together the article,

4    that that makes him liable for anything that you could identify

5    now as a false statement, even if you have no evidence, one,

6    that he knew it was false at the time; or two, that he had

7    anything to do with putting it in the article.

8            MR. WILLEMIN:  At the prediscovery stage -- I'm going

9    to rattle off a bunch of the allegations we have.  At the

10   prediscovery stage, I would contend, your Honor, that we have

11   sufficiently alleged Mr. Butowsky's involvement at least to the

12   point where we can have a reasonable inference that he was

13   involved in these quotes.

14           THE COURT:  You have to give me more than that.  I

15   don't want to know whether he was involved, because you're

16   right.  You've sufficiently alleged that he was involved.

17           Alleging that he was involved is not sufficient to

18   allege that he was the defamer.  That he's involved in the

19   article doesn't allege that he is the person that knowingly was

20   responsible for false information that was in the article.

21           What is it that you claim he did with regard to the

22   false statements?  What is it that you want me to interpret

23   your allegations to mean that you're accusing him of physically

24   doing with regard to the false statement?

25           MR. WILLEMIN:  The entire narrative of the article and

1    the entire purpose and point and message of the article was

2    Butowsky's goal from before he even met Mr. Wheeler and

3    Ms. Zimmerman in connection with this article.

4           Butowsky's stated goal in emails, in voicemails, in

5    recorded conversations was to attempt to prove and establish

6    that the Russians were not the ones that hacked the DNC; that

7    Seth Rich was the one that hacked the DNC.  As a result, Seth

8    Rich was murdered for that.

9           THE COURT:  That was everybody's intent, even your

10   client.  Everybody was going on that premise in.

11          MR. WILLEMIN:  My client was trying to investigate and

12   determine who murdered Seth Rich.  The point is that the

13   quotations that were falsely attributed to Mr. Wheeler were

14   precisely to help bolster what Mr. Butowsky's goal was to begin

15   with.

16          THE COURT:  How does that make Mr. Butowsky -- how

17   does that make him conclude that he drafted those statements or

18   he published those statements knowing that they were false?

19          MR. WILLEMIN:  Because he was involved every single

20   step of the way with this article.  He exchanged the drafts.

21   He worked together with Zimmerman.  He introduced Wheeler to

22   Zimmerman.  He was on the majority of the communications they

23   all had together.

24          THE COURT:  Okay.  But that doesn't tell me -- look.

25   There was a time when -- you agree that she wrote the article.

1    You're not alleging that he wrote the article.

2          MR. WILLEMIN:  I have no idea what the

3    communication --

4          THE COURT:  What are you alleging?  If you have no

5    idea, you can't sue anybody.  You have to have some idea.

6          Who do you claim wrote the article?

7          MR. WILLEMIN:  What I'm saying is the byline of the

8    article is Malia Zimmerman.

9          THE COURT:  So do you claim that Butowsky wrote the

10   article instead of Zimmerman?

11         MR. WILLEMIN:  Whether Butowsky sent his own edits to

12   the article, I don't know.

13         THE COURT:  I'm asking you.  Who are you alleging

14   wrote this article?

15         MR. WILLEMIN:  Physically typed it, Ms. Zimmerman.

16         THE COURT:  Not physically typed it.  Who drafted it?

17         MR. WILLEMIN:  Both of them.

18         THE COURT:  Who are you alleging drafted these

19   defamatory parts of the article?

20         MR. WILLEMIN:  Both of them.

21         THE COURT:  What basis do you have that Butowsky did

22   it rather than Zimmerman doing it on her own?

23         MR. WILLEMIN:  Because he said that he was the one

24   putting the article together.

25         THE COURT:  But he didn't say anything about the

1    statements that you say are defamatory, and he doesn't say

2    anything about knowing that those statements were untrue.

3               MR. WILLEMIN:  He does admit that the statements were

4    untrue.  He denies that he was the one that wrote them, but --

5               THE COURT:  So he denies that he was the one that

6    wrote them.

7               On what basis do you have to allege that he was the

8    one that wrote them?

9               MR. WILLEMIN:  He says that he was the one who put the

10   article together.

