```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 0 2 2018
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- x

ROD WHEELER,

                Plaintiff,

     -against-

TWENTY-FIRST CENTURY FOX,
FOX NEWS NETWORK LLC, MALIA
ZIMMERMAN, *in her individual and professional capacities*, and ED BUTOWSKY, *in his individual and professional capacities*,

                Defendants.

------------------------------------- x

MEMORANDUM DECISION
AND ORDER

17 Civ. 5807 (GBD)

GEORGE B. DANIELS, United States District Judge:

    Plaintiff Rod Wheeler brings this action asserting claims for defamation *per se* and, in the alternative, defamation and libel *per quod*, against Defendant Fox News Network LLC ("Fox News"), its parent company, Defendant Twenty-First Century Fox, Inc. ("21st Century Fox" and, with Fox News, "Fox"), Fox News investigative journalist Defendant Malia Zimmerman (with Fox, "the Fox Defendants"), and Fox News contributor Defendant Ed Butowsky. (*See* Am. Compl., ECF No. 56.) Plaintiff's allegations principally arise out of Fox News's coverage of his investigation into the murder of Seth Rich, a former Democratic National Committee ("DNC") employee who was rumored to have leaked sensitive, private emails from DNC servers to WikiLeaks.[1] (*See id.*)

---

[1] After this action was filed, Seth Rich's parents brought an action pending before this Court in which they assert claims for intentional infliction of emotional distress and tortious interference with contract, among others, against Fox News, Zimmerman, and Butowsky arising out of Fox News's coverage of Wheeler's investigation into Seth Rich's murder. (Compl., *Rich v. Fox News Network, LLC*, No. 18-cv-2223 (S.D.N.Y. Mar. 13, 2018), ECF No. 7.) The defendants in that case filed motions to dismiss, which are addressed in a separate opinion filed today.

Defendants move to dismiss Plaintiff's lawsuit in its entirety for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] (ECF Nos. 74 and 78.) Butowsky also moves for sanctions against Plaintiff and Plaintiff's former counsel pursuant to Rule 11. (ECF No. 43). Both Butowsky and Plaintiff request an award of attorneys' fees and costs in connection with the Rule 11 motion. (Mem. in Supp. of Butowsky's Mot. for Sanctions ("Sanctions Mem."), ECF No. 44, at 4; Pl. Mem. in Opp'n to Butowsky's Mot. for Sanctions ("Sanctions Opp'n"), ECF No. 57, at 1.)

Defendants' motions to dismiss for failure to state a claim are GRANTED. Butowsky's motion for sanctions and Butowsky's and Plaintiff's requests for attorneys' fees and costs are DENIED.

## I. FACTUAL BACKGROUND

On July 10, 2016, Seth Rich, a Democratic National Committee ("DNC") staff member, was murdered. (Am. Compl. ¶ 77.) The Washington D.C. Metropolitan Police Department ("MPDC") believed that the murder occurred in the course of a botched robbery. (*Id.*) In the weeks after the murder, some individuals theorized that Rich was the source of DNC emails leaked to the media organization WikiLeaks during the primaries for the 2016 presidential election, and that his murder was related to the leak. (*Id.* ¶ 78.) However, others believed that Russian hackers leaked the emails to WikiLeaks in an attempt to sway the election in favor of then-candidate Donald Trump, and that Rich's murder was unrelated to the emails. (*Id.* ¶¶ 76–78, 85.)

Butowsky, a Fox News contributor, spoke with Seymour Hersh, an investigative journalist, who claimed that he had received information regarding an FBI report about Rich's murder. (*Id.* ¶ 86.) Though he had not seen the report, Hersh said he had learned from "somebody on the inside"

---

[2] The Fox Defendants also move, in the alternative, to compel arbitration and stay this action pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (*See* ECF No. 38.)

that the FBI report stated the MPDC had obtained a search warrant for Rich's home and recovered Rich's computer. (*Id.* ¶¶ 87–88.) According to Hersh, the report indicated that the FBI, at the MPDC's request, accessed the contents of Rich's computer and found Rich submitted a series of DNC emails to WikiLeaks. (*Id.*)

On February 23, 2017, Butowsky contacted Plaintiff, who has his own private investigative consulting company, and explained that the Rich family wanted to hire an investigator to conduct an independent investigation of Rich's murder. (*Id.* ¶¶ 6, 82–83.) On February 28, 2017, Plaintiff met Butowsky and Zimmerman, an investigative journalist for Fox News who had been investigating Rich's death for several months, to discuss Plaintiff's possible investigation of Rich's murder. (*Id.* ¶ 92.) According to Plaintiff, if the investigation confirmed Rich was murdered for leaking the emails, Butowsky and Zimmerman hoped to use the information to discredit theories that Russians had done so to influence the 2016 presidential election. (*Id.* ¶ 9.)