11              THE COURT:  But your client was part of the drafting

12   of the article.

13              MR. WILLEMIN:  That's not true, your Honor.

14              THE COURT:  What do you mean it's not true?  This is

15   the part he put in before it was published.  He had a hand in

16   drafting this article.  He had the whole article.  He had

17   several drafts of the article.

18              How do you say that he had no participation in this at

19   all?

20              MR. WILLEMIN:  In connection with this, he was a

21   source.

22              THE COURT:  This is not being a source.  This is a

23   draft.  He says, you can add.  He's telling her what specific

24   language to add to the article.

25              You don't consider that to be a drafter?

1          MR. WILLEMIN:  I consider it a drafter, a source

2    participating.  I'm not saying he didn't participate in any

3    way.  What I'm saying is that Butowsky takes responsibility for

4    the article in his own words.

5          For him to get out of this case on a motion to dismiss

6    when he takes responsibility for the article that those

7    defamatory quotes are in and those defamatory quotes --

8          THE COURT:  When you say he takes responsibility for

9    the article by saying what?

10          MR. WILLEMIN:  "I'm actually the one who's been

11    putting this together."

12          THE COURT:  Putting what together?

13          MR. WILLEMIN:  The article.  "I'm actually the one

14    who's been putting this together."

15          THE COURT:  Putting together getting the article ready

16    for publication; right?

17          MR. WILLEMIN:  Putting the entire story together.

18          THE COURT:  But are you saying that that's supposed to

19    be a statement that he drafted the words in the article?

20          MR. WILLEMIN:  That he participated in it, yes.

21          THE COURT:  The key to his participation has got to be

22    he participated in knowingly drafting an untrue defamatory

23    statement in the article.  You're not arguing that if he did

24    not know that this statement was untrue at the time that the

25    article was written or if he did not participate in drafting

1    what he knew to be an untrue statement in the article, you

2    wouldn't argue that he could be sued for defamation because he

3    was responsible for "putting the article together."

4              MR. WILLEMIN:  A publisher of defamatory

5    information -- and in this case, he participated in the

6    publication of the article -- is responsible for the defamatory

7    content.

8              THE COURT:  Even if they did not know that anything in

9    the article was defamatory?

10             MR. WILLEMIN:  He admitted it was not true.

11             THE COURT:  It's not a question of whether he admits

12   it.

13             What part did he admit was not true?

14             MR. WILLEMIN:  That Mr. Wheeler never made the first

15   sentence that's attributed to him in this article.  He admitted

16   that's not true.  That's not the issue.

17             The issue is whether or not he participated in it, and

18   there's plenty of evidence that he was involved every single

19   step of the way.  And at the pleading stage for Mr. Butowsky to

20   just say, which you can't even do on a Rule 12(b)(6) motion, I

21   didn't do anything in connection with this article, is not

22   sufficient to have him dismissed from this case.

23             THE COURT:  His liability is anything other than your

24   indicating that you're relying on the fact that he said that he

25   was responsible for putting the article together, and you say

1    you have a subsequent statement that he says that he knows that

2    the quote that was attributed to him was not true.

3             MR. WILLEMIN:  Yes.  It's not just that he said he was

4    involved.  There are emails going all over the place.

5             THE COURT:  I know, but the emails don't indicate

6    they're discussing these untrue statements.

7             MR. WILLEMIN:  We don't have emails between the two of

8    them, but we have the emails where they're discussing the

9    article.

10            THE COURT:  Right.

11            MR. WILLEMIN:  So he was heavily involved in that.  I

12   don't think your Honor has misstated it.  I'm simply saying

13   that it's not one admission.  He's all over this from the

14   beginning.  This was his baby.

15            THE COURT:  So why do you get to sue him in New York

16   if Butowsky is writing this article and publishing it in

17   California?

18            MR. WILLEMIN:  Under C.P.L.R. 302(a)(1), in terms of

19   specific jurisdiction, there are two elements --

20            THE COURT:  You're not asserting any general

21   jurisdiction.

22            MR. WILLEMIN:  We do assert general jurisdiction.  But

23   I think, your Honor, at this point, I would focus my

24   arguments -- general jurisdiction is in our papers.