Plaintiff had multiple conversations with the Rich family over several weeks. (*Id.* ¶ 94.) On March 14, 2017, the Rich family and Plaintiff entered into a written agreement that Plaintiff would conduct his own independent investigation "with regards to the official police investigation surrounding the death of Seth Rich." (*Id.* ¶ 95.) The agreement expressly stated that Butowsky would pay the costs of the investigation. (*Id.* ¶ 99.) Thereafter, Plaintiff began interviewing Rich's relatives, co-workers, and friends. (*Id.* ¶ 102.) Plaintiff also reviewed evidence made available to him through the MPDC. (*Id.*) While conducting his own investigation, Plaintiff kept Butowsky and Zimmerman informed of the steps he was taking, the people he had spoken to, and what records he had reviewed. (*Id.* ¶ 105.)

On April 25, 2017, Plaintiff met with Detective Joseph Della-Camera of the MPDC, who stated that he believed Rich's murder was the result of a botched robbery. (*Id.* ¶ 108.) Della-Camera

said he had no information indicating Rich's murder was related to the DNC emails and no knowledge of any FBI involvement with the murder investigation. (*Id.*)

On May 10, 2017, Butowsky and Zimmerman informed Plaintiff that they had a source at the FBI who confirmed emails were sent between Rich and WikiLeaks. (*Id.* ¶ 112.) On May 11, 2017, Zimmerman sent Plaintiff a draft of an article regarding Rich's murder (the "Article"). (*Id.* ¶ 113.) The draft did not contain any quotes from Plaintiff suggesting that Rich had sent emails to WikiLeaks or suggesting that the DNC, Democratic Party, presidential candidate Hillary Clinton, or former president Bill Clinton were involved in a cover-up of Rich's murder. (*Id.*)

On Monday, May 15, 2017, Zimmerman emailed Plaintiff that the Article would be published imminently. (*Id.* ¶ 119.) Plaintiff told Zimmerman that he was traveling and would be unable to review drafts of the Article that she sent him throughout the day. (*Id.* ¶ 120.) However, at Zimmerman's request, Plaintiff sent Zimmerman quotes for the Article. (*Id.*) A text message containing one of Plaintiff's quotes read, in part:

> Joe said that when I called the [MPDC] right after that Donna Brazil[e] called him and was asking him why was I snooping around asking questions about the death of Seth [Rich] . . . . I also spoke with another source today who informed me that not only was Donna Brazil[e] snooping around . . . but also . . . Debbie Wasserman Schultz was snooping around wanting to know how much it was I [was] learning.

(Decl. of David B. Harrison in Supp. ("Harrison Decl."), Ex. 6, ECF No. 80-6, at 4–5.[3]) The text message also stated, "you can add that I do strongly believe that the answers to who murdered [Rich] sits on his computer on a shelf at the [MPDC] or FBI headquarters!" (*Id.* at 5.)

---

[3] Though the text message and a transcript of Plaintiff's interview with a Fox News affiliate, Fox 5 (the "Fox 5 Interview") were not attached to the Amended Complaint, this Court may consider those materials because they are "incorporated into the [Amended] [C]omplaint by reference, . . . and documents possessed by or known to the [Plaintiff and upon which [he] relied in bringing the suit." *ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

4

That evening, the news program Fox 5 interviewed Plaintiff. (*Id.* ¶ 122; *see also* Decl. of Joseph M. Terry in Supp. ("Terry Decl."), Ex. 5, ECF No. 76-5.) During the Fox 5 Interview, when asked, "You have sources at the FBI saying that there is information . . . that could link Seth Rich to WikiLeaks?" Plaintiff responded, "Absolutely. Yeah. That's confirmed." (Terry Decl., Ex. 5, at 3:17–23.)

In the same Fox 5 Interview, Plaintiff stated that neither "[t]he [MPDC] nor the FBI have been forthcoming; they haven't been cooperating at all. I believe that the answer to solving [Rich's] death lies on that computer, which I believe is either at the police department or . . . the FBI." (*Id.* at 4:10–15.) Plaintiff further explained:

> I have a source inside the [MPDC] that has looked me straight in the eye and said, 'Rod, we were told to stand down on this case and I can't share any information with you.' . . . I don't think it comes from the Chief's office, but I do believe there is a correlation between the Mayor's office and the DNC and that is the information that's going to come out tomorrow.