25            THE COURT:  I know what's in your papers.  I'm just

1    trying to figure out whether you're relying on it.

2           Are you making an argument that I should keep him in

3    this case because there is sufficient general jurisdiction over

4    him?

5           If there is, explain it to me so I can understand it

6           MR. WILLEMIN:  Would your Honor like me to start with

7    general jurisdiction?

8           THE COURT:  I just want you to tell me in what way you

9    assert a general jurisdiction over him.  What is he?  A

10   California resident and doesn't live or work in New York?

11          MR. WILLEMIN:  He doesn't live in New York.  He lives

12   in Texas actually, but he has substantial business dealings in

13   New York.  He has his website admissions that he does business

14   in New York.  He has clients in New York.

15          He talks about how he retains the services and works

16   with financial experts on Wall Street in New York.  He has a

17   substantial relationship, downplayed by Mr. Harrison, with Fox

18   News in which he regularly appears on their programs broadcast

19   from New York and oftentimes appears in person in New York.

20          He's here today in New York, and he writes articles

21   that are published in New York City by Fox in New York.  He has

22   substantial contacts with New York.

23          And from a general jurisdiction perspective, at a

24   minimum, we've alleged sufficient information to get this to at

25   least jurisdictional discovery where the courts -- there is a

1    quotation I think that's important here from a case, *Biro v.*

2    *Nast*, S.D.N.Y., the Court could hazard a guess as to the degree

3    of Mr. Frank's involvement in the research for the article that

4    gave rise to this lawsuit or how much of the investigation in

5    the Biro's underlying proposals took place in New York.  It

6    would just be that.  It would be a guess.

7            THE COURT:  That has to do with specific jurisdiction,

8    not general jurisdiction.

9            MR. WILLEMIN:  That's true, your Honor.  In connection

10   with allegations of general jurisdiction --

11           THE COURT:  What do you think you're going to be able

12   to find in discovery that's going to establish general

13   jurisdiction on some basis beyond what you've just articulated?

14           MR. WILLEMIN:  I would say jurisdiction on whether or

15   not he has PR efforts in New York and the extent of those

16   efforts in connection with his businesses, whether he actively

17   solicits clients and to what extent in New York, whether he has

18   property in New York, any offices in New York, whether he has

19   any bank accounts associated with any businesses in New York.

20           We have the seeds for what appears to be a pretty

21   substantial connection with New York from a general

22   jurisdiction perspective and certainly warrants discovery.

23           I can talk about specific jurisdiction as well,

24   your Honor.

25           THE COURT:  Okay.  Tell me your specific jurisdiction.

1   How is his defaming your client in an article that's written

2   between a person in California and a person in Texas?  What's

3   the New York connection, other than you want to argue that Fox

4   News is in New York?

5          MR. WILLEMIN:  Fox News is in New York.  Let me just

6   step back.

7          There are two requirements.  One of the requirements

8   is that you transact some sort of business in the state of

9   New York.  Another requirement is that that business is related

10  to the cross-action.

11         THE COURT:  What is the business that he was

12  transacting in New York that you say is related to the

13  defamation that was in New York?

14         MR. WILLEMIN:  I think the primary example -- and I

15  would just refer back to the email that I just referred to --

16  is an email that he sent to On Air Talent producers and editors

17  in Fox News in New York in which he tells them, again, that

18  he's the one that's behind this story.

19         And he encourages them, this On Air Talent in

20  New York, to run with this defamatory story and telling them

21  what they should do when they run with it is to focus on the

22  big conclusion which is that the Russians didn't hack our

23  computer systems and steal emails and there was no conclusion.

24         So he's trying to control and sway and influence the

25  news as related to this article in New York City that was

1  published in New York.

2        THE COURT:  Tell me specifically what the article's

3  connection was to New York.

4        MR. WILLEMIN:  The article is produced, was edited --

5  it is our understanding -- and it was ultimately published out

6  of Fox News' New York office.  The fact that they have a

7  reporter in California is largely irrelevant --

8        THE COURT:  This was an on-air story you say that was

9  published on Fox News in New York.