(*Id.* at 3:23–4:8.)

The next day, Fox published the Article as the lead story on the FoxNews.com homepage. (Am. Compl. ¶ 126.) The Article, entitled *Seth Rich, Slain DC Staffer, Had Contact with WikiLeaks, Say Multiple Sources*, listed Zimmerman as the author. (Am. Compl., Ex. A ("Article"), ECF No. 56-1, at 1.) The Article stated, among other things, "A federal investigator who reviewed an FBI forensic report . . . detailing the contents [of] Rich's computer said he made contact with WikiLeaks," and quoted the investigator as stating, "I have seen and read the emails between Seth Rich and WikiLeaks." (*Id.* at 1–2.)

The Article noted that the FBI investigator's "revelation is consistent with the findings of Rod Wheeler." (*Id.* at 2.) In discussing Plaintiff's findings, the Article attributed a quote to Plaintiff (the "Email Quote") stating, "'My investigation up to this point shows there was some degree of email

5

exchange between Seth Rich and WikiLeaks,' Wheeler said. 'I do believe that the answers to who murdered Seth Rich sit[] on his computer on a shelf at the [MPDC] or FBI headquarters.'" (*Id.*) Another quote attributed to Plaintiff in the Article (the "Murder Investigation Quote") stated, "'My investigation shows that someone within the D.C. government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward.' Wheeler told Fox News. 'That is unfortunate. Seth Rich's murder is unsolved as a result of that.'" (*Id.* at 3.)

Following the publication of the Article, the Rich family issued a statement condemning both the Article and Plaintiff. (*Id.* ¶ 145.) In response, Zimmerman sent an email to Joel Rich, Seth Rich's father, which included the statement (the "Email Statement"), "As you know, much of our information came from . . . Rod Wheeler, who we understand was working on behalf of you." (*Id.*) Plaintiff learned of the Email Statement and told Zimmerman and Butowsky it was inaccurate because "much of the information did not come from me." (*Id.* ¶ 146.) Zimmerman responded, "Not the part about the emails. Not the part about, I mean, about the connection to WikiLeaks, but the rest of the quotes in the story did. A lot of the quotes in the story did." (*Id.*)

In the same conversation, Butowsky told Plaintiff, "[O]ne day you're going to win an award for having said those things you didn't say." (*Id.*) In a different conversation, when Plaintiff read Butowsky the Email Quote, Butowsky stated, "Well I know that's not true. . . . I've never heard you say that" and "if I'm under oath, I would say I've never heard him say that." (*Id.*)

On May 23, 2017, Fox News retracted the Article and issued a statement that said, in part, "the May 16 [Article] was not initially subjected to the high degree of editorial scrutiny we require for all our reporting. Upon appropriate review, the [A]rticle was found not to meet those standards and has since been removed. . . . We will continue to investigate this story and will provide updates as warranted." (*Id.* ¶ 150.)

6

On June 23, 2017, Plaintiff informed Defendants of his intent to seek legal counsel and assert claims against Defendants based upon the Article. (*Id.* ¶ 174.) On June 26, 2017, Butowsky used the social networking platform Twitter to send a tweet (the "DNC Tweet") stating, "Fox News story was pulled because Rod Wheeler said [he] didn't say a quote . . . . How much did DNC pay him?"[4] (*Id.* ¶ 175.) Later that day, Butowsky sent another tweet (the "Truth Tweet") stating, "This shows Rod Wheeler has a major battle with the truth. Everyone needs to hear this. He says the precise words he swears he didn't say???"[5] (*Id.* ¶ 179.)

Plaintiff alleges that the criticism he faced from Butowsky's tweets and from the media and general public regarding the Article have caused him emotional distress, and his professional and personal contacts have ostracized him. (*Id.* ¶ 168.) Plaintiff also alleges that 21st Century Fox and Fox News have prevented Plaintiff from making further appearances on Fox News programs as a contributor. (*Id.* ¶ 168.) In addition, Plaintiff alleges his work as a private investigator has also declined, as the negative attention he received has discouraged his existing and potential clients from working with him. (*Id.* ¶ 169.)

## II. LEGAL STANDARDS

"A Rule 12(b)(6) motion challenges the legal sufficiency of the claims asserted in a complaint." *Trustees of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 131 F. Supp. 3d 103, 119–20 (S.D.N.Y. 2015). To survive such a motion, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[4] "A tweet is a short text post . . . delivered through Internet or phone-based text systems to the author's subscribers" using Twitter, "a social networking and micro-blogging service." *United States v. Feng Ling Liu*, 69 F. Supp. 3d 374, 377 (S.D.N.Y. 2014).