10        MR. WILLEMIN:  Yes.  So what happened is Fox News

11  issued or published this story on their website in the morning.

12  Then it was the talk of the town on all the Fox shows that are

13  broadcast in New York, and Butowsky made a specific effort to

14  try to influence the coverage of those New York talk shows as

15  relates to the article and what points should be taken from the

16  article and what emphasis should be provided in regards to

17  how --

18        THE COURT:  I'm not sure I understand those efforts

19  are supposed to be.  Give me an example of what you're talking

20  about.

21        MR. WILLEMIN:  So he wrote to -- I just have the email

22  in front of me here.  So he wrote to a number of Fox News

23  editors at On Air Talent, Steve Deace, some Fox & Friends

24  people.

25        THE COURT:  In New York?

1              MR. WILLEMIN:  Correct.  They're based in New York.

2     They sit in New York and do their story from New York.  I'll

3     just read the email.  I think it might be helpful.

4              THE COURT:  Do it slowly.

5              MR. WILLEMIN:  Sure.  This is "To these people:  The

6     story is or will be up very early tomorrow morning.  Rob

7     Wheeler is up and ready to give interviews.  There's more to

8     come on this story, but for now, this is a massive story that

9     is going to be talked about for a long time.  If you have any

10    questions about the story or more information needed, call me

11    at 972 --" I won't put the number in.  "Call me."  Call

12    Butowsky.

13             "I'm actually the one who's been putting this

14    together, but as you know, I keep my name out of things because

15    I have no credibility.  One of the big conclusions we need to

16    draw from this is that the Russians did not hack into our

17    computer system and steal emails and there was no collusion

18    like Trump with the Russians.  We're going have a follow-up

19    story which includes Donna Brazile and her role in all this."

20             So Ed Butowsky is contacting New York on his own

21    volition -- no one is forcing him to do this -- telling these

22    people in New York to call him for information about an article

23    that he claims he had nothing to do with and telling these

24    individuals in New York how they should present this article in

25    their New York station.

1          THE COURT:  So what happened with the article after

2     that?  Because the article was already published.

3          MR. WILLEMIN:  The article ultimately was retracted.

4          THE COURT:  I'm trying to decide where the defamation

5     starts.

6          The article had been published already.  Right?

7          MR. WILLEMIN:  Not at the time this email was sent.

8          THE COURT:  It was not published by the time the email

9     was sent?

10          MR. WILLEMIN:  Correct.  He was forewarning the people

11     in New York, hey, this article is about to come out.

12          THE COURT:  I thought you were saying that they had

13     already issued it and then he was talking to them about how

14     they were going to do something else with it.

15          MR. WILLEMIN:  No.  That's the end.  He's saying,

16     there's more to come, but that's separate.

17          THE COURT:  So you say that he communicated with them

18     in New York about the article.

19          Then what happened?

20          MR. WILLEMIN:  And these individuals got on and spent

21     the next however many days on Fox News saying that this article

22     debunked the whole Russian Putin hack.

23          THE COURT:  Who published the article?

24          MR. WILLEMIN:  The article was literally published on

25     Fox News, their website.  But Butowsky is telling people, hey,

1    this article is going to be published on Fox News' website and

2    call me if you have any questions.  I'm the guy to call.  Here

3    is what you should do in terms of promoting the article and

4    reporting on it.

5           In terms of personal jurisdiction, this is one of the

6    contacts he has with New York.  After the article is published,

7    he's hauled up to New York by Fox News to kind of answer for

8    the article.  So the idea that he is disconnected with New York

9    through this process is a little disingenuous I think.

10          THE COURT:  You know I'm not sure I can use that

11   after-publication contact for the basis of asserting

12   jurisdiction.

13          MR. WILLEMIN:  I would agree except I think it's

14   indicative that New York knew who this guy was.  He knew who

15   New York was.  This is not a nonconnection here.  This was

16   something that was an intimately involved connection

17   throughout.

18          THE COURT:  Okay.

19          MR. WILLEMIN:  I don't know if your Honor wants me to

20   speak about arbitration.