[5] Plaintiff's Amended Complaint does not indicate what the word "this" in the Truth Tweet refers to. Butowsky asserts that "this" was a reference to an audio recording of Plaintiff. (*See* Butowsky Mem. in Supp. at 26.)

7

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a Rule 12(b)(6) motion, a court "accept[s] all factual allegations in the complaint as true . . . and draw[s] all reasonable inferences" in favor of the plaintiff. *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). A court is "not, however, 'bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions.'" *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).

### III.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM

All of Plaintiff's claims sound in defamation.[6] Under Maryland law, the tort of defamation has four elements: "(1) the defendant made a defamatory statement to a third person . . . ; (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm."[7] *Meaney v. Nationstar Mortgage*, No. 16 Civ. 2959 (TDC), 2018 WL 1014927, at *14 (D. Md. Feb. 21, 2018) (quoting *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001)). But "the essence of a defamation claim is the publication of a falsehood." *Watkins v. Washington Post*, No. 17 Civ. 818 (PWG), 2018 WL 805394, at *4 (D. Md. Feb. 9, 2018). Thus, "if a plaintiff

---

[6] Plaintiff asserts claims for defamation, defamation *per se*, and libel *per quod*. (*See* Am. Compl.) "Libel is a branch of the tort of defamation, which covers acts of written defamation." *Hodge v. Coll. of S. Md.*, 121 F. Supp. 3d 486, 503 (D. Md. 2015) (citation omitted). "Defamation *per se* is defamation on its face—i.e. the 'words themselves impute the defamatory character.' Defamation *per quod* occurs when the alleged defamatory statement itself does not 'impute the defamatory character' but rather extrinsic facts are necessary to do so." *Sullivan v. City of Frederick*, No. 17 Civ. 1881 (JKB), 2018 WL 337759, at *8 (D. Md. Jan. 9, 2018) (citations omitted). Because Plaintiff's factual allegations in support of all three claims are substantially identical, this Court considers all three claims together. (*Compare* Am. Compl. ¶¶ 183–206 (defamation *per se*), *with id.* ¶¶ 207–30 (defamation); *and* ¶¶ 231–54 (libel *per quod*).)

[7] Where, as here, defamatory statements are "published on the Internet and . . . accessible nationwide . . . . there is a presumptive rule that the law of the plaintiff's domicile applies." *Broadspring, Inc. v. Congoo, LLC*, No. 13 Civ. 1866 (JMF), 2014 WL 4100615, at *6 (S.D.N.Y. Aug. 20, 2014). Here, Plaintiff is domiciled in Maryland. (Am. Compl. ¶ 39.) Even if this Court were to apply New York law, the result of this case would be the same because, as Plaintiff notes, the laws of New York and Maryland regarding defamation are substantially similar. (Pl. Opp'n to Butowsky at 18 n.3.).

cannot prove the falsity of a particular statement, the statement will not support an action for defamation." *Id.* (quoting *Spengler v. Sears Roebuck & Co.*, 878 A.2d 628, 640 (Md. 2005)).

To be defamatory, a statement must be capable of being "objectively characterized as true or false." *Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.*, 836 F. Supp. 1204, 1215 (D. Md. 1998) (citing *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1288 (4th Cir. 1987)). Accordingly, "[s]tatements that cannot be reasonably interpreted as stating actual facts" cannot form the basis of a defamation claim. *Baltimore Sports & Social Club, Inc. v. Sport & Social, LLC*, 228 F. Supp. 3d 544, 550 (D. Md. 2017) (quoting *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008)). A statement of opinion "becomes actionable only if it implie[s] the allegation of undisclosed facts as the basis for the opinion." *Agora, Inc. v. Axxess, Inc.*, 90 F. Supp. 2d 697, 704 (D. Md. 2000) (quoting *Peroutka v. Streng*, 695 A.2d 1287, 1298 (Md. Ct. Spec. App. 1997)). When "the reader understands that . . . opinions represent the writer's interpretation of the facts presented, . . . because the reader is free to draw his or her own conclusions based upon those facts, th[e] . . . statement is not actionable as defamation." *Agora, Inc.*, 90 F. Supp. 2d at 704 (quoting *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144–45 (D.C. Cir. 1994)); *see also Gallardo v. FedEx Kinko's Office & Print Servs., Inc.*, No. 08 Civ. 392 (JFM), 2008 WL 2143011, at *7 (D. Md. May 12, 2008) ("[W]hen a speaker plainly expresses 'a subjective view, an interpretation, a theory, conjecture or surmise [based on disclosed facts] the statement is not actionable.'") (quoting *Biospherics, Inc. v. Forbes*, Inc., 151 F.3d 180, 186 (4th Cir. 1998)). "[R]hetorical statements" are also protected, "because '[t]he general tenor of rhetorical speech, as well as the use of 'loose, figurative, or hyperbolic language' sufficiently negates any impression that the speaker is asserting actual facts." *Baltimore Sports*, 228 F. Supp. at 550 (quoting *Snyder v. Phelps*, 580 F.3d 206, 220 (4th Cir. 2009)).