21          THE COURT:  I just need to know from you whether you

22   want me to decide this motion on its merits or you want me to

23   send you to arbitration.

24          What I get from your papers is that you don't want to

25   go to arbitration, you don't think this is related to his

1    employment with Fox News, and it should not fall under the

2    arbitration clause and going to arbitration with his

3    discrimination claim.

4         MR. WILLEMIN:  That's already in arbitration.  That's

5    correct.  I won't make any other points on arbitration other

6    than to say we shouldn't go there.

7         But I have one point that I do want to make which is

8    the fact that Mr. Wheeler ended up talking about this on Fox

9    News after the fact has zero relevance.

10        If Mr. Wheeler was walking down the street in New York

11   City and a Fox executive ran him over in his car and he broke a

12   couple legs and he was out for three weeks and, because of

13   that, he couldn't do his Fox News appearances and lost money

14   and then, when he got back on Fox News, he talked about how a

15   Fox News exec. rolled him over in his car, no one would be

16   arguing that that case should go to arbitration.

17        That is a total strawman argument.  This case had

18   nothing to do with his contributorship of Fox News, and I will

19   move on from the arbitration point.

20        Mr. Harrison didn't make any mention, when he spoke,

21   about the motion for sanctions which have been brought against

22   our firm and our client in this case.  I would hope, having

23   heard the oral arguments so far, that it is clear that the

24   motion is without any merit.  I'm happy to address it if

25   your Honor would like.

1          THE COURT:  No.  I don't think I need to hear anything

2     on that.

3          MR. WILLEMIN:  Thank you, your Honor.

4          THE COURT:  Thank you.

5          Did you want to respond?

6          MR. BAINE:  Very briefly, your Honor.  Kevin Baine for

7     Fox News.

8          Just on the question of special damages, your Honor.

9     I had said earlier that there were three reasons why there are

10    no special damages in this case, and I gave one, which was the

11    damages aren't based on a publication of a third party.

12         The second, which is related, is that this isn't a

13    claim in which anybody could say that Fox read its own article

14    and concluded Mr. Wheeler was unreliable.

15         To the contrary, the article was presenting him as a

16    reliable source that Fox used.  So they obviously didn't read

17    the article and conclude he was not reliable.

18         THE COURT:  Well, I think your argument is more

19    limited than that.  The argument is that Fox News didn't make a

20    decision to not use him any further until the fallout from the

21    article and from the fallout from the article that made him

22    toxic.  That's why Fox News didn't do any more work with him.

23    That's how I understand the argument.

24         MR. BAINE:  There is no case even remotely like that

25    in which anybody has recognized that that would be special

1  damages.  It's not plausible to say to think that Fox News

2  would base its decision whether to use Mr. Wheeler again on

3  what other people said rather than on it's own judgment about

4  Mr. Wheeler and whether he had anything pertinent to add on the

5  subjects that they were covering in the future.

6       THE COURT:  Well, you're characterizing in a way I

7  don't think they're arguing it.  They're not saying that Fox

8  News made that decision on what other people said.

9       They're saying that Fox made that decision because Fox

10  had defamed him.  And as a result of the defaming him, had

11  ruined his reputation to the extent that he was no longer being

12  used by Fox.  That's the only way I can see it.

13       MR. BAINE:  That's the argument.  That's sort of an

14  indirect causation argument that's unlike any other special

15  damages causation argument that I've seen in any case.

16       Maybe the easiest way that you can dispose of the

17  special damages argument as respect to Fox, and that is, as a

18  matter of law, in the New York Court of Appeals in the case of

19  *Aronson v. Wiersma*, 65 N.Y.2d 592 at 595 said there can be no

20  special damages in the form of lost earnings if the working

21  relationship is at the pleasure of the employer.

22       There is no claim in this case that Mr. Wheeler has

23  some contractual relationship to continue providing services.

24  There is no claim that he was fired.  The whole consulting

25  agreement was completely at the pleasure of Fox which could

1       determine if and when it ever wanted to use him.

2               So, in that case, the New York Court of Appeals has

3       said that kind of relationship cannot be the basis for special

4       damages.