Additionally, for purposes of a defamation claim, a statement is not "false" if it is "substantially correct." *Meaney*, 2018 WL 1014927, at *14 (quoting *Piscatelli*, 35 A.3d at 1147) (internal quotation marks omitted). "[M]inor inaccuracies do not amount to falsity provided that the substance or gist of the statement is justified." *Tucker v. Specialized Loan Servicing, LLC*, No. 14 Civ. 813 (PWG), 2016 WL 6476286, at *11 (D. Md. Nov. 1, 2016) (quoting *Piscatelli*, 35 A.3d at 1147). "Put another way, a statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Batson v. Shiflett*, 602 A.2d 1191, 1212 (Md. 1992) (quoting *Masson v. N.Y. Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted)); see also *Chesapeake Pub. Corp. v. Williams*, 661 A.2d 1169, 1177 (Md. 1995) (finding a statement was not false where "the meaning of [plaintiff's] intended statement was not materially changed by [defendant's] alteration").

Here, Plaintiff's defamation claims are based on five statements: (1) the Email Quote; (2) the Murder Investigation Quote; (3) the Email Statement; (4) the Truth Tweet; and (5) the DNC Tweet. Because none of the statements can be proven false, Plaintiff has failed to state a claim for defamation.

### A. The Email and Murder Investigation Quotes

The two quotes in the Article attributed to Plaintiff are not false because Plaintiff has failed to show that they had "a different effect on the mind of the reader from that which the . . . truth would have produced." *Masson*, 501 U.S. at 517. First, the Email Quote is not materially different from the statement that Plaintiff acknowledges making in the Fox 5 Interview "confirm[ing] that a 'source' . . . had information that could link Seth Rich to WikiLeaks." (Am. Compl. ¶ 122.) Plaintiff contends his statement in the Fox 5 Interview differs from the Email Quote because the statement in the Fox 5 Interview was referring to "Zimmerman's and Butowsky's alleged source," rather than information he had learned personally. (Pl. Opp'n to Butowsky Mot. to Dismiss ("Pl. Opp'n to

Butowsky", ECF No. 85, at 18.) But Plaintiff drew no such distinction in the Fox 5 Interview itself. In fact, Plaintiff answered affirmatively when asked if "*you* have sources" indicating there was information linking Rich to WikiLeaks. (Terry Decl., Ex. 5 at 3:17–23 (emphasis added).)

Plaintiff also asserts that the reference in the Email Quote to what Plaintiff's "investigation . . . shows" would lead a reader to conclude Plaintiff "had personal knowledge or concrete evidence," (Am. Compl. ¶ 238), or that his "personal investigation had conclusively established" and "independently confirm[ed] that Mr. Rich sent . . . emails to WikiLeaks." (Pl. Mem. in Opp'n to Fox Defs. Mot. to Dismiss ("Pl. Opp'n to Fox"), ECF No. 84, at 18.) However, while an investigation may be based on personal knowledge or independently corroborated facts, an investigation may also be based upon sources. And the Email Quote—unlike the quote attributed to the "federal investigator" in the Article, which stated the investigator had "seen and read the emails"—does *not* state or imply that Plaintiff personally reviewed any emails between Rich and WikiLeaks as part of his investigation. (Article at 2.) Because Plaintiff cannot show that the Email Quote had a different effect on the reader than his actual statements in the Fox 5 Interview produced, the Email Quote is not provably false.