5               THE COURT:  I'll look at that case, but I'm not sure

6       that I understand the law to be that you can't have special

7       damages in a situation where you were doing business -- you

8       were getting income from several sources and that as a result,

9       if I'm making $50,000 consulting with a bunch of companies and

10      then you publish a defamatory statement about me and they call

11      me up and say, well, we don't think we can use you anymore

12      because your reputation has been ruined.  So, even though we

13      regularly have done business with you every year to the extent

14      of $50,000, we're not going to do any business going forward,

15      I'm not sure that that cannot be the basis of special damages

16      simply because you say that it was at the pleasure of the

17      people who your defamatory statement convinced to no longer do

18      business with the plaintiff.

19              MR. BAINE:  The case that I'm talking about addresses

20      the circumstance that we have here, which is where there is an

21      employment type of relationship and when that employment type

22      of relationship is at the pleasure of the employer, the lost

23      earnings from lost employment are not special damages, and this

24      is a consulting agreement in the nature of an employment --

25              THE COURT:  Right.  This is a consulting agreement,

1    not an employment agreement.

2         MR. BAINE:  But for purposes -- I think the analysis

3    is the same.  He's working for Fox News.  Fox News uses him

4    when it wants to use him.  And they don't have any -- it's

5    totally at their pleasure whether or not they use him in the

6    future or not.

7         They write something about him, and they decide they

8    don't want to use him anymore for whatever reason, I think it

9    falls --

10        THE COURT:  Not for whatever reason.  I'm not sure --

11   I have to look at the case because I'm not convinced that I

12   understand the logic of that.

13        If I am being used by a company and making income from

14   my business with that company, whether I'm a consultant or

15   whether I'm an employee, simply because they could fire me or

16   stop doing business with me at will, if the only reason that

17   they stopped doing business with me is because you made a

18   defamatory statement about me and they said, you know, we can't

19   be associating with you given these allegations about you and

20   these statements about you, I'm not sure why that can't

21   constitute special damages if I can demonstrate that the only

22   reason that I'm no longer getting that income is because they

23   made a decision based on the defamatory statement that they

24   could not use me because the defamatory statement has tainted

25   me so badly that they no longer feel comfortable using me.

1          I'm not sure why that can't be a basis for special

2    damages.  If I'm making $100,000 off of that, to simply say,

3    well, they could have fired you for any reason, well, they

4    could fire me for any reason.

5          But I'm not sure that they don't have any liability

6    for firing me for any reason, but I'm not sure that you could

7    convince them to fire me by making false and defamatory

8    statements against me, that the result would be that you wanted

9    to make sure that I didn't get any more income from them.  I'm

10   not sure why that's not special damages.

11         MR. BAINE:  Well, the New York Court of Appeals can

12   decide, for purposes of New York law, what they're going to

13   recognize for special damages.

14         THE COURT:  Right.

15         MR. BAINE:  So I would just refer the Court to that

16   case.

17         THE COURT:  And the case said that they don't

18   recognize special damages simply in a situation where their

19   relationship can be terminated at will?

20         MR. BAINE:  If it's a lost earnings type of

21   relationship where someone is working for someone, that's the

22   context the Court of Appeals has said you can't have special

23   damages, if the relationship is at the pleasure of the

24   employer.

25         That's New York law.  That's one of our three reasons

1    why it's not special damages, but of course we can use any of

2    them.  The first one was the basic one that this doesn't rely

3    upon the communication with a third party.  It's the speaker.

4    It's the alleged defamer.

5           THE COURT:  I understand that.  I have to look at the

6    other case because I'm not sure I understand what the New York

7    Court of Appeals has said.

8           I don't understand what the rationale is saying that

9    there can't be special damages when the defamation results in

10   my being fired simply because I could be fired without cause.