For similar reasons, Plaintiff has also failed to allege that the Murder Investigation Quote is false, because it is not materially different from the statements Plaintiff made in a text message he sent Zimmerman, and the statements he made during the Fox 5 Interview. Plaintiff alleges that he "provided a quote" to Zimmerman "regarding Debbie Wasserman Schultz and Donna Brazile, two former chairs of the DNC who apparently called Detective Della-Camera to inquire as to why Mr. Wheeler was investigating the Rich murder." (Am. Compl. ¶ 120.) In the text message providing the quote to Zimmerman, Wheeler stated that "Donna Brazil[e] . . . was asking [Della-Camera] why was [Plaintiff] snooping around asking questions about the death of Seth [Rich]" and that "Debbie

11

Wasserman Schultz . . . want[ed] to know how much it was [Plaintiff] was learning." (Harrison Decl., Ex. 6 at 4–5.) Plaintiff contends that the text message differs from the Murder Investigation Quote because it does not "suggest an attempt to . . . block the investigation of Seth Rich's murder." (Pl. Opp'n to Fox at 19.) But it would make little sense for officials at the DNC to contact the MPDC and ask about Plaintiff unless they were concerned about what Plaintiff might find. In particular, Plaintiff's statement that Wasserman Schultz's inquired into "how much" Plaintiff was learning implies that there was some quantity of information she wished to ensure that Plaintiff did not learn. (Harrison Decl., Ex. 6 at 5.)

Plaintiff further discussed the MPDC's investigation during the Fox 5 Interview, noting that "a source inside the [MPDC] . . . said, 'Rod, we were told to stand down on this case." (Terry Decl., Ex 5 at 3:23–4:1.) In the same interview, Plaintiff also stated that he "believe[d] there is a correlation between the Mayor's office and the DNC and that is the information that's going to come out tomorrow."[8] (*Id.* at 4:6–8.) Plaintiff argues that his statements in the Fox 5 Interview differ from the Murder Investigation Quote because his statements in the Fox 5 Interview do not suggest that the D.C. government or DNC was directly responsible for telling the MPDC to "stand down" in investigating Rich's murder. (Pl. Opp'n to Fox at 19.) But Plaintiff's reference to a "correlation" between the D.C. Mayor's office and DNC implies that he believes the D.C. government and DNC

---

[8] Because Plaintiff alleges that on May 15, 2017, Zimmerman told him the Article would be published "imminently," (Am. Compl. ¶ 119), Plaintiff's reference in the Fox 5 Interview to "information that's going to come out tomorrow" could reasonably be interpreted as indicating his consent to the publication of the Article. (Terry Decl., Ex. 5 at 4:8.) Though Plaintiff alleges he told Zimmerman he could not read drafts of the Article "throughout the day" on May 15, Plaintiff provided Zimmerman with quotes during the day and a "separate quote . . . later that evening." (Am. Compl. ¶ 120.) Plaintiff's provision of those quotes could also reasonably be interpreted as a manifestation of consent to the Article, which "is a complete defense to a defamation claim." *Ziemkiewicz v. R+L Carriers, Inc.*, 996 F. Supp. 2d 378, 398 (D. Md. 2014) (citing *McDermott v. Hughley*, 561 A.2d 1038, 1046 (Md. 1989)). Consent need not be actual; "[c]onduct that gives apparent consent is sufficient to bar recovery." Maryland Law Encyclopedia § 40 (2018) (emphasis added). However, because Plaintiff has otherwise failed to establish the elements of a defamation claim, this Court need not rely on a determination that Plaintiff's conduct supports an inference of apparent consent.

12

may have been involved in preventing the investigation from progressing, even if neither spoke to the MPDC directly.

Plaintiff also notes that his statements in the text message to Zimmerman and in the Fox 5 Interview did not expressly refer to the "Clinton team." (*Id.*) But Plaintiff acknowledges in his Amended Complaint that Hillary Clinton was closely affiliated with the DNC and Democratic Party. (*See* Am. Compl. ¶ 75 (alleging leaked emails sent by DNC officials "indicat[ed] bias on the part of the Democratic Party . . . in favor of Hillary Clinton"). The reference to the "Clinton team" was, at most, an "alteration" of Plaintiff's actual words that did not "materially change[] the meaning" of his statements. *Chesapeake Pub. Corp.*, 661 A.2d at 1177.

Because none of the differences Plaintiff identifies demonstrate that the Murder Investigation Quote had a different effect on the reader than his actual words in the text message to Zimmerman and the Fox 5 Interview produced, the Murder Investigation Quote, like the Email Quote, is not provably false.