11          If that's what it says, then I'll read it, and I'll

12   follow it.  That doesn't make a lot of sense to me because that

13   would mean I guess your law firm could vote you out without any

14   good reason.  I don't know.  Can they do that?  If they do

15   that --

16          MR. BAINE:  They probably don't need a reason.

17          THE COURT:  If the people at the plaintiff's table

18   start saying all these terrible things about you and telling

19   all these terrible lies about you and saying, you wouldn't want

20   to do business with this guy.  Who wants to be associated with

21   this guy.  Here is a list of all the terrible things that he

22   does, and they make up false statements that defame you, and

23   then your firm says, well, we can't keep this guy on.  There

24   are all these statements out there that he did this and he did

25   that.  Even if it's false, not everybody thinks it's false, and

1   a lot of people -- it's not to our advantage to have him

2   continue.  So let's tell him that he's got to find someplace

3   else to work.

4           The Court of Appeals case says that it cannot

5   constitute special damages that you lost that position, lost

6   your total income with them, simply because you could be fired

7   without cause?

8           MR. BAINE:  That's my understanding of the holding of

9   the case, your Honor.

10          THE COURT:  All right.  I'll look.

11          MR. BAINE:  Let me get back to the main point very

12  briefly.  The argument here today has been very helpful in

13  clarifying the issues.

14          What I think has been clarified by everyone here is

15  that the plaintiff's claim all comes down to the word "shows."

16  What they're saying is false and defamatory is that my

17  investigation "shows" some degree of email communication

18  between Rich and WikiLeaks.

19          The plaintiff said that that's false and defamatory

20  because that means that Wheeler is saying that he saw the

21  emails.  There's an important legal point here, and your Honor

22  raised a question.  I'd like to address it.

23          What's the standard here.  The standard is that it's

24  for the Court to decide on the motion to dismiss as a matter of

25  law whether a particular construction is reasonable.

1          I can give you a couple cites for that proposition,

2     the New York Court of Appeals in *Armstrong v. Simon & Schuster*,

3     85 N.Y.2d 373 at 380, and a case that's cited in our papers,

4     *Ava v. NYP Holdings*, 885 N.Y.S.2d 247 at 251.

5          The restatement -- I think it's at 611.  That's from

6     memory -- basically said that it's the role of the court to

7     decide whether a publication is reasonably capable of being

8     understood to mean something.

9          And then if the court thinks that's a reasonable

10    interpretation, then a jury can decide whether people in fact

11    read it that way, but it's a legal question whether that's

12    reasonable.

13         So our argument is it is not reasonable to read the

14    statement, my investigation up to this point shows there was

15    some degree of email exchange to mean, I've read the emails.

16    That's not reasonably what's conveyed there, and we know that

17    for a couple of reasons.

18         One is because when the article wants to say someone

19    has seen and read the emails, they say that.  They said that

20    about the federal investigator.  They don't say it here.

21         In fact, they follow this quote up by quoting

22    Mr. wheeler saying.  I believe that the answers lie on the

23    computer.  "I believe" is much softer than I've read the

24    emails, and I know what they say.

25         So it would be unreasonable --

1          THE COURT:  That was language that was added by him.

2     That language you're referring to was added by him.

3          MR. BAINE:  Yes.  That's the language he texted, and

4     that's in the article.  So no one could read this article and

5     reasonably conclude that not only did the federal investigator

6     who was said to have seen and read them, but Mr. wheeler saw

7     and read these emails, even though the article doesn't say it

8     and just couches his statement in terms of belief and showing

9     some degree of communication.  So that's an unreasonable

10    interpretation.  For that reason alone, they can't base a case

11    on that interpretation.

12         Mr. Willemin acknowledged in his argument that it

13    would not have been false or defamatory to quote Mr. wheeler as

14    saying the following -- and I think I wrote this down

15    correctly -- "My investigation leads me to believe" there was

16    some degree of email exchange between Rich and WikiLeaks.

17    Indeed he even said "strongly believes."  That would accurately

18    reflect his client's position.

19         That is a concession that this quote does not

20    attribute to Mr. Wheeler a belief he did not hold.  And he,

21    therefore, cannot prove falsity in the way that he has to.

22         The *Masson* case which counsel referred to, *Masson v.*

23    *New York* -- that's 501 U.S. 496 at page 511 -- says that an

24    alleged misquotation can be defamatory if it falsely imputes to

25    the speaker -- this is a quote -- "an attitude he does not

1    hold."