Even if the quotes in the Article were capable of being proven false, neither could form the basis for a defamation claim, because neither is defamatory *per se* or *per quod*. The quotes are not defamatory *per se* because they simply state what Plaintiff's "investigation shows." (Am. Compl. ¶¶ 129–30 (quoting Article at 2–3).) It is impossible to ascertain, without comparing Plaintiff's investigation to extrinsic facts (*i.e.*, the findings of other investigators), whether the findings attributed to Plaintiff reflect a lack of competence as an investigator. Nor are the quotes defamatory *per quod*. The Article expressly states that Plaintiff's findings regarding the email exchange between Seth Rich and WikiLeaks were "consistent with" the findings of an unnamed "federal investigator." (Article at 2.) The Article also impliedly presents the theory that the murder investigation is being blocked as consistent with the findings of "sources close to the [MPDC]" who stated that the "[MPDC] has no

suspects and no substantial leads." (*Id.* at 4.) Thus, the quotes are not defamatory, because they do not impugn Plaintiff's skills as an investigator or otherwise tend to expose him to contempt or ridicule. To the contrary, they suggest that Plaintiff's conclusions regarding Rich's murder are consistent with those of other investigators.[9]

### B. The Email Statement

In the Email Statement, Zimmerman told Joel Rich "much of our information came from . . . Rod Wheeler, who we understand was working on behalf of you." (Am. Compl. ¶ 145.) The facts as alleged in the Amended Complaint indicate that Plaintiff is a private investigator who was hired by the Rich family to investigate Rich's murder, and that Plaintiff provided Zimmerman with quotes and information about his investigation for the Article. (*Id.* ¶¶ 39, 95–97, 105, 120.) Nonetheless, Plaintiff claims the Email Statement is false because "much" of the information in the Article did *not* come from Plaintiff. (Pl. Opp'n to Fox at 5; see also Am. Compl. ¶¶ 246–47.) But Zimmerman's assessment of what amount of information qualifies as "much" is a "subjective view." *Gallardo*, 2008 WL 2143011, at *7. Thus, the Email Statement is not provably false.

### C. Butowsky's Tweets

Neither of Butowsky's tweets can be proven false. The facts alleged in the Amended Complaint indicate that Plaintiff "informed various media outlets that he had been misquoted" in the Article, and that Fox subsequently retracted the Article. (Am. Compl. ¶¶ 141, 150.) Thus,

---

[9] The fact that the quotes in the Article appear to be consistent with information from other sources suggest that Defendants did not act with actual malice—*i.e.*, "reckless disregard" for whether the quotes were true or false. *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991). "Conclusory statements" will not suffice, and Plaintiff has not otherwise pled specific facts tending to show the quotes in the Article, Zimmerman's email to Joel Rich, or Butowsky's tweets were made with actual malice. *Velencia v. Drezhlo*, No. 12 Civ. 237 (RDB), 2012 WL 6562764, at *8 (D. Md. Dec. 13, 2012). Because Plaintiff does not dispute that he is a limited purpose public figure, (*see* Pl. Opp'n to Butowsky at 23), Plaintiff's failure to plead actual malice provides a further basis to dismiss his claims. *See Freyd v. Whitfield*, 972 F. Supp. 940, 943–44 (D. Md. 1997).

14

Butowsky's statement in the DNC Tweet that the Article was "pulled b/c Rod Wheeler said [he] didn't say a quote," (*id.* ¶ 175), is Butowsky's "interpretation, . . . theory, conjecture or surmise" based on publicly available facts—i.e., Plaintiff's statements to media outlets and Fox News's retraction. *Biospherics*, 151 F.3d at 186. The second part of the DNC Tweet, Butowsky's question, "How much did the DNC pay him?" (Am. Compl. ¶ 175), is a "rhetorical statement." *Baltimore Sports*, 228 F. Supp. at 550. Thus, the DNC Tweet does not contain any statements that can be characterized as facts and is not provably false.

Second, a reasonable reader would plainly understand that the Truth Tweet is providing Butowsky's "interpretation of the facts presented," *Agora, Inc.*, 90 F. Supp. at 704—i.e., the "this" he characterizes as "show[ing] Rod Wheeler has a major battle with the truth." (Am. Compl. ¶ 201.) Butowsky's statement in the Truth Tweet "everyone needs to hear this," (*id.* ¶ 179), indicates "the reader is free to draw his or her own conclusion based upon those facts." *Agora*, Inc., 90 F. Supp. at 704. Thus, the Truth Tweet reflects Butowsky's interpretation of disclosed facts and, as such, is not provably false.

\* \* \*

In this case, Plaintiff and Defendants embarked on a collective effort to support a sensational claim regarding Seth Rich's murder. Plaintiff cannot now seek to avoid the consequences of his own complicity and coordinated assistance in perpetuating a politically motivated story not having any basis in fact.