2          So they have to prove that we falsely attribute to

3    Mr. wheeler an attitude he does not hold.  Counsel conceded in

4    court today that he does in fact hold the belief, the strong

5    belief, that there was some degree of email exchange between

6    Rich and WikiLeaks.  That concession completely forecloses any

7    possibility of their proving falsity.

8          Finally, a brief word about consent.  Let's assume for

9    a moment that Mr. wheeler did not in fact read Exhibits 2 to 4,

10   those drafts that I gave your Honor.  And he alleges –– he

11   says, his counsel argues, that he told Ms. Zimmerman he was

12   traveling and couldn't read them.

13         Look at the text, which is the document I gave you

14   earlier.  At 3:59 p.m. Ms. Zimmerman says, "Can you read the

15   stories now?"  And he answers over on the right –– that's the

16   answer –– "yes."  "Can you read the stories now?" at 3:59 p.m.

17   "Yes".

18         So, whatever he said earlier about I won't have time

19   to read them today.  I'm traveling, he's saying yes.  I can

20   read them.

21         We know he wasn't traveling all day because he gave

22   Fox a live interview on camera in Washington D.C.  He wasn't

23   traveling somewhere else.

24         After he says:  "Yes.  I'm reading the story now,"

25   She says:  "Get back to me as soon as you can so I can turn

them in."

Then he says:  "Reading it now," and he adds his

quote.  By the way, the quote, "You can add that I do strongly

believe that the answers lie in the computer" -- that

implicitly embraces the statement that the emails -- that there

was some degree of email exchange.

It would have made no sense for him to come up with

that quote out of the blue unless he was aware that the story

already referred to there being some degree of email exchange.

So maybe Mr. wheeler wasn't clear in his

communications, but the question is apparent consent.  Did the

Fox News reporter with that exchange and the additional quotes

being given -- did she understand reasonably that he appeared

to be consenting.

Clearly there's apparent consent from this exchange

and from the supplying and from the failure to object to the

quotes in the story, the supplying of an additional quote which

embraces that quote, clearly there's apparent consent, even if

Mr. wheeler adheres to the position today that he didn't

actually read the story.

He apparently did, and he apparently consented.  So

for that reason as well, consent, truth, and it's just not

defamatory.

Again, what is defamatory about saying that his

investigation shows some degree of email exchange.  That's a

1  conclusion that another federal investigator had already given

2  based on the personal observation of emails.  Nothing about

3  this makes him look ridiculous.

4          So nobody reading this article could think he's a bad

5  person, that he's an incompetent investigator, that he's evil,

6  that he's corrupt or dishonest.

7          Fox presented him as a reliable source articulating a

8  very vaguely worded conclusion that's consistent with someone

9  else.  It just isn't defamatory, your Honor.  That's purely a

10  legal question.  Thank you.

11          THE COURT:  Are we done?  I'm late for another

12  appointment.

13          MR. WILLEMIN:  Could I have 45 seconds, your Honor?

14  I'll be very quick.

15          THE COURT:  Yes.

16          MR. WILLEMIN:  I think I spent at least 15 minutes of

17  my opening remarks not conceding what has now just been

18  attributed as a concession to me.

19          The entire point of my statement as we went back and

20  forth -- and I know I frustrated your Honor -- is that he would

21  not say that he believed something without qualifying it by

22  saying that it is a potential or perhaps or even qualifying it

23  by saying that there likely is some communications, but that is

24  absolutely not something that I conceded that he would say

25  without qualification, which is exactly the point of I think

```
1    what made my remarks so long.

2            I'll leave it at that, other than to just again leave

3    the Court with the title of this article which is that "Seth

4    Rich had contact with WikiLeaks say multiple sources."

5            It would not be in any way, shape, or form

6    unreasonable for a reader to review this and think that our

7    client had proof that Seth Rich had contact with WikiLeaks.

8            THE COURT:  Thank you.

9            I'm going to get the transcript.  So I think that will

10   be helpful.  I'll get back to you as quickly as possible,

11   hopefully within the next couple of days.

12           MR. BAINE:  Thank you, your Honor.

13           MR. WILLEMIN:  Thank you, your Honor.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```