### IV. SANCTIONS ARE NOT WARRANTED

In addition to moving to dismiss Plaintiff's Amended Complaint, Butowsky moves for sanctions against Plaintiff and his counsel under Rule 11, and both parties request attorneys' fees and

costs incurred in making and defending the motion.[10] (Sanctions Mem. at 4; Sanctions Opp'n at 1.) "Rule 11 'is targeted at situations where it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands.'" *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 34 (2d Cir. 1992) (citations and additional internal quotation marks omitted); *see also McBurnie v. Rutledge*, 646 F. App'x 108, 112 (2d Cir. 2016) (affirming denial of sanctions when "arguments, though close to frivolous, contained 'enough of a kernel of a theory' to avoid being objectively unreasonable"). A party that "merely reiterates its arguments in support of [a] motion to dismiss . . . fail[s] to demonstrate that Rule 11 motion practice [i]s warranted." *United Specialty Ins. Co. v. Fisk Fine Art Servs., LLC*, No. 15 Civ. 2802 (LTS) (JCF), 2016 WL 1268273, at *5 (S.D.N.Y. Mar. 31, 2016); *see also* Fed. R. Civ. P. 11, 1993 Advisory Committee Notes ("Rule 11 motions . . . should not be employed . . . to test the legal sufficiency or efficacy of the allegations in the pleadings.").

"[E]ven when a district court finds a violation of Rule 11, '[t]he decision whether to impose a sanction . . . is . . . committed to the district court's discretion.'" *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012). "[S]anctions should be imposed with caution." *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 88 (2d Cir. 1998), and "should be reserved for extreme cases." *Sorenson v. Wolfson*, 170 F. Supp. 3d 622, 626 (S.D.N.Y. 2016), *aff'd*, 683 F. App'x 33 (2d Cir. 2017); *see also E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 178 (S.D.N.Y. 2008) ("Courts may issue Rule 11 sanctions only in extraordinary circumstances.").

Butowsky argues Plaintiff "does not allege a single fact . . . that would support personal jurisdiction over Butowsky" in his complaint. (Sanctions Mem. at 14–15.) However, the complaint

---

[10] Rule 11(c) provides, in relevant part, that "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for" a Rule 11 motion. Fed. R. Civ. P 11(c)(2).

16

alleges that Fox News "has its principal place of business . . . [in] New York, New York" and that Butowsky is a "frequent contributor to Fox News and Fox Business." (Compl., ECF No. 1, ¶¶ 38, 40.) The Complaint also alleges that Butowsky "sent an email to various Fox News producers and on air talent" regarding the Article. (*Id.* ¶ 78.) These allegations, viewed in the light most favorable to Plaintiff, could support an inference that Butowsky was in communication with Fox News personnel in New York regarding the Article. Though an argument for jurisdiction based on such communications is weak, it contains "enough of a kernel of a theory to avoid being objectively unreasonable." *McBurnie*, 646 F. App'x at 112. The parties' remaining arguments as to the merits of Plaintiff's claims simply "reiterate[] [their] arguments" regarding Butowsky's motion to dismiss and, as such, do not provide a basis for imposing sanctions. *United Specialty Ins. Co.*, 2016 WL 1268273, at *5.

Butowsky also argues Plaintiff's complaint contains "irrelevant and inflammatory allegations" designed to discredit Fox, and was filed to pressure Fox into settling several other cases. (Sanctions Mem. at 22.) The allegations identified by Butowsky—relating to the 2016 Presidential election, the proposed merger between 21st Century Fox, and Butowsky's interactions with Hersh (*id.* at 22–25)—while not necessary to prove Plaintiff's defamation claim, could be characterized as background information, as Plaintiff alleges that they are relevant to Fox's political and economic motivations for publishing the Article. (*See* Am. Compl. ¶¶ 85, 159–60, 163); *cf. Charles v. Levitt*, No. 15 Civ. 9334 (PAE), 2016 WL 3982514, at *7 (S.D.N.Y. July 21, 2016) (imposing sanctions based on "plainly irrelevant" allegations that plaintiff "could not reasonably have believed . . . were material . . . even as background or commentary").

Because the circumstances identified by Butowsky are not "extraordinary," this Court declines to impose sanctions on Plaintiff or Plaintiff's former counsel. *Gluck Corp.*, 252 F.R.D. at 178.

17

Moreover, the situation in which all of the parties now find themselves hardly engenders sympathy. Accordingly, this Court declines to award attorneys' fees and costs to either party.

## V. CONCLUSION

Defendants' motions to dismiss, (ECF Nos. 74, 78), are GRANTED.

Butowsky's motion for sanctions and request for attorneys' fees and costs, (ECF Nos. 43), are DENIED.

Plaintiff's request for attorneys' fees and costs in defending the Rule 11 motion is DENIED.

Dated: New York, New York
      August 2, 2018

                                            SO ORDERED.

                                            *George B. Daniels*
                                            GEORGE B. DANIELS
                                            United States District Judge